# EXHIBIT 7

1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

S.O.I. TEC SILICON ON INSULATOR    :    Civil Action
TECHNOLOGIES S.A. and                      :
SOITEC USA, INC.,                                :
                                                          :
            Plaintiffs and                        :
            Counterclaim Defendants,    :
                                                          :
      v.                                               :
                                                          :
MEMC ELECTRONIC MATERIALS, INC.,    :
                                                          :
            Defendant and                      :
            Counterclaim Plaintiff.         :    No. 05-806(GMS)

- - -

Wilmington, Delaware
Thursday, February 28, 2008
10:30 a.m.
Telephone Conference

- - -

BEFORE:  HONORABLE MARY PAT THYNGE, U.S.M.J.

APPEARANCES:

JOSEPH B. CICERO, ESQ.
Edwards Angell Palmer & Dodge LLP
          -and-
BRIAN M. GAFF, ESQ.
Edwards Angell Palmer & Dodge LLP
(Boston, MA)
          -and-
MICHAEL BRODY, ESQ.
Winston & Strawn LLP
(Chicago, IL)

            Counsel for Plaintiffs
            and Counterclaim Defendants

---

2

1    APPEARANCES CONTINUED:

2        PATRICIA SMINK ROGOWSKI, ESQ.

         Connolly Bove Lodge & Hutz, LLP

3            -and-

         ROBERT M. EVANS, JR., ESQ., and

4        MARC W. VANDER TUIG, ESQ.

         Senniger Powers

5        (St. Louis, MO)

6                Counsel for Defendant
                 and Counterclaim Plaintiff

7

8            - - -

9        THE COURT: Good morning. This is Judge Thynge.

10       (Counsel respond "Good morning.")

11           THE COURT: Counsel, before we begin, who is on

12   the line for Soitec?

13           MR. BRODY: This is Michael Brody, Your Honor.

14           THE COURT: All right.

15           MR. CICERO: Your Honor, Joseph Cicero from the

16   office of Edwards Angell Palmer & Dodge here in Wilmington.

17   Michael Brody is on from Winston & Strawn, and Brian Gaff is

18   on from our Boston office.

19           THE COURT: All right. Thank you.

20           Who is on the line on behalf of the defendants,

21   then?

22           MS. ROGOWSKI: Yes, Your Honor. This is Pat

23   Rogowski of Connolly Bove for MEMC. Also with me will be

24   Bob Evans and Marc Vander Tuig from Senniger Powers.

25           THE COURT: Thank you. All of you have

---

4

1    different first names, so that is how I am probably going to

2    refer to you.

3            There is a couple of motions regarding some

4    discovery disputes.

5            Counsel, before we begin, just a couple of

6    reminders: One, state your name before you begin speaking

7    so that the court reporter, who today is Kevin Maurer, by

8    the way, knows who is speaking.

9            Also, counsel, this is now Judge Sleet's case,

10   and he has not reassigned it to me. But I felt, in light of

11   the fact that we had had discussions about discovery

12   matters, rather than passing it back to Judge Sleet, I

13   should just handle it and take care of it for him. I can't

14   predict what is going to happen in the future in this case.

15   I just don't know. So I am not giving you much direction,

16   if there is any other discovery matters that arise.

17           All right. Let's take them in some type of

18   order. Why don't we take the motion for protective order

19   and to exclude a conflicted expert witness, which I believe

20   is Soitec's issue.

21           MR. BRODY: That is correct, Your Honor. Would

22   you like us to speak to it?

23           THE COURT: Sure.

24           MR. BRODY: I think it's pretty straightforward.

25   We contacted Dr. Rozgonyi a number of months

---

4

1    ago. There was an initial conversation in which Mr. Gaff

2    described some of our theories of the case. There was a

3    followup conversation between Dr. Rozgonyi, myself, and Mr.

4    Neuner in which we had some further discussions.

5            Dr. Rozgonyi quoted us a rate. And when we told

6    him it sounded okay to us, he told us he was going to be

7    working for MEMC.

8            There is no question that we sent him a copy of

9    the patent. There is an e-mail from him giving a

10   preliminary read on the patent and on the theories that we

11   had discussed with him.

12           THE COURT: Why don't you point out to me, Mike,

13   if you wouldn't mind, in your submission where that shows a

14   copy of the patent, the preliminary read.

15           MR. BRODY: Sure. That is -- hold on.

16           THE COURT: I know it's under Exhibit A. It's

17   what page under Exhibit A?

18           MR. GAFF: Your Honor, I believe that's Exhibit

19   A, Page 1.

20           THE COURT: The actual first page.

21           MR. GAFF: Yes. There is a series of three

22   e-mails on there. At the bottom of that page is the initial

23   e-mail from me to Dr. Rozgonyi enclosing the patent. And

24   then, just above that, there is an excerpt of another e-mail

25   from me, directing him to particular column and lines in the

1    patent.

2          THE COURT: I just want to double-check, so I

3    make sure we are both on the same page, if you excuse the

4    expression. "Please see, e.g., Column 23, Lines 8 through

5    12"?

6          MR. GOFF: Right. That is a snippet of a second

7    e-mail that I sent to Dr. Rozgonyi after the one just below

8    that on that page, thanking him for his time. Then Dr.

9    Rozgonyi's response is the top of that page.

10         THE COURT: Okay. I am trying to go through

11   this. Are you saying the one, "I took a quick look at the

12   patent and think I could help with demonstrating how weak

13   MEMC's position is"?

14         UNIDENTIFIED SPEAKER: Yes.

15         THE COURT: Then he relates to you, he will be

16   at the Hilton and he is off to Italy in two weeks.

17         UNIDENTIFIED SPEAKER: That's right.

18         THE COURT: I have read through these. I wanted

19   to make sure what sections you were actually relying on. I

20   have them highlighted.

21         MR. BRODY: Mr. Gaff, Brian has certainly

22   pointed out the passage.

23         We are not pretending like we asked Dr. Rozgonyi

24   to spend hundreds of hours on this matter. But there

25   clearly was a series of discussions in which we shared with

6

1    him our thinking about the case and in which he gave us an

2    initial response that was sufficient for us to conclude

3    that -- and, frankly, for him to initially conclude that he

4    could go forward and provide us with expert support in the

5    matter.

6          The case that I think gets cited here is the

7    Koch Refining case.

8          THE COURT: I have read through that. I have

9    also read through the Hewlett-Packard Company matter.

10         MR. BRODY: Okay. I think the reality, the Koch

11   case kind of sets out two, you know, polar extremes. One is

12   the case where you have basically an extended compensated

13   relationship, and the other is where there is one call. And

14   I think we are clearly in between those.

15         Here we would say that at the one extreme is, as

16   Koch characterizes it, there was a series of interactions.

17   They did coalesce to the extent that Dr. Rozgonyi understood

18   our position in the case and our theories of it, and did so

19   well enough to be able to give us his preliminary view on

20   the subject.

21         The other extreme, the Koch Court talks about a

22   situation where you have only one meeting with counsel,

23   which is not the case here. There were at least two

24   substantive discussions.

25         It's true that Dr. Rozgonyi was not retained,

1    although he quoted us a rate and we proposed to retain him.

2    He was supplied with some specific material in the case,

3    namely, the patents in reference to the particular portions

4    that we wanted him to think about, and, of course, our

5    discussions with him about our thinking. And he was

6    requested to perform a service. Essentially, we asked him

7    to give us his preliminary thoughts on the substance of the

8    matter.

9          There is a suggestion in Dr. Rozgonyi's

10   declaration that there is nothing in our conversations that

11   wasn't disclosed in the interrogatory answers. With due

12   respect to his recollection, in fact, the heart of our

13   discussion had to do with the defense under Section 112 of

14   the Patent Act, which is not a defense that was requested in

15   those interrogatories, and actually is not something that --

16   our thinking on that subject, at least, is not something

17   that we have been asked to share with MEMC. As a result, we

18   haven't.

19         So he knows about our theory of the case that up

20   to now had been confidential. It's a problem for us if he

21   picks up and switches sides.

22         While I realize that folks with these

23   qualifications, you can't exactly find one on every street

24   corner, there are a number of people who do this type of

25   work. I don't understand the contention that, in fact, MEMC

8

1    would be without recourse if Dr. Rozgonyi were disqualified

2    in this case. In fact, they have retained another expert in

3    this matter, who has very strong credentials in this field,

4    and presumably could address these issues if they need him

5    to.

6          So we have a real concern here. I think we had

7    a legitimate expectation that we were speaking to Dr.

8    Rozgonyi on a confidential basis. And we would prefer not

9    to see him popping up on the other side. And we think we

10   have a right to request that.

11         (Pause.)

12         THE COURT: Counsel, we are back. Mr. Maurer

13   expresses his apologies.

14         Michael, are you finished?

15         MR. BRODY: Mr. Gaff has, I think, a brief

16   thought to add to this.

17         MR. GAFF: Your Honor, Brian Gaff here.

18         In my initial conversation with Dr. Rozgonyi,

19   the first thing I inquired into was any conflicts of

20   interest on his part, whether he was familiar with the

21   parties who are involved, did he have a working relationship

22   with any of them currently or any time in the recent past.

23         And he assured me that there were no conflicts.

24   And based on that representation, I then launched into a

25   discussion with him of the details of the case, the history

1  of the dispute, the parties, et cetera. And I can assure
2  you that I would never have had that conversation regarding
3  that subject matter with Dr. Rozgonyi had he indicated that
4  there was a conflict of interest, if, for example, he said
5  he had a relationship with MEMC.
6      It has always been my practice to tell an expert
7  witness in these discussions that the discussions are
8  confidential and that he should treat information
9  confidentially going forward.
10     Again, I wouldn't have had the conversation with
11 him had there been any representation on his part that there
12 could have been a conflict of interest.
13     Thank you.
14     THE COURT: Thank you. Is there anything else
15 that the plaintiffs' counsel wishes to add?
16     MR. BRODY: No, Your Honor.
17     THE COURT: Thank you. Can I please hear MEMC's
18 argument?
19     MR. VANDER TUIG: Yes, Your Honor. Mark Vander
20 Tuig for MEMC.
21     First of all, we would contend that even the
22 details that have been added to the conversations with Dr.
23 Rozgonyi by Soitec during the phone call today, they clearly
24 fall on sort of the initial screening informal relationship
25 side of the spectrum. The details that they have identified

10

1  are those which you have to disclose to any expert to
2  determine whether or not that expert has the appropriate
3  knowledge to be helpful in the case.
4      I don't think they have identified anything by
5  identifying the copy of the patent and the Column 23 excerpt
6  that has been identified. It's simply the definition
7  section of the '104 patent. They have identified nothing
8  that is anything more than they have disclosed in this
9  lawsuit as far as their theories of the case, their
10 position.
11     Mr. Brody identified the fact that we never
12 asked about 112. But they have in Interrogatory No. 7,
13 which is attached as Exhibit D to our filing, they did flag
14 an ambiguous defense, which would be under 112, Paragraph 2,
15 they state the phrase "substantially free of agglomerated
16 intrinsic point defects," which happens to be the column
17 number that they referenced here, the column and line number
18 that they reference in their submission. That phrase, they
19 claim, is ambiguous and cannot be construed.
20     So they have disclosed their position that they
21 think that's indefinite under 112, it is my reading of that.
22     That was just a counter to Mr. Brody's point.
23     They have to identify under the law something
24 specific and unambiguous that would prejudice them if it is
25 revealed. I just don't think that they have done so here.

1      To address the point about the limited number of
2  experts in this field, it's true that there is, as Mr. Brody
3  points out, there is a limited number with the appropriate
4  qualifications. And I note that Soitec at the time it
5  contacted Dr. Rozgonyi had already retained several
6  witnesses with expertise in this field.
7      THE COURT: I read Soitec's argument, as far as
8  MEMC was concerned on this what you call, I guess, public
9  information or public concern, that MEMC has been able to
10 retain an expert in the same field.
11     MR. VANDER TUIG: They have one expert, that's
12 true. They have retained one expert. Their specialties are
13 a little different. The reason we approached Dr. Rozgonyi
14 was to explore different areas of expertise that wouldn't
15 have been covered by Bergholz, who is the other expert we
16 have retained.
17     THE COURT: All right. Have you finished your
18 arguments for MEMC?
19     MR. VANDER TUIG: Yes, Your Honor.
20     THE COURT: Is there any brief rebuttal that
21 Soitec wishes to present?
22     MR. BRODY: Your Honor, very briefly, Mr. Vander
23 Tuig is certainly correct that we indicated our view that
24 that phrase was ambiguous. The concern is that we talked
25 with Dr. Rozgonyi about our theories as to why that was the

1  case. And that's what we shared with him, and that's what
2  we really would prefer not to share with Mr. Vander Tuig and
3  Mr. Evans until we get to the appropriate point in the
4  litigation.
5      THE COURT: Well, I had a chance to go over the
6  two cases I predominantly looked at, because they seem to
7  have been cited numerous times by both sides, the
8  Hewlett-Packard case and the Koch Refining Company matter, I
9  think both of them are instructive to this Court.
10     I note that one, the Hewlett-Packard case, is
11 from the Northern District of California. The Koch Refining
12 Company case is from the Fifth Circuit. But the issue the
13 way that I was looking at it was the standards that were
14 outlined in both of those opinions. And I also note that in
15 the Hewlett-Packard case there was a bit of a conflict as to
16 what information was conveyed to the expert. And I also
17 note that in the Hewlett-Packard case, the relationship with
18 the expert, from what I can tell, in that case certainly
19 advanced further in my mind, based upon information that was
20 discussed, than what necessarily occurred in this case.
21     For example, I think counsel in that case
22 claimed the topics he had discussed included impressions of
23 the patent, specific claim limitations, prior art, accused
24 inventions, the type of evidence needed to prove
25 infringement, and the names and qualifications of other

1 potential expert witnesses.

2     Of course, the expert characterized the

3 conversation very differently. So the Court in

4 Hewlett-Packard was faced with some conflicting differences

5 between counsel who had had the discussion with the expert

6 and the expert himself, not too unlike what we have here,

7 that there is a difference between what counsel remembers

8 and what the expert remembered.

9     In addition, that expert, I think, was

10 compensated for his time that he had spent in his analysis

11 on behalf of the party who had first contacted him.

12     There is a couple, I think, though, aspects that

13 can't be ignored. One is that although we as Courts have

14 the power to disqualify expert witnesses to protect the

15 integrity of the adversarial process, disqualification is

16 considered to be a drastic measure that the Courts impose

17 hesitantly and rarely.

18     Also, there is a difference between

19 communication between counsel and an expert and the

20 attorney-client privilege, which was pointed out in the

21 Hewlett-Packard case, noting that experts perform a very

22 different function in litigation than do attorneys, and they

23 are not advocates in the litigation but sources of

24 information and opinions.

25     What this Court is supposed to look at to

14

1 determine if a disqualification of an expert is warranted,

2 based upon the prior relationship with an adversary,

3 includes whether the adversary had a confidential

4 relationship with the expert and the adversary disclosed

5 confidential information to the expert that is relevant to

6 the current litigation.

7     To do the analysis of whether the disclosures

8 were confidential is whether they were undertaken without an

9 objectively reasonable expectation that they would be so

10 maintained as being confidential or if, despite a

11 relationship conducive to such disclosures, no significant

12 disclosures were made, and therefore under those

13 circumstances disqualification would be inappropriate.

14     It is the burden on the party seeking

15 disqualification of an expert to demonstrate that it was

16 reasonable for it to believe that a confidential

17 relationship existed, and if so whether the relationship

18 developed into a matter sufficiently substantial to make

19 disqualification or some other judicial remedy appropriate.

20     And in evaluating the reasonableness of the

21 parties' assumptions, there are a number of factors that

22 were pointed out in the Hewlett-Packard case for this Court

23 to look at, which I think have been discussed by the parties

24 in this. And that Court also pointed out, as was oppositely

25 pointed out in the Koch case, that you could have

1 disqualification denied, that is, it is not warranted, even

2 if the expert has signed a confidentiality agreement with

3 the adversary.

4     Koch and Hewlett-Packard both recognized that

5 you don't have to have a confidential agreement already

6 signed. Both cases emphasized what was the relationship and

7 the expectation from, and really what is emphasized is

8 whether there was confidential information disclosed.

9     As I said, there is a different standard, to

10 some extent, as to what that confidentiality may very well

11 be. Different isn't the right word. It's not the same as

12 attorney-client privilege.

13     Confidential information is information of

14 particular significance which can be readily identified as

15 either attorney work product or within the scope of

16 attorney-client privilege. And the strategy of the

17 litigation is part of it that the Court takes into account.

18 However, as decided in the Hewlett-Packard case, I find that

19 the discussions between counsel and experts do not carry the

20 presumption that confidential information has been

21 exchanged. And the party is required to point to specific

22 and unambiguous disclosures that if revealed would prejudice

23 the party.

24     The Court is also required to consider the

25 issues of fundamental fairness, that is, asking whether the

16

1 moving party was unduly disadvantaged and the opposing party

2 would be also unduly disadvantaged, and whether any

3 prejudice might occur if the expert is or is not

4 disqualified.

5     Having considered all those factors, in applying

6 it to this case, I am finding that Soitec hasn't met the

7 standards that have been outlined in both the Koch and the

8 Hewlett-Packard case.

9     Recognizing that there is some dispute between

10 the expert as to what was disclosed, I don't think

11 disclosing the patent and suggesting areas of the patent for

12 the expert to read is sufficient enough, falls into the

13 category of confidential information.

14     First of all, the patent is clearly not a

15 confidential document. And pointing out an area or areas

16 that they want the expert to concentrate on is insufficient,

17 in my mind, to necessarily meet the aspect of was

18 confidential information disclosed.

19     It to me is more like an initial screening

20 process, certainly the type of questions that I believe

21 Brian pointed out that he would have asked the expert, that

22 is to determine if he is qualified, to determine if there is

23 any conflicts of interest. And although, Brian, you may

24 have expected that everything you were going to say to him

25 was confidential, it still had to qualify that what you were

1  saying to him qualified as being confidential based upon the

2  relationship or lack thereof that existed between the expert

3  and counsel that was part of the conversation.

4        If, as you pointed out to me, Brian, you said

5  you wouldn't have continued the discussions if there had

6  been areas of potential conflict, that's fine.  But

7  potential conflict does not necessarily mean information

8  disclosed rises to the level of being confidential.  What I

9  have heard so far today, I don't find that to have existed.

10       So I am not going to disqualify Dr. Rozgonyi in

11  this case in light of the information that has been conveyed

12  to me both in the arguments today and in the written

13  submissions.

14       I also recognize that there is no doubt that

15  this is a limited area of experts.  I find that just because

16  MEMC has retained an expert in this area, that suddenly

17  means that MEMC is locked in and solely -- and that goes to

18  somehow disprove that because it's been able to retain an

19  expert there are available experts elsewhere.  I note that

20  parties frequently in patent litigation, and it doesn't seem

21  this litigation is any different in that regard, frequently

22  retain experts within the same field that may have a

23  sub-field of expertise that might be particularly important

24  to certain issues in the litigation.

25       I also find that some of the information that

18

1  was disclosed, apparently disclosed by Soitec to the expert,

2  was also disclosed to the defense.  I am not saying

3  necessarily all, but certainly a piece of it.  So that again

4  removes the confidentiality aspect to me.

5        So, therefore, I am finding that, basically

6  denying the motion to disqualify Dr. Rozgonyi.

7        All right.  I think there is a series of

8  different concerns, I believe, that have been expressed in

9  the other motion that was filed in this case.  Let me just

10  pull that up, counsel.

11       Again, this is another motion by Soitec.  First

12  of all, it deals with the test data summaries and then your

13  request for documents and deposition testimony relating to

14  the conception of the alleged invention at issue.

15       So am I correct, this is the two other remaining

16  issues that are both Soitec's?

17       MR. BRODY:  That's correct, Your Honor.

18       THE COURT:  Okay.  Let's do the test data

19  summaries.  Michael, what I would like to really know from

20  you is:  What are you trying to get?  I mean, you said that

21  MEMC has agreed to produce the raw test data.  Understand

22  that you are talking to somebody that is completely ignorant

23  about this technological area, so I am not exactly certain

24  what the raw test data doesn't have that the written

25  technology report summarizing and analyzing the test data

1  would have, that you would expect it to have.

2        MR. BRODY:  Well, it's got the conclusions.

3        THE COURT:  I understand it has the conclusions.

4        MR. BRODY:  The data, it's not an accident that

5  you have somebody write up reports on this sort of data.

6  The data requires interpretation, and it requires analysis.

7        THE COURT:  And you are basically saying that

8  the sole basis given for MEMC's allegation of patent

9  infringement was the testing that MEMC had performed on the

10  donor wafer seized in the French case.  Is that the same

11  argument, is that being made in this case?

12       MR. BRODY:  Yes.  In fact, the interrogatory

13  answer, we asked them why do you think we infringe.  Their

14  answer was, well, we tested the wafers we seized and we

15  concluded that they infringed.  So what I think we are

16  entitled to is both the data on which that conclusion rests

17  and the report drawing the conclusion and explaining the

18  basis for the inference from the data.

19       So it's a situation where we have, you know, a

20  contention of infringement that purports to be based on a

21  report, and they are giving us half of you, you know, the

22  underlying data but not the report.

23       THE COURT:  What do you do about their argument

24  that you could easily conduct your own further testing of

25  these wafers that are in your possession and find out why

20

1  they concluded in such a fashion?

2        MR. BRODY:  I think there are two answers to

3  that.  The first is, I think we are entitled to know -- I

4  don't understand --

5        THE COURT:  You are entitled to know the basis

6  for their contentions.

7        MR. BRODY:  Yes, exactly.  Our view is that --

8  in fact, we have already produced to them documentation that

9  at least some of the wafers that were seized don't infringe.

10  They apparently reached a different conclusion.  So we would

11  like to know what it is.

12       THE COURT:  They seem to feel that there is an

13  argument that this is attorney work product.

14       MR. BRODY:  Yes.  I am not clear --

15       THE COURT:  Would you prefer to hear their

16  argument as to the basis as to why it is attorney work

17  product before you try to answer that in the abstract?

18       MR. BRODY:  Sure.  I think that would probably

19  be more productive.

20       THE COURT:  I do, too, because if somebody is

21  alleging attorney work product, the burden is on them to

22  show that it is.  So that is my first question to MEMC.

23       MR. VANDER TUIG:  Your Honor, the tests that

24  were run and the summaries that are at issue today were both

25  conducted and put together at the request of counsel for

1    litigation with Soitec. As such, we think that that is a

2    showing that it is attorney work product.

3        THE COURT: Let me put it this way: Haven't you

4    put into issue that Soitec infringes? And if these tests

5    were run to show that Soitec has infringed, even though the

6    attorney may have requested them being run, haven't you

7    directly put into issue that particular point?

8        MR. VANDER TUIG: That would be going towards

9    the waiver argument, I think?

10       THE COURT: Sort of, yes.

11       MR. VANDER TUIG: On that point we think that

12   the scope of work product waiver is narrowly construed, and

13   to the extent there was a waiver in our interrogatory

14   responses by alluding to the test data, our agreement with

15   Soitec's counsel to produce the raw test data, the numbers

16   generated by the test methodology that were relied on would

17   be the extent of that scope, that any kind of conclusions or

18   opinions of MEMC's employees who conducted the testing

19   concerning the test data would fall outside the scope of

20   that narrow waiver, if there was one.

21       THE COURT: Well --

22       MR. BRODY: I just want to make clear, we are

23   not contending that the production of the raw data was a

24   waiver, because we did have an agreement with Mr. Evans to

25   that effect.

22

1        THE COURT: And I wasn't reading that that is

2    what you were saying. I got the read from you, and I wasn't

3    talking about a waiver in the sense of production of, that

4    somehow you waived by producing the raw data.

5        My question is, haven't you put Soitec's

6    infringement directly into issue in this case? And in doing

7    that, if it's in issue, I don't know how protected anything

8    is, whether it is attorney work product or whatever. But

9    the information that they are asking for, is this

10   information that will be used in the case to prove

11   infringement?

12       MR. VANDER TUIG: No, Your Honor. We asked

13   Soitec to produce wafers in this case, in the Delaware

14   litigation, and they have. And tests have been conducted

15   and are being conducted on those wafers, and that will be

16   the subject of our expert reports in this case on

17   infringement, and we will not be relying on the prefiling

18   testing that occurred.

19       THE COURT: But you used the prefiling testing

20   to justify what you started off in this case. Is that

21   correct? So that you could avoid Rule 11.

22       MR. VANDER TUIG: That's correct, Your Honor.

23   We relied on the test data, the raw test data. We didn't

24   rely on, necessarily, the various opinions and discussions

25   that were in the report that was generated by MEMC's

1    employees at counsel's request.

2        MR. EVANS: Your Honor, we asked the employee to

3    answer a number of questions for us and look at a number of

4    different things. So he answered our questions in the

5    course of his report. The concern we have is that when we

6    produce anything -- and we will see it in the next question

7    with respect to conception -- every time you do something,

8    somebody says, well, you've waived up to that point, you've

9    waived up to that point, you've waived up to that point.

10       Our point is to the extent there is infringement

11   in the prefiling investigation, and we believe there is, we

12   have given them all that raw data and answered the

13   interrogatory as to our contention on that, the contention

14   interrogatory.

15       To the extent we ask an employee in the context

16   of an ongoing lawsuit, you know, specific questions and look

17   at things from different directions, that would seem to be

18   work product.

19       THE COURT: I see what you are saying.

20       MR. EVANS: So this is the employee's analysis

21   that was written from our perspective of, you know, in the

22   context of our discussions with him and what we wanted. All

23   the raw data, they can look at it, they can reach their own

24   conclusions.

25       Michael Brody, Mr. Brody said that there were

24

1    some wafers where they believe they don't infringe. And we

2    have spoken with Mr. Brody, and we agree with him that on

3    the wafers that showed what we call agglomerated defects, we

4    have agreed with him that those wafers don't infringe.

5        So we don't have a dispute, I don't think, in

6    terms of what wafers are in true contention here and which

7    ones are not. And we are willing to give them all the raw

8    data, and then they can make their own arguments if they

9    think we have violated Rule 11, to make the argument as to

10   why they think the data doesn't support what we did. We

11   think it supports what we did.

12       THE COURT: When you gave them the raw data, did

13   you give them the protocols on how they were tested?

14       MR. EVANS: If we haven't given them how the

15   data was collected, we would certainly be happy to give them

16   the protocols for how it was collected, certainly, yes.

17       THE COURT: Because the raw data is worthless

18   unless you know how it was tested.

19       MR. EVANS: No. We are not going to hide

20   behind -- if they need that information or don't have that

21   information, we will certainly get that to them.

22       THE COURT: So is your argument to me, and

23   explain this to me, that by giving conclusions of why the

24   wafers that are still in dispute infringe, it would

25   constitute basically crawling into your mind as to the type

1  of questions that were asked of these employees in doing

2  their analysis?

3       MR. EVANS: Yeah. I think the employee's

4  analysis written for the attorney in response to

5  conversations with the employee is a work product document.

6  He has prepared it for us to address the questions that we

7  asked. And the raw data is what it is. And their expert

8  can look at the raw data and reach whatever conclusions they

9  want.

10      So it seems like the employee's impressions and

11 responses to our questions are classic work product.

12      THE COURT: I understand what you are saying

13 then.

14      Does that help you a little more, Mike, as to

15 what their basis is for the work product argument? And do

16 you have any response?

17      MR. BRODY: Yes, it does help me understand. I

18 know you won't be shocked to learn that I still see an issue

19 here.

20      THE COURT: Did you get the protocols, first of

21 all, on how the testing was done?

22      MR. BRODY: First of all, we haven't actually

23 gotten all the testing yet or the protocols.

24      We have had a very good-faith relationship, I

25 think, with Mr. Evans and Mr. Vander Tuig. And if he says

26

1  he is going to give us everything up to the reports, it

2  would be uncharacteristic of him not to do that. So I am

3  confident he will give us full disclosure of what the

4  testing was and how it was done. And if we have other

5  questions, I am confident he will give us all that

6  underlying information.

7       I think the real focus here is on, you know,

8  essentially you have got the testing. You have got a

9  report. Then you have got an interrogatory answer that was

10 provided to us. The real focus is on that intermediate

11 step.

12      THE COURT: Yes.

13      MR. BRODY: And whether that is work product and

14 whether any privilege was waived.

15      I guess I would say that every expert report is

16 always based on underlying data. If it were sufficient to

17 simply disclose the underlying data, then we wouldn't have

18 some of the provisions that we have in Rule 26, and we

19 wouldn't have anywhere near the sort of disclosure that we

20 typically do, precisely because the reason you ask an expert

21 to prepare a report is to interpret data that is not

22 transparent to lawyers or judges or juries and about which

23 reasonable experts may disagree.

24      And in evaluating the data -- and more

25 importantly, I mean, it's not just that we want to ask our

1  expert what do you think the data shows. We also want to

2  ask our expert, do you think that MEMC was justified in

3  reaching the conclusion that is stated as a contention in

4  the interrogatories. And part of that analysis is

5  understanding precisely the inference that's made from the

6  data to the contention. And that is what is in the report.

7       You know, we have got the conclusion, we will

8  get the data. But we are not being given the glue that

9  holds the two together.

10      In order to understand whether the contention

11 holds water, I think we are entitled to that.

12      Now, Mr. Evans, I have forgotten if it was Bob

13 or Marc, indicated that there would probably be further

14 testing, which there may well be. But that actually kind of

15 heightens the importance of exactly the report, because we

16 are entitled to test whatever we ultimately get against what

17 they themselves initially viewed as an appropriate

18 methodology for analyzing these wafers. You know, it may be

19 that the two are perfectly consistent. But it may well be

20 that they aren't.

21      We certainly ought to be in a position to

22 understand that.

23      The fact that questions were asked the first

24 time around that may or may not have been asked the second

25 time around, you know, again, is really very much fair game.

28

1  Once you get past the step of talking about a consulting

2  expert, once you get to the point where you are relying on

3  an expert to support a contention made in a formal pleading,

4  I think all that stuff is out the window.

5       THE COURT: Well, now, I wonder about that.

6  That's the question I do have. If these individuals are not

7  going to be called as experts, or used as factual witnesses

8  for information to reach a conclusion -- the factual

9  information they may have, but whether or not they are

10 going -- what I was just told was that the types of

11 questions that were asked of these employees -- and this is

12 how I interpret it, and MEMC can tell me whether I am right

13 or wrong on this -- those types of questions that were asked

14 of those employees on these series of tests, and the

15 findings or conclusions they made, will not be used in this

16 case.

17      UNIDENTIFIED SPEAKER: That's correct, Your

18 Honor.

19      MR. BRODY: But they have already been used.

20 They formed the basis of a contention as to our

21 infringement. We can't know what the basis of that

22 contention is unless we know what the analysis was that was

23 done to get from the raw data to the contention.

24      THE COURT: Are you saying, then, that in all

25 circumstances, Mike, that if in support of responding to

1  contention interrogatories counsel uses information from a

2  consulting expert, that that consulting expert's analysis

3  then becomes free game?

4         MR. BRODY: I think if the factual basis for the

5  contention is a report from an expert, that expert is no

6  longer a consulting expert, because, precisely because the

7  work product the expert has generated is no longer being

8  held in confidence. It is being asserted as the basis for

9  the contention.

10         Think about it from the other direction, Your

11  Honor. If that information could be protected, then what

12  that, in effect, says is you are allowed to know what the

13  contention is but you are not allowed to know why the

14  contention is being made.

15         I just can't -- well, I think we are entitled to

16  that.

17         THE COURT: I understand.

18         MR. VANDER TUIG: Your Honor, if I may, we are

19  giving them all the facts and the protocols that underlie

20  the investigation. You know, the fact that they are getting

21  all the raw data, they are getting all the protocols for how

22  it is collected, they are going to get that.

23         Dr. Mulsamuel (phonetic), the person who wrote

24  the report, did not conduct all of the tests. I am not sure

25  if he conducted any of the tests. We had the testing

30

1  facilities at MEMC that actually ran the tests. So those

2  are the people that actually did, I believe, most of the lab

3  work.

4         He wrote the report. When I say report, it's

5  not a Rule 26 report. It's: I asked him questions, he

6  answered the questions, and sent it to me in the form of a

7  report. But he is a nontestifying expert who we asked

8  questions about the data that was collected and he answered

9  them.

10         So it seems to me that this is -- if on a

11  contention interrogatory they suddenly get all of the

12  sources that the attorney uses to assemble and assess the

13  facts, as well as those independent sources' analysis of the

14  facts, well, then, it seems like contention interrogatories

15  automatically amount to a waiver in every circumstance, and

16  I don't know how that works.

17         I think you have got to give people the facts.

18  To the extent contention interrogatories are permissible,

19  you have to answer the contention. But they are not

20  entitled to all the work product you use in the context of

21  the answer you use with the contention interrogatory.

22         UNIDENTIFIED SPEAKER: Your Honor, if I could

23  very briefly. I think Mr. Evans's argument, you know, sort

24  of argues too much and too little.

25         On the one hand, if all you need is the facts,

1  the underlying data, and that's enough to satisfy their

2  obligation to explain the basis for their contention, then

3  they probably don't even owe us the testing data. They

4  could just say, you know, you have got the wafers, here are

5  the tests that were used, you can go ahead and test them

6  yourself.

7         But the point, I think, is that -- it remains

8  their burden of proof and we are entitled to understand the

9  factual basis for their contentions.

10         On the other side of the coin, Mr. Evans didn't

11  simply get the test results in the interrogatory answer. He

12  didn't ask Dr. Mulsamuel for a report because the data was,

13  you know, self-evident and transparent and there was no need

14  for any further analysis of it. He presumably asked for the

15  report because he needed help from an expert to draw the

16  inference that the wafers infringed.

17         I don't know that Dr. Mulsamuel went down the

18  claims and did an analysis for him. But presumably he gave

19  him enough information from the perspective of a person of

20  skill in the art of these kinds of testing methodologies

21  that let Bob do the legal analysis on his own.

22         I don't want Bob's legal analysis. I am not

23  entitled to it. But I do want to know what the basis of the

24  legal conclusions was.

25         THE COURT: The factual basis.

32

1         MR. BRODY: Exactly.

2         THE COURT: Okay. I find that the raw data,

3  obviously, should be made available, which I understand.

4  The methodology for analyzing the wafers should also be made

5  available.

6         The issue gets a bit thornier as to how much

7  further beyond that point Soitec would be entitled to

8  information, because, clearly, Rule 26 recognizes experts

9  that are going to be called upon to testify at trial. And

10  basically it's practically anything and everything they

11  looked at you get access to, even if it didn't become part

12  of their opinion. Then you have got the balancing with it

13  experts that are used in consultation for the purposes of

14  assisting counsel.

15         I think it gets problematic, although I

16  recognize Soitec's argument that a conclusion was put into

17  the answers to interrogatories, and I think some

18  potential -- let me just try to remember -- response was

19  indicating some of the basis for why the conclusion was what

20  it was. And this is where -- I don't think that counsel is

21  entitled to know what questions were asked of the Doctor.

22         To the extent that, how he reached his

23  conclusion that there is infringement, that information I do

24  think Soitec is entitled to. That means that may very well

25  be parsing out portions of this report. I haven't seen his

1  report, so I can't determine that. And to that extent I
2  would be willing to look at it and give you an idea as to
3  what portions of that report I think are discoverable.
4          UNIDENTIFIED SPEAKER: Would you like us to
5  submit a copy, Your Honor?
6          THE COURT: Yes. And I could go through it,
7  because it's hard for me to explain it. But why he
8  concluded that they infringed, that type of information I do
9  think is disclosable, but not "Did you look at X to make
10  this conclusion" or "Did you look at Y" or "Have you looked
11  at this," that type of information I don't think is.
12         So it is parsing it out. I don't know whether
13  you want to try to go through one, run through and produce
14  it and see without me looking at it, because I am no expert
15  in this field by any stretch of the imagination.
16         UNIDENTIFIED SPEAKER: I haven't thought about
17  the report from that direction. So I want to look through
18  it and see.
19         THE COURT: Sure. And if you want me to review
20  it, I will, and try to give some direction as to where I see
21  what type of disclosures I think are appropriate and where I
22  don't think they are appropriate.
23         UNIDENTIFIED SPEAKER: I would feel more
24  comfortable, probably, with letting you be the arbiter of
25  what should and not be produced to me. Why don't we send

34

1  you a copy of the report confidentially, and go from there.
2          THE COURT: That is fine. Show me where the
3  areas that were not disclosed — I don't want the raw test
4  data, thank you. It is not going to help me one iota. You
5  can send it to me. But I am not real comfortable I am going
6  to be able to figure out what that means.
7          UNIDENTIFIED SPEAKER: There is a fair amount of
8  volume on the actual test data.
9          THE COURT: I would imagine.
10         UNIDENTIFIED SPEAKER: We are going to give it
11  to them anyway.
12         THE COURT: Those two points definitely, I
13  think, the methodology and also the raw test data. I don't
14  know how long the report is or how it is broken down.
15         UNIDENTIFIED SPEAKER: It is not terribly long.
16  Why don't we put together a submission to you that sort of
17  explains what we think should stay in and what should stay
18  out and why in the context of what you are saying now. We
19  will forward it to you and then you can give us guidance or
20  tell us what to do.
21         THE COURT: That is fine.
22         The report, obviously, I think maybe — if I
23  have any problems I will just get us back on the phone
24  again.
25         Okay. The next issue is, from what I

1  understand, you are requesting documents and deposition
2  testimony relating to the conception of the alleged
3  invention at issue. This I find to be a little thornier,
4  too, as far as analysis is concerned in this. I am really
5  trying to understand what information you are trying to get.
6  I guess you got to provide me with a little bit more
7  specifics, to the extent that you feel comfortable doing
8  that, and what information was allegedly provided, because
9  the two of you seem to be at odds as to what invention
10  disclosure and related testimony was conveyed, because
11  what's been pointed out to me — and I know the Fed Circuit
12  does recognize this — is that invention disclosures
13  generally fall within the category of attorney-client
14  privilege.
15         MR. BRODY: Is it all right if I start on this?
16         THE COURT: Absolutely. It is your motion.
17         MR. BRODY: Yes. We are not disputing that
18  invention disclosures are sort of prima facie privileged,
19  and this is a clear waiver issue.
20         Really, there are two things that we are asking
21  for. One is what I will call the '302, the bulk silicon,
22  let me put it that way, invention disclosure. And the other
23  is, we are asking to be allowed to pursue some questions
24  with Mr. Hejlek and Dr. Falster about some conversations
25  that they had.

1          Let me try to be brief about the factual
2  background. But I do think it's helpful here.
3          Basically, MEMC has two sets of patents. One is
4  sort of a patent on, if you will, chunky peanut butter. And
5  another is a patent on putting chunky peanut butter in a
6  sandwich.
7          MEMC disclosed the — and, I guess I would add
8  that the patent on chunky peanut butter in a sandwich
9  essentially talks about how great chunky peanut butter
10  tastes and what a wonderful feeling it is.
11         MEMC has produced the invention disclosure on
12  chunky peanut butter. So one question is whether — and
13  there is a separate invention disclosure on putting it in a
14  sandwich, which has not been produced.
15         So one question is whether disclosing the
16  invention disclosure or producing the invention disclosure,
17  the feature of the combination that makes it sort of novel
18  and patentable, is a waiver with respect to the subject
19  matter of the second disclosure.
20         There we think the argument is that the subject
21  matter of the second disclosure, if you will, or the second
22  patent, is inextricably tied up with the subject matter of
23  the first disclosure.
24         It's not that they are claiming that they
25  invented silicon on insulator or peanut butter and peanut

1  butter sandwiches. It is they are claiming that using a
2  particular type of material in these devices, these wafers,
3  makes them particularly desirable.
4          In fact, a very large portion, I don't know what
5  the exact percentage is, 30, 40, 50 percent of the
6  disclosure is sort of simply lifted verbatim from the patent
7  on peanut butter.
8          There is additional disclosure about making the
9  combination, making the sandwich. But there is no question
10  that the subject matter of the second patent encompasses the
11  subject matter of the first patent. Therefore, the subject
12  matter of the second disclosure encompasses the subject
13  matter of the first disclosure.
14          And they, in effect, are saying, well,
15  notwithstanding that we have waived the privilege with
16  respect to how you make the special spread, we are going to
17  preserve the privilege with respect to a sandwich containing
18  that special spread.
19          I think that's a pretty clear waiver. If it
20  weren't, even if it weren't, I think that the waiver is
21  compounded by the deposition testimony that we did get.
22  Apparently, what happened is that at some point after the
23  patent issued there was a conversation between counsel and
24  Dr. Falster, the inventor, patent counsel and Dr. Falster,
25  the inventor, about the circumstances under which he

1  conceived this invention. Apparently, an issue arose as to
2  whether Soitec was a co-inventor, and, in fact, that is an
3  issue in the case, and Mr. Hejlek having testified as to a
4  conversation he had with Dr. Falster about whether, in fact,
5  Soitec was a co-inventor, and about a meeting that everybody
6  acknowledges took place about almost two years before the
7  patent was applied for, in which Soitec's folks and Dr.
8  Falster talked about essentially the combination, the
9  subjects of the patents in the case.
10          In addition, in their interrogatory answers, and
11  at Dr. Falster's deposition, the story that we have been
12  given is that he conceived of this sandwich in conjunction
13  with a meeting between him and Soitec where Soitec was
14  saying, in essence, we want to make a sandwich of this type.
15  We are looking for suppliers to provide us with this type of
16  peanut butter. Can you do it? And then he spent some time
17  explaining to them how he thought in fact he could.
18          So, you know, what we have got is a disclosure
19  in the interrogatories as to the circumstances under
20  which -- or some disclosure as to the circumstances under
21  which he claims to have conceived the invention, the
22  invention disclosure as to the critical element in the
23  combination. We have got testimony from counsel about his
24  conversations with Dr. Falster regarding what was disclosed
25  in the interrogatories.

1          I asked Mr. Hejlek if Dr. Falster's discussion
2  with him had been consistent with what was in the
3  interrogatories. And he was allowed to answer that
4  question, and he said yes. And then I asked, and did he
5  tell you anything else about the conception of the invention
6  or about the meetings. And at that point I was told that
7  the testimony was privileged. And when I took Dr.
8  Falster's deposition, he wasn't even allowed to testify to
9  as much as Mr. Hejlek testified to.
10          So there is a disclosure out there that either
11  confirms or disconfirms what's disclosed in the
12  interrogatories and what Mr. Hejlek testified to. There is
13  presumably testimony available that goes beyond what was
14  said that's consistent with the interrogatory answer. And
15  we are not being allowed to get it.
16          I think it's a pretty fundamental rule of waiver
17  law that you can't get a little bit pregnant on these
18  things. If you are willing to disclose part of the story,
19  the stuff that helps, you just got to, you know, give the
20  rest of it up as well. We are entitled to the entire --
21  once they start down the road of sharing with us the
22  privileged information on the conception story, they have to
23  give us the rest of it. And they have given us the
24  invention disclosure on the peanut butter, which they
25  acknowledge is privileged, and which they acknowledge was a

1  waiver. They have given us testimony about conversations
2  between counsel and the inventor on the conception of the
3  peanut butter, to the extent they are consistent with the
4  interrogatory answer on the conception of the peanut butter.
5  But when we ask, can we see the other stuff that might
6  disconfirm your story, that's when we get the stone wall.
7  And I don't think they can do that.
8          THE COURT: They seem to emphasize the timing of
9  this discussion as being significant.
10          MR. BRODY: I saw that. And I apologize. I
11  will express this directly. I don't see that as a response.
12  The fact that the conversation took place after the
13  application was filed probably goes to the question of
14  whether Mr. Hejlek should have disclosed it at some point.
15  But it doesn't go to -- the underlying question is, when did
16  he conceive the invention and under what circumstances. And
17  that's a huge issue in this case, because we think he did it
18  in conjunction with our people, that actually we gave him
19  the basic idea.
20          He says, no, no, no. I came up with it
21  separately. If Mr. Falster, Dr. Falster, had told Mr.
22  Hejlek last week, you know what, Ed? I have been thinking
23  about it, and Soitec is right, the fact that that came last
24  week or, you know, a year ago or five years ago doesn't have
25  anything to do with it.

1    The question is whether they have waived the
2  privilege with respect to facts surrounding the conception
3  of this invention. And the reality is that they have given
4  us admittedly privileged documents -- and they are not
5  asking for it back -- about the conception of the peanut
6  butter, that they have given us testimony about
7  conversations between inventor and counsel, which, you know,
8  are clearly within the scope of the attorney-client
9  relationship, and they want to give us some but not all.
10    The fact that the waiver, you know, the waivers
11  came both before and after, I suppose the application is
12  being prepared -- I am sorry, the invention disclosure and
13  the conversation came before and after the application was
14  prepared. But the waivers both came in the context of this
15  litigation. And they can't give us some and not the rest.
16    THE COURT: All right. Thank you.
17    From MEMC's part, please?
18    MR. VANDER TUIG: I guess I will start by
19  saying -- your question to Mr. Brody was what info are you
20  trying to get here. I think what they are trying to get and
21  what we agree they are entitled to are the facts surrounding
22  the conception of the invention claimed in the '104 patent.
23  And they have had a full opportunity, and already have
24  deposed the inventor, Dr. Falster, on this issue. And we
25  did not block on the facts surrounding the conception of the

42

1  invention.
2    I wanted to make that clear.
3    The info that they are really seeking is, okay,
4  when did you come up with this idea and what were the
5  surrounding circumstances, that they have had full
6  opportunity to depose Dr. Falster on. Now we are just
7  dealing with the waiver issue. And I will take their points
8  one at a time.
9    The first point that they raise is that MEMC
10  waived the privilege it has in its '104 patent invention
11  disclosure by producing the invention disclosure relating to
12  the '302 patent, the perfect silicate patent. That
13  production of that document occurred in a separate
14  litigation concerning the '302 patent. And it has to do
15  with different subject matter.
16    The fact that the patents are somehow related, I
17  don't think that carries the day for Soitec. Patents are
18  received all the time on combination of prior developments.
19  Here, this is a classic situation where there was a prior
20  invention and that was built upon, and another patent was
21  received for the combination of prior invention and the new
22  invention.
23    I didn't notice that Soitec was able to find any
24  authority for the fact that, if you disclose one invention
25  disclosure, all related patents, all invention disclosures

1  for all related patents, the attorney-client privilege in
2  those documents is therefore waived. And I think that would
3  be a bad outcome and a very slippery slope.
4    Turning now to the argument that the
5  interrogatory response somehow waived the attorney-client
6  privilege with respect to conception, there we just set
7  forth the facts of the conception as testified to by our
8  inventor, Dr. Falster. And I just don't quite understand
9  how that can be a waiver of the attorney-client privilege.
10    Finally, turning to the testimony of the patent
11  attorney, Mr. Hejlek, to the extent, as you correctly
12  pointed out, Your Honor, the disclosure, the discussion
13  there -- let me back up a little bit.
14    After the prosecutions closed and the '104
15  patent issued and it was out in the public domain, Soitec
16  started making noise in the marketplace somehow that there
17  is some inventorship issue. And it is at that point that
18  Mr. Hejlek was approached to provide advice on the issue.
19  And to the extent there was any disclosure of the facts of
20  conception through Mr. Hejlek's testimony, it related to
21  that issue and not to anything that occurred during
22  prosecution.
23    I am kind of at a loss as to how they are
24  unfairly prejudiced and that they can't get the full facts
25  of conception when they are not allowed to probe the

44

1  attorney-client privileged communications that occurred
2  after the patent issued, so we are dealing with, you know, a
3  hearsay witness -- I am just at a loss as to how they are
4  unfairly prejudiced if they are not allowed to explore those
5  communications.
6    MR. EVANS: Your Honor, one other point I would
7  make is, we answer interrogatories. We object at
8  deposition. We try to be respectful to process and we try
9  to make judgment calls as to where privilege starts and
10  stops. And we try not to get the Court involved with a lot
11  of them. We try to be sort of even-handed about it.
12    The frustration that I am feeling a little bit
13  is we provide discovery in good faith, and then suddenly we
14  turn around and we hear because we gave them something we
15  are entitled to more. And they try to walk you down the
16  slope.
17    Here, invention disclosures per the Federal
18  Circuit are clearly a privileged document. The invention
19  disclosure that we did give them was one that had been
20  produced in an earlier litigation. And in that earlier
21  litigation it was produced inadvertently, but it was
22  produced nonetheless. And so since it was out there and we
23  couldn't get it back in that case, we in good faith said,
24  well, it is no longer a privileged document, so we gave it
25  to them here. But it is a patent that is not related to the

1  priority of the patents in suit here.  It was an earlier
2  patent.  So it is an unrelated patent as a matter of
3  priority.  As a matter of subject matter, Mr. Brody is
4  correct, a fair amount of it does appear in the '104 patent,
5  but it appears in the '104 patent in the context of
6  explaining one component, one part, if not the invention,
7  you know, that is at issue here.
8         So the law is pretty clear, these documents are
9  privileged.  I don't understand why we answer an
10  interrogatory, we, you know, put witnesses up on the facts,
11  and now they think they are entitled to the privileged
12  documents that are also related to other areas, when the
13  Federal Circuit case law is directly against that.
14         THE COURT:  Okay.
15         MR. BRODY:  Can I respond, Your Honor?
16         THE COURT:  Yes, please do.  Because I am now
17  getting the feel that you are talking at cross-purposes.
18  But go ahead.
19         MR. BRODY:  I think there are two critical
20  things here.  First of all, the conception of the invention
21  happens when the inventor has in his mind a complete idea of
22  the invention.  This invention involves making a sandwich
23  with a particular filling.  And in order to have that
24  conception, it was necessary for Dr. Falster to have a
25  conception both of the filling and of the idea of using it

46

1  in a sandwich.
2         They have admittedly waived the privilege as to
3  the first part of that conception, but they have insisted
4  that they are entitled to continue to assert the privilege
5  as to the second part.
6         That I just think is not -- the reason it is not
7  fair is because, with due respect, I am 98-percent sure that
8  when we get that invention disclosure statement, it's going
9  to indicate that he conceived of this two years later and
10  that he didn't acknowledge Soitec's role in it, or maybe
11  it's going to say that he thought of it when he met with
12  Soitec.
13         But one way or another, it is going to throw
14  light on whether he actually conceived of it on his own and
15  when he did so.  They can't give us half of the story and
16  not the other half.
17         Second.  With respect to the interrogatory
18  answer and the testimony, the interrogatory answer discloses
19  their contention as to how the invention was conceived.
20  When I was deposing Mr. Hejlek, I asked him about this
21  conversation with Dr. Falster.  He acknowledged that it took
22  place.  Then I said -- this is in Exhibit 4 at Page 152 of
23  the deposition:
24         Okay.  Did Dr. Falster, did his description of
25  the conception of the invention differ in any way from

1  what's disclosed in MEMC's Interrogatory Response to
2  Interrogatory No. 5?
3         So I am asking him directly about a conversation
4  between attorney and client.  And I am asking him about the
5  substance of that conversation.  And I am asking was it
6  consistent with what's in your interrogatory answer.  And he
7  was allowed to answer that question.  And he said:
8         What's described here is consistent with what my
9  recollection is.
10         And then I said:  Did he give you additional
11  information about the conception?
12         And Mr. Vander Tuig interposed an objection.
13  And I said, Well, right now I am not asking for the
14  substance.  I am just asking whether anything else was
15  disclosed.
16         And Dr. Falster was allowed to answer.  He said:
17         Yes, he shared more than what's here with me.
18         Then I said, What else did he share with you?
19         Then the objection was interposed.
20         So he was allowed to -- Hejlek was allowed to
21  testify that Falster said some things that were consistent
22  with what's in the interrogatory and what's been disclosed,
23  that he gave -- that he, Falster, gave Hejlek additional
24  information, and we weren't allowed to inquire about it.
25         So, you know, they -- if the second question was

48

1  privileged, so was the first question.  And if he is allowed
2  to answer the first question, he has to be allowed to answer
3  the second question.  And what's more, if he is allowed to
4  testify, if they are going -- if he is allowed to testify as
5  to evidence that is confirmatory of their contention, we
6  have got to be allowed to see -- and if we are going to get
7  the disclosure that's confirmatory of his conception of a
8  piece of the invention that was prior to the Soitec meeting,
9  we have to be allowed to see the disclosure that goes to the
10  rest of the invention, and we have to get the rest of the
11  testimony.
12         I appreciate Bob's comments.  But, frankly, from
13  our perspective, it's not that they are being kind of good
14  citizens about this.  It's that they have disclosed the
15  stuff that helps them and they are withholding the stuff
16  that may or may not help them.
17         It's not just that there was a disclosure in a
18  prior case, but there was also disclosure in this case.  And
19  they can't -- once they choose to start down the slippery
20  slope, they don't get to be the ones who decide to stop.
21         If there really was an inadvertent disclosure in
22  the prior case, then presumably they were entitled to get
23  that back.  There is tons of law about how inadvertent
24  disclosure is not a waiver and documents can be gotten back.
25  All of that is well-established.  Even if they couldn't have

1 gotten it back there, at least they could have contended
2 here that that disclosure was inadvertent and they could
3 have sought to reestablish the waiver in this case.
4       But they didn't. They gave us what they wanted
5 to give us on this story, and they haven't given us the
6 rest. And they just can't do that.
7       MR. VANDER TUIG: Your Honor, may I respond?
8       THE COURT: Sure.
9       MR. VANDER TUIG: I just wanted to point out
10 that -- first of all, we are not going to rely on Mr. Heljek
11 as some sort of corroborating witness on conception, which
12 the unfairness argument seems to rely on. And secondly, on
13 the pages of that deposition transcript of Hejlek that
14 follow the part that Mr. Brody pointed out, we actually took
15 a break and Mr. Hejlek came back and described some of the
16 situations -- some of the facts, that he was aware of
17 various stuff relating to the meeting that they are
18 concerned about.
19       So I don't think it's accurate that we cut him
20 off and only allowed him to confirm the accuracy of the
21 facts in the interrogatory response. In fact, if you read
22 Pages -- this is in the exhibit, I can't remember which
23 exhibit -- but it is Pages 154 through to about 158 or so,
24 or even further, there is a point where the line was
25 eventually drawn is when they wanted to get into Mr.

50

1 Hejlek's legal advice relating to the situation that
2 developed after the '104 patent had issued where the line
3 was drawn.
4       So this unfairness argument really, I don't
5 think there is much substance to it because they did
6 actually get from Mr. Hejlek all the facts that they wanted
7 relating to the October '96 meeting and what Mr. Hejlek was
8 aware of, the facts that he was aware of concerning that
9 meeting. I wanted to clarify that.
10       MR. BRODY: With due respect, first of all,
11 please do look at the transcript. You know, eventually we
12 were not allowed to inquire. But the fact that he was
13 allowed to answer further questions, you know, merely
14 compounds the waiver with respect to whatever may have
15 been -- whatever the underlying evidence is with respect to
16 Falster's conception.
17       At Falster's deposition, we weren't allowed to
18 ask anything. And we still haven't seen the disclosure
19 statement.
20       You know, it's not that we are looking to Hejlek
21 to corroborate Falster's testimony. Frankly, we think that
22 if we are allowed the discovery, we are going to be getting
23 evidence that disconfirms the contentions. And that is
24 exactly what we are looking for.
25       This isn't hearsay. This is testimony by the

inventor, who is an employee of the party, which makes it
2 squarely an admission.
3       So, you know, they can't have it both ways. It
4 can't both be the case that Hejlek's conversation with
5 Falster about conception -- and there is no question that
6 they had a conversation about conception -- it can't both be
7 that that conversation was privileged, which it clearly was,
8 and that they are allowed to testify as to that
9 conversation, and then say, but, you know, that's all you
10 get.
11       So we have got Hejlek's version of a
12 conversation on conception --
13       THE COURT: Let me just finish this. You should
14 have been entitled to get Hejlek's recollection of what the
15 conception was once it was allowed, you should have been
16 allowed to ask the Doctor the same type questions to confirm
17 it. The issue then that I think that is left is what do we
18 do about the invention disclosure statement.
19       UNIDENTIFIED SPEAKER: Let me speak directly to
20 that, if it is okay.
21       THE COURT: Yes. Because that, I will tell you
22 right now, is the one that is giving me probably the most
23 indigestion.
24       MR. BRODY: We tried to save the hard ones for
25 you, Judge.

52

1       If we are entitled to that testimony, then the
2 reason we are entitled to the testimony is because there is
3 a subject matter waiver as to what was communicated between
4 attorney and client about conception. And that's exactly
5 what the written disclosure statement is.
6       You know, there apparently were three
7 communications between Falster and his lawyers about his
8 conception of this invention. One was the initial invention
9 disclosure on the bulk silicon patents, the peanut butter
10 patents. The second was a conversation between Hejlek and
11 Falster about the conception of the peanut butter sandwich
12 patent. And the third is the written disclosure about the
13 conception of the peanut butter sandwich patent.
14       If there is a waiver as to the first and the
15 third communications, then there is also a waiver as to the
16 second, because it's the same subject matter. It's the same
17 as if there had been a subsequent or a prior conversation
18 about conception. They can't waive with respect to one
19 conversation and not with respect to the other.
20       They can't waive with respect to the oral
21 communication and not with respect to the written
22 communication.
23       That is the unfairness.
24       THE COURT: Okay.
25       MR. VANDER TUIG: Can I respond, Your Honor?

1       THE COURT: Yes.

2       MR. VANDER TUIG: I would just like to point out

3   that Mr. Hejlek clearly said that he did not have a

4   conversation about conception. He had a conversation with

5   Dr. Falster about this October meeting from which Soitec was

6   making these inventorship allegations after the '104 patent

7   issued. If you look at Page 156 of the transcript that

8   Soitec submitted --

9       THE COURT: Let me say this: The problem that I

10  am facing in this is the fact that, apparently, is it Dr.

11  Falster, was cut off with some information relating to

12  conception. There was some exploration, and probably what's

13  been represented to me, further exploration allowed with the

14  attorney. And that was even piece-mealed out.

15      The problem that I have is, did that go to

16  waiving the -- and I think there was a waiver. If this was

17  confidential, you just don't suddenly say, we only waived

18  this section of it, we didn't waive the rest. I do think

19  you did.

20      The question I have is, that I am asking is,

21  does that constitute a waiver of the invention disclosure.

22      MR. VANDER TUIG: Well, Your Honor, my point is

23  that you did not -- that the Hejlek testimony was not to

24  conception but it was to the fact of this October '96

25  meeting which Soitec alleges was, when their employee came

54

1   THE COURT: Let's look at Page 155. It starts

2   out where there was a meeting that was attended by Dr.

3   Falster at Soitec's office sometime in October of '96.

4       So he brought to my attention the meeting and

5   the fact that he conceived it before the meeting.

6       I am sorry, I overlooked that before. When you

7   say conceived it, I take it you are saying in conjunction

8   with the meeting, he had conceived the invention before

9   attending the meeting.

10      Then: Did he tell you when he had conceived it?

11      The answer was, I do not recall the date.

12      Not that he didn't know the date. That he

13  didn't recall it.

14      Did he tell you anything about the circumstances

15  under which he had conceived the invention?

16      No. That was a question you asked me before.

17  No.

18      So the privilege doesn't even apply then, I

19  guess, if I looked at this literally, the fact that Dr.

20  Falster has circumstances under which he conceived the

21  invention that he didn't share with his attorney, that

22  obviously isn't even subject to privilege.

23      Have you seen any written material corroborating

24  his recollection as to his conception of the invention?

25      Other than the invention disclosure, no.

56

1   up with the idea, rather than the conception of the

2   invention. We submitted in our submission the fact that Mr.

3   Hejlek testified that he never had a conversation with Dr.

4   Falster about conception during prosecution of the '104

5   patent. And at Page 156 of the transcript that Soitec

6   submitted --

7       THE COURT: But that may go to inequitable

8   conduct. I don't know whether it goes to conception and

9   reduction to practice.

10      MR. VANDER TUIG: The point is they didn't talk

11  about conception. They talked about this October meeting,

12  which is different.

13      So to address one other point that he raised,

14  Dr. Falster was not cut off as to the facts of conception.

15  They had a full opportunity to explore all the facts

16  relating to his conception of the idea.

17      He was instructed not to answer when he was

18  asked what conversations he had with Hejlek after the '104

19  patent issued, that conversation we have been talking about.

20  He was not allowed to talk about that conversation. But he

21  was -- I mean, he testified fully about the facts of

22  conception.

23      I mean, there is no unfairness here, Your Honor.

24  They have all the facts they need. I am not sure what else

25  they want.

1       So, you know, those four series of questions

2   seems to be in conflict with one another. But what the

3   attorney said was he didn't tell him anything about the

4   circumstances under which he had conceived the invention.

5       Have you seen an invention disclosure

6   corroborating his concept of, his account of the conception

7   of the invention?

8       And then the attorney says, you asked his

9   account. Do you mean this account? I am not sure what you

10  mean because you sort of moved your hand like it was

11  supposed to communicate something.

12      I communicated that I was moving my hand, I

13  think nothing more.

14      Have you seen any written material corroborating

15  the account of the conception of the invention that's set

16  forth in Interrogatory No. 5 and apparently was communicated

17  to you sometime between 2001 and 2005?

18      I don't recall any such documents.

19      So he is saying I don't recall. He is not

20  saying he didn't have it.

21      Have you spoken with anybody other than Mr.

22  Falster about who corroborated his account?

23      Answer: As to what subject?

24      As to the conception of the invention that's set

25  forth in response to Interrogatory No. 5.

1          To corroborate the date, no.
2          To corroborate any other aspect of the
3    conception?
4          No.
5          So it is clear that he had conversations with
6    Foster about something. But it's not clear to me what's
7    even under the privilege at this stage of the game.
8          UNIDENTIFIED SPEAKER: That is one of the
9    struggles, Your Honor, at the deposition, is to figure out
10   where to draw lines.
11         THE COURT: That is the problem. That is the
12   reason why I am finding that you are going to produce the
13   invention disclosure. I think there is enough here that has
14   caused -- I don't think the Court can, in the end, parse
15   out, okay, this much we disclosed and we allowed it and we
16   were good guys by disclosing it, but the rest of it we are
17   going to protect. I think there has been a whole host of
18   related subject matter that has been disclosed. I am not
19   just relying upon the fact that the disclosure of the
20   disclosure statement of the '104 patent was produced.
21         It seems to me that trying to draw these nice,
22   little lines and areas is just, if you will excuse the
23   expression, dammed near impossible.
24         So the disclosure statement for the, my
25   understanding of the patent that is in dispute here, which

58

1    is, I think is the '302 disclosure, will be provided.
2          UNIDENTIFIED SPEAKER: It is the '104, Your
3    Honor.
4          THE COURT: It is the '104 in this case but the
5    '302 had been disclosed.
6          UNIDENTIFIED SPEAKER: Yes.
7          THE COURT: I got them confused. I apologize.
8    Then the '104 will also be disclosed.
9          So I think I have covered all the issues that
10   were addressed by the parties in their two submissions,
11   except for the one thing that is left is if you wish me to
12   do that review. And I will do it.
13         UNIDENTIFIED SPEAKER: Okay.
14         UNIDENTIFIED SPEAKER: Thank you very much for
15   your patience, Judge.
16         THE COURT: It's not patience. It's just trying
17   to parse out what you are asking me to do. And sometimes I
18   can't do the impossible. It's just easier to try to draw
19   some line someplace.
20         UNIDENTIFIED SPEAKER: Thank you, Your Honor.
21         THE COURT: Thank you, all.
22         (Teleconference concluded at 12:05 p.m.)
23              - - -
24   Reporter: Kevin Maurer
25

**'**

'104 [14] - 10:7, 41:22, 42:10, 43:14, 45:4, 45:5, 50:2, 53:6, 54:4, 54:18, 57:20, 58:2, 58:4, 58:8
'302 [5] - 35:21, 42:12, 42:14, 58:1, 58:5
'96 [3] - 50:7, 53:24, 55:3

**0**

05-806(GMS [1] - 1:10

**1**

1 [1] - 4:19
10:30 [1] - 1:13
11 [2] - 22:21, 24:9
112 [4] - 7:13, 10:12, 10:14, 10:21
12 [1] - 5:5
12:05 [1] - 58:22
152 [1] - 46:22
154 [1] - 49:23
155 [1] - 55:1
156 [2] - 53:7, 54:5
158 [1] - 49:23

**2**

2 [1] - 10:14
2001 [1] - 56:17
2005 [1] - 56:17
2008 [1] - 1:12
23 [2] - 5:4, 10:5
26 [3] - 26:18, 30:5, 32:8
28 [1] - 1:12

**3**

30 [1] - 37:5

**4**

4 [1] - 46:22
40 [1] - 37:5

**5**

5 [3] - 47:2, 56:16, 56:25
50 [1] - 37:5

**7**

7 [1] - 10:12

**8**

8 [1] - 5:4

**9**

98-percent [1] - 46:7

**A**

a.m [1] - 1:13
able [5] - 6:19, 11:9, 17:18, 34:6, 42:23
Absolutely [1] - 35:16
abstract [1] - 20:17
access [1] - 32:11
accident [1] - 19:4
account [6] - 15:17, 56:6, 56:9, 56:15, 56:22
accuracy [1] - 49:20
accurate [1] - 49:19
accused [1] - 12:23
acknowledge [3] - 39:25, 46:10
acknowledged [1] - 46:21
acknowledges [1] - 38:6
Act [1] - 7:14
Action [1] - 1:4
actual [2] - 4:20, 34:8
add [3] - 8:16, 9:15, 36:7
added [1] - 9:22
addition [2] - 13:9, 38:10
additional [3] - 37:8, 47:10, 47:23
address [4] - 8:4, 11:1, 25:6, 54:13
addressed [1] - 58:10
admission [1] - 51:2

admittedly [2] - 41:4, 46:2
advanced [1] - 12:19
adversarial [1] - 13:15
adversary [4] - 14:2, 14:3, 14:4, 15:3
advice [2] - 43:18, 50:1
advocates [1] - 13:23
agglomerated [2] - 10:15, 24:3
ago [3] - 4:1, 40:24
agree [2] - 24:2, 41:21
agreed [2] - 18:21, 24:4
agreement [4] - 15:2, 15:5, 21:14, 21:24
ahead [2] - 31:5, 45:18
allegation [1] - 19:8
allegations [1] - 53:6
alleged [2] - 18:14, 35:2
allegedly [1] - 35:8
alleges [1] - 53:25
alleging [1] - 20:21
allowed [30] - 29:12, 29:13, 35:23, 39:3, 39:8, 39:15, 43:25, 44:4, 47:7, 47:16, 47:20, 47:24, 48:1, 48:2, 48:3, 48:4, 48:6, 48:9, 49:20, 50:12, 50:13, 50:17, 50:22, 51:8, 51:15, 51:16, 53:13, 54:20, 57:15
alluding [1] - 21:14
almost [1] - 38:6
ambiguous [3] - 10:14, 10:19, 11:24
amount [3] - 30:15, 34:7, 45:4

analysis [15] - 13:10, 14:7, 19:6, 23:20, 25:2, 25:4, 27:4, 28:22, 29:2, 30:13, 31:14, 31:18, 31:21, 31:22, 35:4
analyzing [3] - 18:25, 27:18, 32:4
AND [1] - 1:2
Angell [3] - 1:18, 1:20, 2:16
answer [2] - 19:13, 19:14, 20:17, 23:3, 26:9, 30:19, 30:21, 31:11, 39:3, 39:14, 40:4, 44:7, 45:9, 46:18, 47:6, 47:7, 47:16, 48:2, 50:13, 54:17, 55:11
Answer [1] - 56:23
answered [4] - 23:4, 23:12, 30:6, 30:8
answers [4] - 7:11, 20:2, 32:17, 38:10
anyway [1] - 34:11
apologies [1] - 8:13
apologize [2] - 40:10, 58:7
appear [1] - 45:4
APPEARANCES [2] - 1:16, 2:1
application [3] - 40:13, 41:11, 41:13
applied [1] - 38:7
apply [1] - 55:18
applying [1] - 16:5
appreciate [1] - 48:12
approached [2] - 11:13, 43:18
appropriate [7] - 10:2, 11:3, 12:3, 14:19, 27:17, 33:21, 33:22
arbiter [1] - 33:24
area [4] - 16:15, 17:15, 17:16,

18:23
areas [7] - 11:14, 16:11, 16:15, 17:6, 34:3, 45:12, 57:22
argues [1] - 30:24
argument [16] - 9:18, 11:7, 19:11, 19:23, 20:13, 20:16, 21:9, 24:9, 24:22, 25:15, 30:23, 32:16, 36:20, 43:4, 49:12, 50:4
arguments [3] - 11:18, 17:12, 24:8
arise [1] - 3:16
arose [1] - 38:1
art [2] - 12:23, 31:20
aspect [3] - 16:17, 18:4, 57:2
aspects [1] - 13:12
assemble [1] - 30:12
assert [1] - 46:4
asserted [1] - 29:8
assess [1] - 30:12
assisting [1] - 32:14
assumptions [1] - 14:21
assure [1] - 9:1
assured [1] - 8:23
attached [1] - 10:13
attended [1] - 55:2
attending [1] - 55:9
attention [1] - 55:4
attorney [25] - 13:20, 15:12, 15:15, 15:16, 20:13, 20:16, 20:21, 21:2, 21:6, 22:8, 25:4, 30:12, 35:13, 41:8, 43:5, 43:9, 43:11, 44:1, 47:4, 52:4, 53:14, 55:21, 56:3, 56:8
attorney-client

[9] - 13:20, 15:12, 15:16, 35:13, 41:8, 43:1, 43:5, 43:9, 44:1
attorneys [1] - 13:22
authority [1] - 42:24
automatically [1] - 30:15
available [4] - 17:19, 32:3, 32:5, 39:13
avoid [1] - 22:21
aware [3] - 49:16, 50:8

**B**

background [1] - 36:2
bad [1] - 43:3
balancing [1] - 32:12
based [6] - 8:24, 12:19, 14:2, 17:1, 19:20, 26:16
basic [1] - 40:19
basis [15] - 8:8, 19:8, 19:18, 20:5, 20:16, 25:15, 28:20, 28:21, 29:4, 29:8, 31:2, 31:9, 31:23, 31:25, 32:19
become [1] - 32:11
becomes [1] - 29:3
BEFORE [1] - 1:15
begin [3] - 2:11, 3:5, 3:6
behalf [2] - 2:20, 13:11
behind [1] - 24:20
below [1] - 5:7
Bergholz [1] - 11:15
between [18] - 4:3, 6:14, 13:5, 13:7, 13:18, 13:19, 15:19, 16:9, 17:2, 37:23, 38:13, 40:2, 41:7, 47:4, 52:3, 52:7, 52:10, 56:17
beyond [2] - 32:7, 39:13

**bit** [6] - 12:15, 32:6, 35:6, 39:17, 43:13, 44:12
**block** [1] - 41:25
**Bob** [3] - 2:24, 27:12, 31:21
**Bob's** [2] - 31:22, 48:12
**Boston** [2] - 1:20, 2:18
**bottom** [1] - 4:22
**Bove** [2] - 2:2, 2:23
**break** [1] - 49:15
**BRIAN** [1] - 1:19
**Brian** [6] - 2:17, 5:21, 8:17, 16:21, 16:23, 17:4
**brief** [3] - 8:15, 11:20, 36:1
**briefly** [2] - 11:22, 30:23
**BRODY** [32] - 1:21, 2:13, 3:21, 3:24, 4:15, 5:21, 6:10, 8:15, 9:16, 11:22, 18:17, 19:2, 19:4, 19:12, 20:2, 20:7, 20:14, 20:18, 21:22, 25:17, 25:22, 26:13, 28:19, 29:4, 32:1, 35:15, 35:17, 40:10, 45:15, 45:19, 50:10, 51:24
**Brody** [10] - 2:13, 2:17, 10:11, 11:2, 23:25, 24:2, 41:19, 45:3, 49:14
**Brody's** [1] - 10:22
**broken** [1] - 34:14
**brought** [1] - 55:4
**built** [1] - 42:20
**bulk** [2] - 35:21, 52:9
**burden** [3] - 14:14, 20:21, 31:8
**butter** [16] - 36:4, 36:5, 36:8, 36:9, 36:12, 36:25, 37:1, 37:7, 38:16, 39:24, 40:3, 40:4, 41:6, 52:9, 52:11,

52:13

**C**

**California** [1] - 12:11
**cannot** [1] - 10:19
**care** [1] - 3:13
**carries** [1] - 42:17
**carry** [1] - 15:19
**case** [52] - 3:9, 3:14, 4:2, 6:1, 6:6, 6:7, 6:11, 6:12, 6:18, 6:23, 7:2, 7:19, 8:2, 8:25, 10:3, 10:9, 12:1, 12:8, 12:10, 12:12, 12:15, 12:17, 12:18, 12:20, 12:21, 13:21, 14:22, 14:25, 15:18, 16:6, 16:8, 17:11, 18:9, 19:10, 19:11, 22:6, 22:10, 22:13, 22:16, 22:20, 28:16, 38:3, 38:9, 40:17, 44:23, 45:13, 48:18, 48:22, 49:3, 51:4, 58:4
**cases** [2] - 12:6, 15:6
**category** [2] - 16:13, 35:13
**caused** [1] - 57:14
**certain** [2] - 17:24, 18:23
**certainly** [9] - 5:21, 11:23, 12:18, 16:20, 18:3, 24:15, 24:16, 24:21, 27:21
**cetera** [1] - 9:1
**chance** [1] - 12:5
**characterized** [1] - 13:2
**characterizes** [1] - 6:16
**check** [1] - 5:2
**Chicago** [1] - 1:22
**choose** [1] - 48:19

**chunky** [5] - 36:4, 36:5, 36:8, 36:9, 36:12
**Cicero** [1] - 2:15
**CICERO** [2] - 1:18, 2:15
**Circuit** [4] - 12:12, 35:11, 44:18, 45:13
**circumstance** [1] - 30:15
**circumstances** [10] - 14:13, 28:25, 37:25, 38:19, 38:20, 40:16, 42:5, 55:14, 55:20, 56:4
**cited** [2] - 6:6, 12:7
**citizens** [1] - 48:14
**Civil** [1] - 1:4
**claim** [2] - 10:19, 12:23
**claimed** [1] - 12:22, 41:22
**claiming** [2] - 36:24, 37:1
**claims** [2] - 31:18, 38:21
**clarify** [1] - 50:9
**classic** [2] - 25:11, 42:19
**clear** [8] - 20:14, 21:22, 35:19, 37:19, 42:2, 45:8, 57:5, 57:6
**clearly** [9] - 5:25, 6:14, 9:23, 16:14, 32:8, 41:8, 44:18, 51:7, 53:3
**client** [11] - 13:20, 15:12, 15:16, 35:13, 41:8, 43:1, 43:5, 43:9, 44:1, 47:4, 52:4
**closed** [1] - 43:14
**co** [2] - 38:2, 38:5
**co-inventor** [2] - 38:2, 38:5
**coalesce** [1] - 6:17
**coin** [1] - 31:10
**collected** [4] - 24:15, 24:16, 29:22, 30:8

**column** [3] - 4:25, 10:16, 10:17
**Column** [2] - 5:4, 10:5
**combination** [6] - 36:17, 37:9, 38:8, 38:23, 42:18, 42:21
**comfortable** [3] - 33:24, 34:5, 35:7
**comments** [1] - 48:12
**communicate** [1] - 56:11
**communicated** [3] - 52:3, 56:12, 56:16
**communication** [3] - 13:19, 52:21, 52:22
**communications** [4] - 44:1, 44:5, 52:7, 52:15
**Company** [3] - 6:9, 12:8, 12:12
**compensated** [2] - 6:12, 13:10
**complete** [1] - 45:21
**completely** [1] - 18:22
**component** [1] - 45:6
**compounded** [1] - 37:21
**compounds** [1] - 50:14
**conceive** [1] - 40:16
**conceived** [13] - 38:1, 38:12, 38:21, 46:9, 46:14, 46:19, 55:5, 55:7, 55:8, 55:10, 55:15, 55:20, 56:4
**concentrate** [1] - 16:16
**concept** [1] - 56:6
**conception** [48] - 18:14, 23:7, 35:2, 39:5, 39:22, 40:2, 40:4, 41:2, 41:5, 41:22, 41:25, 43:6, 43:7, 43:20, 43:25, 45:20, 45:24,

45:25, 46:3, 46:25, 47:11, 48:7, 49:11, 50:16, 51:5, 51:6, 51:12, 51:15, 52:4, 52:8, 52:11, 52:13, 52:18, 53:4, 53:12, 53:24, 54:1, 54:4, 54:8, 54:11, 54:14, 54:16, 54:22, 55:24, 56:6, 56:15, 56:24, 57:3
**concern** [4] - 8:6, 11:9, 11:24, 23:5
**concerned** [3] - 11:8, 35:4, 49:18
**concerning** [3] - 21:19, 42:14, 50:8
**concerns** [1] - 18:8
**conclude** [2] - 6:2, 6:3
**concluded** [4] - 19:15, 20:1, 33:8, 58:22
**conclusion** [10] - 19:16, 19:17, 20:10, 27:3, 27:7, 28:8, 32:16, 32:19, 32:23, 33:10
**conclusions** [8] - 19:2, 19:3, 21:17, 23:24, 24:23, 25:8, 28:15, 31:24
**conducive** [1] - 14:11
**conduct** [3] - 19:24, 29:24, 54:8
**conducted** [5] - 20:25, 21:18, 22:14, 22:15, 29:25
**Conference** [1] - 1:13
**confidence** [1] - 29:8
**confident** [2] - 26:3, 26:5
**confidential** [18] - 7:20, 8:8, 9:8, 14:3, 14:5, 14:8, 14:10, 14:16, 15:5, 15:8, 15:20,

16:13, 16:15, 16:18, 16:25, 17:1, 17:8, 53:17
**Confidential** [1] - 15:13
**confidentiality** [3] - 15:2, 15:10, 18:4
**confidentially** [2] - 9:9, 34:1
**confirm** [2] - 49:20, 51:16
**confirmatory** [2] - 48:5, 48:7
**confirms** [1] - 39:11
**conflict** [6] - 9:4, 9:12, 12:15, 17:6, 17:7, 56:2
**conflicted** [1] - 3:19
**conflicting** [1] - 13:4
**conflicts** [3] - 8:19, 8:23, 16:23
**confused** [1] - 58:7
**conjunction** [3] - 38:12, 40:18, 55:7
**Connolly** [2] - 2:2, 2:23
**consider** [1] - 15:24
**considered** [2] - 13:16, 16:5
**consistent** [7] - 27:19, 39:2, 39:14, 40:3, 47:6, 47:8, 47:21
**constitute** [2] - 24:25, 53:21
**construed** [2] - 10:19, 21:12
**consultation** [1] - 32:13
**consulting** [4] - 28:1, 29:2, 29:6
**contacted** [3] - 3:25, 11:5, 13:11
**containing** [1] - 37:17
**contend** [1] - 9:21
**contended** [1] - 49:1
**contending** [1] - 21:23
**contention** [25] - 7:25, 19:20,

23:13, 24:6, 27:3, 27:6, 27:10, 28:3, 28:20, 28:22, 28:23, 29:1, 29:5, 29:9, 29:13, 29:14, 30:11, 30:14, 30:18, 30:19, 30:21, 31:2, 46:19, 48:5

**contentions** [3] - 20:6, 31:9, 50:23

**context** [6] - 23:15, 23:22, 30:20, 34:18, 41:14, 45:5

**continue** [1] - 46:4

**CONTINUED** [1] - 2:1

**continued** [1] - 17:5

**conversation** [27] - 4:1, 4:3, 8:18, 9:2, 9:10, 13:3, 17:3, 37:23, 38:4, 40:12, 41:13, 46:21, 47:3, 47:5, 51:4, 51:6, 51:7, 51:9, 51:12, 52:10, 52:17, 52:19, 53:4, 54:3, 54:19, 54:20

**conversations** [9] - 7:10, 9:22, 25:5, 35:24, 38:24, 40:1, 41:7, 54:18, 57:5

**conveyed** [3] - 12:16, 17:11, 35:10

**copy** [5] - 4:8, 4:14, 10:5, 33:5, 34:1

**corner** [1] - 7:24

**correct** [8] - 3:21, 11:23, 18:15, 18:17, 22:21, 22:22, 28:17, 45:4

**correctly** [1] - 43:11

**corroborate** [3] - 50:21, 57:1, 57:2

**corroborated** [1] - 56:22

**corroborating** [4] - 49:11, 55:23, 56:6, 56:14

**counsel** [20] - 3:9, 6:22, 9:15, 12:21, 13:5, 13:7, 13:19, 15:19, 17:3, 18:10, 20:25, 21:15, 29:1, 32:14, 32:20, 37:23, 37:24, 38:23, 40:2, 41:7

**Counsel** [6] - 1:23, 2:6, 2:10, 2:11, 3:5, 8:12

**counsel's** [1] - 23:1

**counter** [1] - 10:22

**Counterclaim** [4] - 1:6, 1:10, 1:24, 2:6

**couple** [3] - 3:3, 3:5, 13:12

**course** [3] - 7:4, 13:2, 23:5

**court** [1] - 3:7

**Court** [10] - 6:21, 12:9, 13:3, 13:25, 14:22, 14:24, 15:17, 15:24, 44:10, 57:14

**COURT** [71] - 1:1, 2:9, 2:11, 2:14, 2:19, 2:25, 3:23, 4:12, 4:16, 4:20, 5:2, 5:10, 5:15, 5:18, 6:8, 8:12, 9:14, 9:17, 11:7, 11:17, 11:20, 12:5, 18:18, 19:3, 19:7, 19:23, 20:5, 20:12, 20:15, 20:20, 21:3, 21:10, 21:21, 22:1, 22:19, 23:19, 24:12, 24:17, 24:22, 25:12, 25:20, 26:12, 28:5, 28:24, 29:17, 31:25, 32:2, 33:6, 33:19, 34:2, 34:9, 34:12, 34:21, 35:16, 40:8, 41:16, 45:14, 45:16, 49:8, 51:13, 51:21, 52:24, 53:1, 53:9, 54:7, 55:1, 57:11, 58:4, 58:7, 58:16,

58:21

**Courts** [2] - 13:13, 13:16

**covered** [2] - 11:15, 58:9

**crawling** [1] - 24:25

**credentials** [1] - 8:3

**critical** [2] - 38:22, 45:19

**cross** [1] - 45:17

**cross-purposes** [1] - 45:17

**current** [1] - 14:6

**cut** [3] - 49:19, 53:11, 54:14

---

## D

**dammed** [1] - 57:23

**data** [44] - 18:12, 18:18, 18:21, 18:24, 18:25, 19:4, 19:5, 19:6, 19:16, 19:18, 19:22, 21:14, 21:15, 21:19, 21:23, 22:4, 22:23, 23:12, 23:23, 24:8, 24:10, 24:12, 24:15, 24:17, 25:7, 25:8, 26:16, 26:17, 26:21, 26:24, 27:1, 27:6, 27:8, 28:23, 29:21, 30:8, 31:1, 31:3, 31:12, 32:2, 34:4, 34:8, 34:13

**date** [3] - 55:11, 55:12, 57:1

**dealing** [2] - 42:7, 44:2

**deals** [1] - 18:12

**decide** [1] - 48:20

**decided** [1] - 15:18

**declaration** [1] - 7:10

**defects** [2] - 10:16, 24:3

**Defendant** [2] - 1:9, 2:6

**defendants** [1] - 2:20

**Defendants** [2] - 1:6, 1:24

**defense** [4] - 7:13, 7:14, 10:14, 18:2

**definitely** [1] - 34:12

**definition** [1] - 10:6

**DELAWARE** [1] - 1:2

**Delaware** [2] - 1:12, 22:13

**demonstrate** [1] - 14:15

**demonstrating** [1] - 5:12

**denied** [1] - 15:1

**denying** [1] - 18:6

**depose** [1] - 42:6

**deposed** [1] - 41:24

**deposing** [1] - 46:20

**deposition** [10] - 18:13, 35:1, 37:21, 38:11, 39:8, 44:8, 46:23, 49:13, 50:17, 57:9

**described** [3] - 4:2, 47:8, 49:15

**description** [1] - 46:24

**desirable** [1] - 37:3

**despite** [1] - 14:10

**details** [3] - 8:25, 9:22, 9:25

**determine** [5] - 10:2, 14:1, 16:22, 33:1

**developed** [2] - 14:18, 50:2

**developments** [1] - 42:18

**devices** [1] - 37:2

**differ** [1] - 46:25

**difference** [2] - 13:7, 13:18

**differences** [1] - 13:4

**different** [12] - 3:1, 11:13, 11:14, 13:22, 15:9, 17:21, 18:8,

20:10, 23:4, 23:17, 42:15, 54:12

**Different** [1] - 15:11

**differently** [1] - 13:3

**directing** [1] - 4:25

**direction** [4] - 3:15, 29:10, 33:17, 33:20

**directions** [1] - 23:17

**directly** [6] - 21:7, 22:6, 40:11, 45:13, 47:3, 51:19

**disadvantaged** [2] - 16:1, 16:2

**disagree** [1] - 26:23

**disclosable** [1] - 33:9

**disclose** [4] - 10:1, 26:17, 39:18, 42:24

**disclosed** [24] - 7:11, 10:8, 10:20, 14:4, 15:8, 16:10, 16:18, 17:8, 18:1, 18:2, 34:3, 36:7, 38:24, 39:11, 40:14, 47:1, 47:15, 47:22, 48:14, 57:15, 57:18, 58:5, 58:8

**discloses** [1] - 46:18

**disclosing** [3] - 16:11, 36:15, 57:16

**disclosure** [48] - 26:3, 26:19, 35:10, 35:22, 36:11, 36:13, 36:16, 36:19, 36:21, 36:23, 37:6, 37:8, 37:12, 37:13, 38:18, 38:20, 38:22, 39:10, 39:24, 41:12, 42:11, 42:25, 43:12, 43:19, 44:19, 46:8, 48:7, 48:9, 48:17, 48:18, 48:21, 48:24, 49:2, 50:18, 51:18, 52:5, 52:9,

52:12, 53:21, 55:25, 56:5, 57:13, 57:19, 57:20, 57:24, 58:1

**disclosures** [9] - 14:7, 14:11, 14:12, 15:22, 33:21, 35:12, 35:18, 42:25, 44:17

**disconfirm** [1] - 40:6

**disconfirms** [1] - 39:11, 50:23

**discoverable** [1] - 33:3

**discovery** [5] - 3:4, 3:11, 3:16, 44:13, 50:22

**discussed** [4] - 4:11, 12:20, 12:22, 14:23

**discussion** [6] - 7:13, 8:25, 13:5, 39:1, 40:9, 43:12

**discussions** [11] - 3:11, 4:4, 5:25, 6:24, 7:5, 9:7, 15:19, 17:5, 22:24, 23:22

**disprove** [1] - 17:18

**dispute** [5] - 9:1, 16:9, 24:5, 24:24, 57:25

**disputes** [1] - 3:4

**disputing** [1] - 35:17

**disqualificatio n** [6] - 13:15, 14:1, 14:13, 14:15, 14:19, 15:11

**disqualified** [2] - 8:1, 16:4

**disqualify** [3] - 13:14, 17:10, 18:6

**DISTRICT** [2] - 1:1, 1:2

**District** [1] - 12:11

**Doctor** [2] - 32:21, 51:16

**document** [6] - 16:15, 25:5, 42:13, 44:18, 44:24

**documentation**

[1] - 20:8
**documents** [8] - 18:13, 35:1, 41:4, 43:2, 45:8, 45:12, 48:24, 56:18
**Dodge** [3] - 1:18, 1:20, 2:16
**domain** [1] - 43:15
**done** [4] - 10:25, 25:21, 26:4, 28:23
**donor** [1] - 19:10
**double** [1] - 5:2
**double-check** [1] - 5:2
**doubt** [1] - 17:14
**down** [5] - 31:17, 34:14, 39:21, 44:15, 48:19
**Dr** [46] - 3:25, 4:3, 4:5, 4:23, 5:7, 5:8, 5:23, 6:17, 6:25, 7:9, 8:1, 8:7, 8:18, 9:3, 9:22, 11:5, 11:13, 11:25, 17:10, 18:6, 29:23, 31:12, 31:17, 35:24, 37:24, 38:4, 38:7, 38:11, 38:24, 39:1, 39:7, 40:21, 41:24, 42:6, 43:8, 45:24, 46:21, 46:24, 47:16, 53:5, 53:10, 54:3, 54:14, 55:2, 55:19
**drastic** [1] - 13:16
**draw** [4] - 31:15, 57:10, 57:21, 58:18
**drawing** [1] - 19:17
**drawn** [2] - 49:25, 50:3
**due** [3] - 7:11, 46:7, 50:10
**during** [3] - 9:23, 43:21, 54:4

**E**

**e-mail** [4] - 4:9, 4:23, 4:24, 5:7
**e-mails** [1] - 4:22

**e.g** [1] - 5:4
**easier** [1] - 58:18
**easily** [1] - 19:24
**Ed** [1] - 40:22
**Edwards** [3] - 1:18, 1:20, 2:16
**effect** [3] - 21:25, 29:12, 37:14
**either** [2] - 15:15, 39:10
**ELECTRONIC** [1] - 1:8
**element** [1] - 38:22
**elsewhere** [1] - 17:19
**emphasize** [1] - 40:8
**emphasized** [2] - 15:6, 15:7
**employee** [5] - 23:2, 23:15, 25:5, 51:1, 53:25
**employee's** [3] - 23:20, 25:3, 25:10
**employees** [5] - 21:18, 23:1, 25:1, 28:11, 28:14
**enclosing** [1] - 4:23
**encompasses** [2] - 37:10, 37:12
**end** [1] - 57:14
**entire** [1] - 39:20
**entitled** [21] - 19:16, 20:3, 20:5, 27:11, 27:16, 29:15, 30:20, 31:8, 31:23, 32:7, 32:21, 32:24, 39:20, 41:21, 44:15, 45:11, 46:4, 48:22, 51:14, 52:1, 52:2
**ESQ** [6] - 1:18, 1:19, 1:21, 2:2, 2:3, 2:4
**essence** [1] - 38:14
**Essentially** [1] - 7:6
**essentially** [3] - 26:8, 36:9, 38:8
**established** [1] - 48:25
**et** [1] - 9:1
**evaluating** [2] -

14:20, 26:24
**EVANS** [7] - 2:3, 23:2, 23:20, 24:14, 24:19, 25:3, 44:6
**Evans** [8] - 2:24, 12:3, 21:24, 25:25, 27:12, 31:10
**Evans's** [1] - 30:23
**even-handed** [1] - 44:11
**eventually** [2] - 49:25, 50:11
**evidence** [4] - 12:24, 48:5, 50:15, 50:23
**evident** [1] - 31:13
**exact** [1] - 37:5
**exactly** [6] - 7:23, 18:23, 20:7, 27:15, 50:24, 52:4
**Exactly** [1] - 32:1
**example** [2] - 9:4, 12:21
**except** [1] - 58:11
**excerpt** [2] - 4:24, 10:5
**exchanged** [1] - 15:21
**exclude** [1] - 3:19
**excuse** [2] - 5:3, 57:22
**exhibit** [2] - 49:22, 49:23
**Exhibit** [5] - 4:16, 4:17, 4:18, 10:13, 46:22
**existed** [3] - 14:17, 17:2, 17:9
**expect** [1] - 19:1
**expectation** [3] - 8:7, 14:9, 15:7
**expected** [1] - 16:24
**expert** [50] - 3:19, 6:4, 8:2, 9:6, 10:1, 10:2, 11:10, 11:11, 11:12, 11:15, 12:16, 12:18, 13:1, 13:2, 13:5, 13:6, 13:8, 13:9, 13:14, 13:19,

14:1, 14:4, 14:5, 14:15, 15:2, 16:3, 16:10, 16:12, 16:16, 16:21, 17:2, 17:16, 17:19, 18:1, 22:16, 25:7, 26:15, 26:20, 27:1, 27:2, 28:2, 28:3, 29:2, 29:5, 29:6, 29:7, 30:7, 31:15, 33:14
**expert's** [1] - 29:2
**expertise** [3] - 11:6, 11:14, 17:23
**experts** [10] - 11:2, 13:21, 15:19, 17:15, 17:19, 17:22, 26:23, 28:7, 32:8, 32:13
**explain** [3] - 24:23, 31:2, 33:7
**explaining** [3] - 19:17, 38:17, 45:6
**explains** [1] - 34:17
**exploration** [2] - 53:12, 53:13
**explore** [3] - 11:14, 44:4, 54:15
**express** [1] - 40:11
**expressed** [1] - 18:8
**expresses** [1] - 8:13
**expression** [2] - 5:4, 57:23
**extended** [1] - 6:12
**extent** [13] - 6:17, 15:10, 21:13, 21:17, 23:10, 23:15, 30:18, 32:22, 33:1, 35:7, 40:3, 43:11, 43:19
**extreme** [2] - 6:15, 6:21
**extremes** [1] - 6:11

**F**

**faced** [1] - 13:4
**facie** [1] - 35:18

**facilities** [1] - 30:1
**facing** [1] - 53:10
**fact** [26] - 3:11, 7:12, 7:25, 8:2, 10:11, 19:12, 20:8, 27:23, 29:20, 37:4, 38:2, 38:4, 38:17, 40:12, 40:23, 41:10, 42:16, 42:24, 49:21, 50:12, 53:10, 53:24, 54:2, 55:5, 55:19, 57:19
**factors** [2] - 14:21, 16:5
**facts** [20] - 29:19, 30:13, 30:14, 30:17, 30:25, 41:2, 41:21, 41:25, 43:7, 43:19, 43:24, 45:10, 49:16, 49:21, 50:6, 50:8, 54:14, 54:15, 54:21, 54:24
**factual** [6] - 28:7, 28:8, 29:4, 31:9, 31:25, 36:1
**fair** [4] - 27:25, 34:7, 45:4, 46:7
**fairness** [1] - 15:25
**faith** [3] - 25:24, 44:13, 44:23
**fall** [3] - 9:24, 21:19, 35:13
**falls** [1] - 16:12
**Falster** [27] - 35:24, 37:24, 38:4, 38:8, 38:24, 40:21, 41:24, 42:6, 43:8, 45:24, 46:21, 46:24, 47:16, 47:21, 47:23, 51:5, 52:7, 52:11, 53:5, 53:11, 54:4, 54:14, 55:3, 55:20, 56:22
**Falster's** [6] - 38:11, 39:1, 39:8, 50:16, 50:17, 50:21
**familiar** [1] - 8:20
**far** [4] - 10:9,

11:7, 17:9, 35:4
**fashion** [1] - 20:1
**feature** [1] - 36:17
**February** [1] - 1:12
**Fed** [1] - 35:11
**Federal** [2] - 44:17, 45:13
**felt** [1] - 3:10
**field** [7] - 8:3, 11:2, 11:6, 11:10, 17:22, 17:23, 33:15
**Fifth** [1] - 12:12
**figure** [2] - 34:6, 57:9
**filed** [2] - 18:9, 40:13
**filing** [1] - 10:13
**filling** [2] - 45:23, 45:25
**Finally** [1] - 43:10
**findings** [1] - 28:15
**fine** [3] - 17:6, 34:2, 34:21
**finish** [1] - 51:13
**finished** [2] - 8:14, 11:17
**first** [18] - 3:1, 4:20, 8:19, 13:11, 20:3, 20:22, 25:20, 27:23, 36:23, 37:11, 37:13, 42:9, 46:3, 48:1, 48:2, 49:10, 50:10, 52:14
**First** [5] - 9:21, 16:14, 18:11, 25:22, 45:20
**five** [1] - 40:24
**flag** [1] - 10:13
**focus** [2] - 26:7, 26:10
**folks** [2] - 7:22, 38:7
**follow** [1] - 49:14
**followup** [1] - 4:3
**FOR** [1] - 1:2
**forgotten** [1] - 27:12
**form** [1] - 30:6
**formal** [1] - 28:3
**formed** [1] - 28:20

forth [3] - 43:7, 56:16, 56:25
forward [3] - 6:4, 9:9, 34:19
Foster [1] - 57:6
four [1] - 56:1
Frankly [1] - 50:21
frankly [2] - 6:3, 48:12
free [2] - 10:15, 29:3
French [1] - 19:10
frequently [2] - 17:20, 17:21
frustration [1] - 44:12
full [5] - 26:3, 41:23, 42:5, 43:24, 54:15
fully [1] - 54:21
function [1] - 13:22
fundamental [2] - 15:25, 39:16
future [1] - 3:14

**G**

GAFF [4] - 1:19, 4:18, 4:21, 8:17
Gaff [5] - 2:17, 4:1, 5:21, 8:15, 8:17
game [3] - 27:25, 29:3, 57:7
generally [1] - 35:13
generated [3] - 21:16, 22:25, 29:7
given [10] - 19:8, 23:12, 24:14, 27:8, 38:12, 39:23, 40:1, 41:3, 41:6, 49:5
glue [1] - 27:8
GOFF [1] - 5:6
good-faith [1] - 25:24
great [1] - 36:9
guess [6] - 11:8, 26:15, 35:6, 36:7, 41:18, 55:19
guidance [1] - 34:19
guys [1] - 57:16

**H**

half [3] - 19:21, 46:15, 46:16
hand [3] - 30:25, 56:10, 56:12
handed [1] - 44:11
handle [1] - 3:13
happy [1] - 24:15
hard [2] - 33:7, 51:24
hear [3] - 9:17, 20:15, 44:14
heard [1] - 17:9
hearsay [2] - 44:3, 50:25
heart [1] - 7:12
heightens [1] - 27:15
Hejlek [22] - 35:24, 38:3, 39:1, 39:9, 39:12, 40:14, 40:22, 43:11, 43:18, 46:20, 47:20, 47:23, 49:13, 49:15, 50:6, 50:7, 50:20, 52:10, 53:3, 53:23, 54:3, 54:18
Hejlek's [5] - 43:20, 50:1, 51:4, 51:11, 51:14
held [1] - 29:8
Heljek [1] - 49:10
help [6] - 5:12, 25:14, 25:17, 31:15, 34:4, 48:16
helpful [2] - 10:3, 36:2
helps [2] - 39:19, 48:15
hesitantly [1] - 13:17
Hewlett [11] - 6:9, 12:8, 12:10, 12:15, 12:17, 13:4, 13:21, 14:22, 15:4, 15:18, 16:8
Hewlett-Packard [11] - 6:9, 12:8, 12:10, 12:15, 12:17, 13:4, 13:21, 14:22, 15:4, 15:18, 16:8
hide [1] - 24:19
highlighted [1] - 5:20
Hilton [1] - 5:16
himself [1] - 13:6
history [1] - 8:25
hold [1] - 4:15
holds [2] - 27:9, 27:11
Honor [30] - 2:13, 2:15, 2:22, 3:21, 4:18, 8:17, 9:16, 9:19, 11:19, 11:22, 18:17, 20:23, 22:12, 22:22, 23:2, 28:18, 29:11, 29:18, 30:22, 33:5, 43:12, 44:6, 45:15, 49:7, 52:25, 53:22, 54:23, 57:9, 58:3, 58:20
HONORABLE [1] - 1:15
host [1] - 57:17
hours [1] - 5:24
huge [1] - 40:17
hundreds [1] - 5:24
Hutz [1] - 2:2

**I**

idea [7] - 33:2, 40:19, 42:4, 45:21, 45:25, 54:1, 54:16
identified [6] - 9:25, 10:4, 10:6, 10:7, 10:11, 15:14
identify [1] - 10:23
identifying [1] - 10:5
ignorant [1] - 18:22
ignored [1] - 13:13
IL [1] - 1:22
imagination [1] - 33:15
imagine [1] - 34:9
importance [1] - 27:15
important [1] -

17:23
importantly [1] - 26:25
impose [1] - 13:16
impossible [2] - 57:23, 58:18
impressions [2] - 12:22, 25:10
IN [2] - 1:1, 1:2
inadvertent [3] - 48:21, 48:23, 49:2
inadvertently [1] - 44:21
inappropriate [1] - 14:13
INC [2] - 1:5, 1:8
included [1] - 12:22
includes [1] - 14:3
indefinite [1] - 10:21
independent [1] - 30:13
indicate [1] - 46:9
indicated [3] - 9:3, 11:23, 27:13
indicating [1] - 32:19
indigestion [1] - 51:23
individuals [1] - 28:6
inequitable [1] - 54:7
inextricably [1] - 36:22
inference [3] - 19:18, 27:5, 31:16
info [2] - 41:19, 42:3
informal [1] - 9:24
information [35] - 9:8, 11:9, 12:16, 12:19, 13:24, 14:5, 15:8, 15:13, 15:20, 16:13, 16:18, 17:7, 17:11, 17:25, 22:9, 22:10, 24:20, 24:21, 26:6, 28:8, 28:9, 29:1, 29:11, 31:19, 32:8, 32:23, 33:8,

33:11, 35:5, 35:8, 39:22, 47:11, 47:24, 53:11
infringe [5] - 19:13, 20:9, 24:1, 24:4, 24:24
infringed [4] - 19:15, 21:5, 31:16, 33:8
infringement [9] - 12:25, 19:9, 19:20, 22:6, 22:11, 22:17, 23:10, 28:21, 32:23
infringes [1] - 21:4
initial [7] - 4:1, 4:22, 6:2, 8:18, 9:24, 16:19, 52:8
inquire [2] - 47:24, 50:12
inquired [1] - 8:19
insisted [1] - 46:3
instructed [1] - 54:17
instructive [1] - 12:9
insufficient [1] - 16:16
insulator [1] - 36:25
INSULATOR [1] - 1:4
integrity [1] - 13:15
interactions [1] - 6:16
interest [4] - 8:20, 9:4, 9:12, 16:23
intermediate [1] - 26:10
interposed [2] - 47:12, 47:19
interpret [2] - 26:21, 28:12
interpretation [1] - 19:6
interrogatories [11] - 7:15, 27:4, 29:1, 30:14, 30:18, 32:17, 38:19, 38:25, 39:3, 39:12, 44:7
Interrogatory [5] - 10:12, 47:1, 47:2, 56:16,

56:25
interrogatory [19] - 7:11, 19:12, 21:13, 23:13, 23:14, 26:9, 30:11, 30:21, 31:11, 38:10, 39:14, 40:4, 43:5, 45:10, 46:17, 46:18, 47:6, 47:22, 49:21
intrinsic [1] - 10:16
invented [1] - 36:25
invention [54] - 18:14, 35:3, 35:9, 35:12, 35:18, 35:22, 36:11, 36:13, 36:16, 38:1, 38:21, 38:22, 39:5, 39:24, 40:16, 41:3, 41:12, 41:22, 42:1, 42:10, 42:11, 42:20, 42:21, 42:22, 42:24, 42:25, 44:17, 44:18, 45:6, 45:20, 45:22, 46:8, 46:19, 46:25, 48:8, 48:10, 51:18, 52:8, 53:21, 54:2, 55:8, 55:15, 55:21, 55:24, 55:25, 56:4, 56:5, 56:7, 56:15, 56:24, 57:13
inventions [1] - 12:24
inventor [10] - 37:24, 37:25, 38:2, 38:5, 40:2, 41:7, 41:24, 43:8, 45:21, 51:1
inventorship [2] - 43:17, 53:6
investigation [2] - 23:11, 29:20
involved [2] - 8:21, 44:10
involves [1] - 45:22
iota [1] - 34:4
issue [23] - 3:20, 12:12, 18:14, 20:24, 21:4, 21:7, 22:6, 22:7, 25:18,

32:6, 34:25, 35:3, 35:19, 38:1, 38:3, 40:17, 41:24, 42:7, 43:17, 43:18, 43:21, 45:7, 51:17

**issued** [6] - 37:23, 43:15, 44:2, 50:2, 53:7, 54:19

**issues** [5] - 8:4, 15:25, 17:24, 18:16, 58:9

**Italy** [1] - 5:16

## J

**JOSEPH** [1] - 1:18

**Joseph** [1] - 2:15

**JR** [1] - 2:3

**Judge** [5] - 2:9, 3:9, 3:12, 51:25, 58:15

**judges** [1] - 26:22

**judgment** [1] - 44:9

**judicial** [1] - 14:19

**juries** [1] - 26:22

**justified** [1] - 27:2

**justify** [1] - 22:20

## K

**Kevin** [2] - 3:7, 58:24

**kind** [5] - 6:11, 21:17, 27:14, 43:23, 48:13

**kinds** [1] - 31:20

**knowledge** [1] - 10:3

**knows** [2] - 3:8, 7:19

**Koch** [9] - 6:7, 6:10, 6:16, 6:21, 12:8, 12:11, 14:25, 15:4, 16:7

## L

**lab** [1] - 30:2

**lack** [1] - 17:2

**large** [1] - 37:4

**last** [2] - 40:22, 40:23

**launched** [1] - 8:24

**law** [5] - 10:23, 39:17, 45:8, 45:13, 48:23

**lawsuit** [2] - 10:9, 23:16

**lawyers** [2] - 26:22, 52:7

**learn** [1] - 25:18

**least** [4] - 6:23, 7:16, 20:9, 49:1

**left** [2] - 51:17, 58:11

**legal** [4] - 31:21, 31:22, 31:24, 50:1

**legitimate** [1] - 8:7

**letting** [1] - 33:24

**level** [1] - 17:8

**lifted** [1] - 37:6

**light** [3] - 3:10, 17:11, 46:14

**limitations** [1] - 12:23

**limited** [3] - 11:1, 11:3, 17:15

**line** [6] - 2:12, 2:20, 10:17, 49:24, 50:2, 58:19

**lines** [3] - 4:25, 57:10, 57:22

**Lines** [1] - 5:4

**literally** [1] - 55:19

**litigation** [14] - 12:4, 13:22, 13:23, 14:6, 15:17, 17:20, 17:21, 17:24, 21:1, 22:14, 41:15, 42:14, 44:20, 44:21

**LLP** [4] - 1:18, 1:20, 1:22, 2:2

**locked** [1] - 17:17

**Lodge** [1] - 2:2

**look** [14] - 5:11, 13:25, 14:23, 23:3, 23:16, 23:23, 25:8, 33:2, 33:9, 33:10, 33:17, 50:11, 53:7, 55:1

**looked** [4] - 12:6, 32:11,

33:10, 55:19

**looking** [5] - 12:13, 13:14, 38:15, 50:20, 50:24

**loss** [2] - 43:23, 44:3

**Louis** [1] - 2:5

## M

**MA** [1] - 1:20

**mail** [4] - 4:9, 4:23, 4:24, 5:7

**mails** [1] - 4:22

**maintained** [1] - 14:10

**MARC** [1] - 2:4

**Marc** [2] - 2:24, 27:13

**Mark** [1] - 9:19

**marketplace** [1] - 43:16

**MARY** [1] - 1:15

**material** [4] - 7:2, 37:2, 55:23, 56:14

**MATERIALS** [1] - 1:8

**matter** [22] - 5:24, 6:5, 6:9, 7:8, 8:3, 9:3, 12:8, 14:18, 36:19, 36:21, 36:22, 37:10, 37:11, 37:12, 37:13, 42:15, 45:2, 45:3, 52:3, 52:16, 57:18

**matters** [2] - 3:12, 3:16

**Maurer** [3] - 3:7, 8:12, 58:24

**mealed** [1] - 53:14

**mean** [7] - 17:7, 18:20, 26:25, 54:21, 54:23, 56:9, 56:10

**means** [3] - 17:17, 32:24, 34:6

**measure** [1] - 13:16

**meet** [1] - 16:17

**meeting** [15] - 6:22, 38:9, 38:13, 48:8, 49:17, 50:7, 50:9, 53:5, 53:25, 54:11, 55:2, 55:4,

55:5, 55:8, 55:9

**meetings** [1] - 39:6

**MEMC** [22] - 1:8, 2:23, 4:7, 7:17, 7:25, 9:5, 9:20, 11:8, 11:9, 11:18, 17:16, 17:17, 18:21, 19:9, 20:22, 27:2, 28:12, 30:1, 36:3, 36:7, 36:11, 42:9

**MEMC's** [7] - 5:13, 9:17, 19:8, 21:18, 22:25, 41:17, 47:1

**merely** [1] - 50:13

**met** [2] - 16:6, 46:11

**methodologies** [1] - 31:20

**methodology** [4] - 21:16, 27:18, 32:4, 34:13

**Michael** [5] - 2:13, 2:17, 8:14, 18:19, 23:25

**MICHAEL** [1] - 1:21

**might** [3] - 16:3, 17:23, 40:5

**Mike** [3] - 4:12, 25:14, 28:25

**mind** [5] - 4:13, 12:19, 16:17, 24:25, 45:21

**MO** [1] - 2:5

**months** [1] - 3:25

**morning** [2] - 2:9, 2:10

**most** [2] - 30:2, 51:22

**motion** [5] - 3:18, 18:6, 18:9, 18:11, 35:16

**motions** [1] - 3:3

**moved** [1] - 56:10

**moving** [2] - 16:1, 56:12

**MR** [58] - 2:13, 2:15, 3:21, 3:24, 4:15, 4:18, 4:21, 5:6, 5:21, 6:10, 8:15, 8:17, 9:16, 9:19, 11:11, 11:19, 11:22, 18:17, 19:2, 19:4,

19:12, 20:2, 20:7, 20:14, 20:18, 20:23, 21:8, 21:11, 21:22, 22:12, 22:22, 23:2, 23:20, 24:14, 24:19, 25:3, 25:17, 25:22, 26:13, 28:19, 29:4, 29:18, 32:1, 35:15, 35:17, 40:10, 41:18, 44:6, 45:15, 45:19, 49:7, 49:9, 50:10, 51:24, 52:25, 53:2, 53:22, 54:10

**MS** [1] - 2:22

**Mulsamuel** [3] - 29:23, 31:12, 31:17

## N

**name** [1] - 3:6

**namely** [1] - 7:3

**names** [2] - 3:1, 12:25

**narrow** [1] - 21:20

**narrowly** [1] - 21:12

**near** [2] - 26:19, 57:23

**necessarily** [1] - 12:20, 16:17, 17:7, 18:3, 22:24

**necessary** [1] - 45:24

**need** [5] - 8:4, 24:20, 30:25, 31:13, 54:24

**needed** [2] - 12:24, 31:15

**Neuner** [1] - 4:4

**never** [3] - 9:2, 10:11, 54:3

**new** [1] - 42:21

**next** [2] - 23:6, 34:25

**nice** [1] - 57:21

**noise** [1] - 43:16

**nonetheless** [1] - 44:22

**nontestifying** [1] - 30:7

**Northern** [1] - 12:11

**note** [5] - 11:4,

19:12, 20:2, 20:7, 20:14, 20:18, 20:23, 21:8, 21:11, 21:22, 22:12, 22:22, 23:2, 23:20, 24:14, 24:19, 25:3, 25:17, 25:22, 26:13, 28:19, 29:4, 29:18, 32:1, 35:15, 35:17, 40:10, 41:18, 44:6, 45:15, 45:19, 49:7, 49:9, 50:10, 51:24, 52:25, 53:22, 54:10

**MS** [1] - 2:22

**Mulsamuel** [3] - 29:23, 31:12, 31:17

**12:10, 12:14, 12:17, 17:19**

**nothing** [3] - 7:10, 10:7, 56:13

**notice** [1] - 42:23

**noting** [1] - 13:21

**notwithstandin g** [1] - 37:15

**novel** [1] - 36:17

**number** [9] - 3:25, 7:24, 10:17, 11:1, 11:3, 14:21, 23:3

**numbers** [1] - 21:15

**numerous** [1] - 12:7

## O

**object** [1] - 44:7

**objection** [2] - 47:12, 47:19

**objectively** [1] - 14:9

**obligation** [1] - 31:2

**obviously** [3] - 32:3, 34:22, 55:22

**occur** [1] - 16:3

**occurred** [5] - 12:20, 22:18, 42:13, 43:21, 44:1

**October** [5] - 50:7, 53:5, 53:24, 54:11, 55:3

**odds** [1] - 35:9

**OF** [1] - 1:2

**office** [3] - 2:16, 2:18, 55:3

**ON** [1] - 1:4

**Once** [1] - 28:1

**once** [4] - 28:2, 39:21, 48:19, 51:15

**one** [28] - 5:7, 5:11, 6:13, 6:15, 6:22, 7:23, 11:11, 11:12, 12:10, 21:20, 30:25, 33:13, 34:4, 36:12, 36:15, 42:8, 42:24, 44:6, 44:19, 45:6, 46:13, 51:22, 52:18, 54:13,

56:2, 57:8, 58:11
**One** [6] - 3:6,
6:11, 13:13,
35:21, 36:3, 52:8
**ones** [3] - 24:7,
48:20, 51:24
**ongoing** [1] -
23:16
**opinion** [1] -
32:12
**opinions** [4] -
12:14, 13:24,
21:18, 22:24
**opportunity** [3] -
41:23, 42:6,
54:15
**opposing** [1] -
16:1
**oppositely** [1] -
14:24
**oral** [1] - 52:20
**order** [4] - 3:18,
27:10, 45:23
**ought** [1] - 27:21
**outcome** [1] -
43:3
**outlined** [1] -
12:14, 16:7
**outside** [1] -
21:19
**overlooked** [1] -
55:6
**owe** [1] - 31:3
**own** [5] - 19:24,
23:23, 24:8,
31:21, 46:14

**P**

**p.m** [1] - 58:22
**Packard** [11] -
6:9, 12:8, 12:10,
12:15, 12:17,
13:4, 13:21,
14:22, 15:4,
15:18, 16:8
**page** [6] - 4:17,
4:20, 4:22, 5:3,
5:8, 5:9
**Page** [5] - 4:19,
46:22, 53:7, 54:5,
55:1
**pages** [1] -
49:13
**Pages** [2] -
49:22, 49:23
**Palmer** [3] -
1:18, 1:20, 2:16
**Paragraph** [1] -
10:14

**parse** [2] -
57:14, 58:17
**parsing** [2] -
32:25, 33:12
**part** [12] - 8:20,
9:11, 15:17, 17:3,
27:4, 32:11,
39:18, 41:17,
45:6, 46:3, 46:5,
49:14
**particular** [6] -
4:25, 7:3, 15:14,
21:7, 37:2, 45:23
**particularly** [2] -
17:23, 37:3
**parties** [5] -
8:21, 9:1, 14:23,
17:20, 58:10
**parties'** [1] -
14:21
**party** [7] - 13:11,
14:14, 15:21,
15:23, 16:1, 51:1
**passage** [1] -
5:22
**passing** [1] -
3:12
**past** [2] - 8:22,
28:1
**Pat** [1] - 2:22
**PAT** [1] - 1:15
**patent** [46] - 4:9,
4:10, 4:14, 4:23,
5:1, 5:12, 10:5,
10:7, 12:23,
16:11, 16:14,
17:20, 19:8, 36:4,
36:5, 36:8, 36:22,
37:6, 37:10,
37:11, 37:23,
37:24, 38:7,
41:22, 42:10,
42:12, 42:14,
42:20, 43:10,
43:15, 44:2,
44:25, 45:2, 45:4,
45:5, 50:2, 52:12,
52:13, 53:6, 54:5,
54:19, 57:20,
57:25
**Patent** [1] - 7:14
**patentable** [1] -
36:18
**Patents** [1] -
42:17
**patents** [9] - 7:3,
36:3, 38:9, 42:16,
42:25, 43:1, 45:1,
52:9, 52:10
**patience** [2] -

58:15, 58:16
**PATRICIA** [1] -
2:2
**Pause** [1] - 8:11
**peanut** [16] -
36:4, 36:5, 36:8,
36:9, 36:12,
36:25, 37:7,
38:16, 39:24,
40:3, 40:4, 41:5,
52:9, 52:11,
52:13
**people** [4] -
7:24, 30:2, 30:17,
40:18
**per** [1] - 44:17
**percent** [1] -
37:5
**percentage** [1] -
37:5
**perfect** [1] -
42:12
**perfectly** [1] -
27:19
**perform** [2] -
7:6, 13:21
**performed** [1] -
19:9
**permissible** [1] -
30:18
**person** [2] -
29:23, 31:19
**perspective** [3] -
23:21, 31:19,
48:13
**phone** [2] - 9:23,
34:23
**phonetic** [1] -
29:23
**phrase** [3] -
10:15, 10:18,
11:24
**picks** [1] - 7:21
**piece** [3] - 18:3,
48:8, 53:14
**piece-mealed**
[1] - 53:14
**place** [3] - 38:6,
40:12, 46:22
**Plaintiff** [2] -
1:10, 2:6
**Plaintiffs** [2] -
1:6, 1:23
**plaintiffs'** [1] -
9:15
**pleading** [1] -
28:3
**point** [27] - 4:12,
10:16, 10:22,
11:1, 12:3, 15:21,

21:7, 21:11, 23:8,
23:9, 23:10, 28:2,
31:7, 32:7, 37:22,
39:6, 40:14, 42:9,
43:17, 44:6, 49:9,
49:24, 53:2,
53:22, 54:10,
54:13
**pointed** [10] -
5:22, 13:20,
14:22, 14:24,
14:25, 16:21,
17:4, 35:11,
43:12, 49:14
**pointing** [1] -
16:15
**points** [3] - 11:3,
34:12, 42:7
**polar** [1] - 6:11
**popping** [1] -
8:9
**portion** [1] -
37:4
**portions** [3] -
7:3, 32:25, 33:3
**position** [5] -
5:13, 6:18, 10:10,
10:20, 27:21
**possession** [1] -
19:25
**potential** [4] -
13:1, 17:6, 17:7,
32:18
**power** [1] -
13:14
**Powers** [2] - 2:4,
2:24
**practically** [1] -
32:10
**practice** [2] -
9:6, 54:9
**precisely** [3] -
26:20, 27:5, 29:6
**predict** [1] - 3:14
**predominantly**
[1] - 12:6
**prefer** [3] - 8:8,
12:2, 20:15
**prefiling** [3] -
22:17, 22:19,
23:11
**pregnant** [1] -
39:17
**prejudice** [3] -
10:24, 15:22,
16:3
**prejudiced** [2] -
43:24, 44:14
**preliminary** [4] -
4:10, 4:14, 6:19,

7:7
**prepare** [1] -
26:21
**prepared** [3] -
25:6, 41:12,
41:14
**present** [1] -
11:21
**preserve** [1] -
37:17
**presumably** [5] -
8:4, 31:14, 31:18,
39:13, 48:22
**presumption** [1]
- 15:20
**pretending** [1] -
5:23
**pretty** [4] - 3:24,
37:19, 39:16,
45:8
**prima** [1] - 35:18
**priority** [2] -
45:1, 45:3
**privilege** [18] -
13:20, 15:12,
15:16, 26:14,
35:14, 37:15,
37:17, 41:2,
42:10, 43:1, 43:6,
43:9, 44:9, 46:2,
46:4, 55:18,
55:22, 57:7
**privileged** [12] -
35:18, 39:7,
39:22, 39:25,
41:4, 44:1, 44:18,
44:24, 45:9,
45:11, 48:1, 51:7
**probe** [1] - 43:25
**problem** [4] -
7:20, 53:9, 53:15,
57:11
**problematic** [1]
- 32:15
**problems** [1] -
34:23
**process** [3] -
13:15, 16:20,
44:8
**produce** [6] -
18:21, 21:15,
22:13, 23:6,
33:13, 57:12
**produced** [8] -
20:8, 33:25,
36:11, 36:14,
44:20, 44:21,
44:22, 57:20
**producing** [3] -
22:4, 36:16,

42:11
**product** [14] -
15:15, 20:13,
20:17, 20:21,
21:2, 21:12, 22:8,
23:18, 25:5,
25:11, 25:15,
26:13, 29:7,
30:20
**production** [3] -
21:23, 22:3,
42:13
**productive** [1] -
20:19
**proof** [1] - 31:8
**proposed** [1] -
7:1
**prosecution** [2]
- 43:22, 54:4
**prosecutions**
[1] - 43:14
**protect** [2] -
13:14, 57:17
**protected** [2] -
22:7, 29:11
**protective** [1] -
3:18
**protocols** [6] -
24:13, 24:16,
25:20, 25:23,
29:19, 29:21
**prove** [2] -
12:24, 22:10
**provide** [5] - 6:4,
35:6, 38:15,
43:18, 44:13
**provided** [3] -
26:10, 35:8, 58:1
**provisions** [1] -
26:18
**public** [3] - 11:8,
11:9, 43:15
**pull** [1] - 18:10
**purports** [1] -
19:20
**purposes** [2] -
32:13, 45:17
**pursue** [1] -
35:23
**put** [9] - 20:25,
21:3, 21:4, 21:7,
22:5, 32:16,
34:16, 35:22,
45:10
**putting** [2] -
36:5, 36:13

**Q**

**qualifications**

[3] - 7:23, 11:4, 12:25
**qualified** [2] - 16:22, 17:1
**qualify** [1] - 16:25
**questions** [19] - 16:20, 23:3, 23:4, 23:16, 25:1, 25:6, 25:11, 26:5, 27:23, 28:11, 28:13, 30:5, 30:6, 30:8, 32:21, 35:23, 50:13, 51:16, 56:1
**quick** [1] - 5:11
**quite** [1] - 43:8
**quoted** [2] - 4:5, 7:1

**R**

**raise** [1] - 42:9
**raised** [1] - 54:13
**ran** [1] - 30:1
**rarely** [1] - 13:17
**rate** [2] - 4:5, 7:1
**rather** [2] - 3:12, 54:1
**raw** [18] - 18:21, 18:24, 21:15, 21:23, 22:4, 22:23, 23:12, 23:23, 24:7, 24:12, 24:17, 25:7, 25:8, 28:23, 29:21, 32:2, 34:3, 34:13
**reach** [3] - 23:23, 25:8, 28:8
**reached** [2] - 20:10, 32:22
**reaching** [1] - 27:3
**read** [9] - 4:10, 4:14, 5:18, 6:8, 6:9, 11:7, 16:12, 22:2, 49:21
**readily** [1] - 15:14
**reading** [2] - 10:21, 22:1
**real** [4] - 8:6, 26:7, 26:10, 34:5
**reality** [2] - 6:10, 41:3
**realize** [1] - 7:22
**Really** [1] - 35:20

**really** [8] - 12:2, 15:7, 18:19, 27:25, 35:4, 42:3, 48:21, 50:4
**reason** [5] - 11:13, 26:20, 46:6, 52:2, 57:12
**reasonable** [3] - 14:9, 14:16, 26:23
**reasonablenes** s [1] - 14:20
**reassigned** [1] - 3:10
**rebuttal** [1] - 11:20
**received** [2] - 42:18, 42:21
**recent** [1] - 8:22
**recognize** [3] - 17:14, 32:16, 35:12
**recognized** [1] - 15:4
**recognizes** [1] - 32:8
**Recognizing** [1] - 16:9
**recollection** [4] - 7:12, 47:9, 51:14, 55:24
**recourse** [1] - 8:1
**reduction** [1] - 54:9
**reestablish** [1] - 49:3
**refer** [1] - 3:2
**reference** [2] - 7:3, 10:18
**referenced** [1] - 10:17
**Refining** [3] - 6:7, 12:8, 12:11
**regard** [1] - 17:21
**regarding** [3] - 3:3, 9:2, 38:24
**related** [8] - 35:10, 42:16, 42:25, 43:1, 43:20, 44:25, 45:12, 57:18
**relates** [1] - 5:15
**relating** [8] - 18:13, 35:2, 42:11, 49:17, 50:1, 50:7, 53:11, 54:16
**relationship** [14]

- 6:13, 8:21, 9:5, 9:24, 12:17, 14:2, 14:4, 14:11, 14:17, 15:6, 17:2, 25:24, 41:9
**relevant** [1] - 14:5
**relied** [2] - 21:16, 22:23
**rely** [3] - 22:24, 49:10, 49:12
**relying** [4] - 5:19, 22:17, 28:2, 57:19
**remaining** [1] - 18:15
**remains** [1] - 31:7
**remedy** [1] - 14:19
**remember** [2] - 32:18, 49:22
**remembered** [1] - 13:8
**remembers** [1] - 13:7
**reminders** [1] - 3:6
**removes** [1] - 18:4
**report** [26] - 18:25, 19:17, 19:21, 19:22, 22:25, 23:5, 26:9, 26:15, 26:21, 27:15, 29:5, 29:24, 30:4, 30:5, 30:7, 31:12, 31:15, 32:25, 33:1, 33:3, 33:17, 34:1, 34:14, 34:22
**Reporter** [1] - 58:24
**reporter** [1] - 3:7
**reports** [3] - 19:5, 22:16, 26:1
**representation** [2] - 8:24, 9:11
**represented** [1] - 53:13
**request** [4] - 8:10, 18:13, 20:25, 23:1
**requested** [3] - 7:6, 7:14, 21:6
**requesting** [1] - 35:1
**required** [2] - 15:21, 15:24

**requires** [2] - 19:6
**respect** [16] - 7:12, 23:7, 36:18, 37:16, 37:17, 41:2, 43:6, 46:7, 46:17, 50:10, 50:14, 50:15, 52:18, 52:19, 52:20, 52:21
**respectful** [1] - 44:8
**respond** [4] - 2:10, 45:15, 49:7, 52:25
**responding** [1] - 28:25
**response** [9] - 5:9, 6:2, 25:4, 25:16, 32:18, 40:11, 43:5, 49:21, 56:25
**Response** [1] - 47:1
**responses** [2] - 21:14, 25:11
**rest** [8] - 39:20, 39:23, 41:15, 48:10, 49:6, 53:18, 57:16
**rests** [1] - 19:16
**result** [1] - 7:17
**results** [1] - 31:11
**retain** [4] - 7:1, 11:10, 17:18, 17:22
**retained** [6] - 6:25, 8:2, 11:5, 11:12, 11:16, 17:16
**revealed** [2] - 10:25, 15:22
**review** [2] - 33:19, 58:12
**rises** [1] - 17:8
**road** [1] - 39:21
**ROBERT** [1] - 2:3
**ROGOWSKI** [2] - 2:2, 2:22
**Rogowski** [1] - 2:23
**role** [1] - 46:10
**Rozgonyi** [18] - 3:25, 4:3, 4:5, 4:23, 5:7, 5:23, 6:17, 6:25, 8:1, 8:8, 8:18, 9:3, 9:23, 11:5, 11:13,

11:25, 17:10, 18:6
**Rozgonyi's** [2] - 5:9, 7:9
**rule** [1] - 39:16
**Rule** [5] - 22:21, 24:9, 26:18, 30:5, 32:8
**run** [4] - 20:24, 21:5, 21:6, 33:13

**S**

**S.A** [1] - 1:4
**S.O.I** [1] - 1:4
**sandwich** [11] - 36:6, 36:8, 36:14, 37:9, 37:17, 38:12, 38:14, 45:22, 46:1, 52:11, 52:13
**sandwiches** [1] - 37:1
**satisfy** [1] - 31:1
**save** [1] - 51:24
**saw** [1] - 40:10
**scope** [5] - 15:15, 21:12, 21:17, 21:19, 41:8
**screening** [2] - 9:24, 16:19
**second** [12] - 5:6, 27:24, 36:19, 36:21, 37:10, 37:12, 46:5, 47:25, 48:3, 52:10, 52:16
**Second** [1] - 46:17
**secondly** [1] - 49:12
**section** [2] - 10:7, 53:18
**Section** [1] - 7:13
**sections** [1] - 5:19
**see** [12] - 5:4, 8:9, 23:6, 23:19, 25:18, 33:14, 33:18, 33:20, 40:5, 40:11, 48:6, 48:9
**seeking** [2] - 14:14, 42:3
**seem** [6] - 12:6, 17:20, 20:12, 23:17, 35:9, 40:8
**seized** [3] -

19:10, 19:14, 20:9
**self** [1] - 31:13
**self-evident** [1] - 31:13
**send** [2] - 33:25, 34:5
**Senniger** [2] - 2:4, 2:24
**sense** [1] - 22:3
**sent** [3] - 4:8, 5:7, 30:6
**separate** [2] - 36:13, 42:13
**separately** [1] - 40:21
**series** [8] - 4:21, 5:25, 6:16, 18:7, 28:14, 56:1
**service** [1] - 7:6
**set** [3] - 43:6, 56:15, 56:24
**sets** [2] - 6:11, 36:3
**several** [1] - 11:5
**share** [4] - 7:17, 12:2, 47:18, 55:21
**shared** [3] - 5:25, 12:1, 47:17
**sharing** [1] - 39:21
**shocked** [1] - 25:18
**Show** [1] - 34:2
**show** [2] - 20:22, 21:5
**showed** [1] - 24:3
**showing** [1] - 21:2
**shows** [2] - 4:13, 27:1
**side** [3] - 8:9, 9:25, 31:10
**sides** [2] - 7:21, 12:7
**signed** [2] - 15:2, 15:6
**significance** [1] - 15:14
**significant** [2] - 14:11, 40:9
**silicate** [1] - 42:12
**SILICON** [1] - 1:4
**silicon** [2] - 35:21, 36:25,

52:9
simply [4] - 10:6, 26:17, 31:11, 37:6
situation [4] - 6:22, 19:19, 42:19, 50:1
situations [1] - 49:16
skill [1] - 31:20
Sleet [1] - 3:12
Sleet's [1] - 3:9
slippery [2] - 43:3, 48:19
slope [3] - 43:3, 44:16, 48:20
SMINK [1] - 2:2
snippet [1] - 5:6
SOITEC [1] - 1:5
Soitec [27] - 2:12, 9:23, 11:4, 11:21, 16:6, 18:1, 18:11, 21:1, 21:4, 21:5, 22:13, 32:7, 32:24, 38:2, 38:5, 38:13, 40:23, 42:17, 42:23, 43:15, 46:12, 48:8, 53:5, 53:8, 53:25, 54:5
Soitec's [9] - 3:20, 11:7, 18:16, 21:15, 22:5, 32:16, 38:7, 46:10, 55:3
sole [1] - 19:8
solely [1] - 17:17
someplace [1] - 58:19
sometime [2] - 55:3, 56:17
sometimes [1] - 58:17
sorry [2] - 41:12, 55:6
Sort [1] - 21:10
sort [12] - 9:24, 19:5, 26:19, 30:23, 34:16, 35:18, 36:4, 36:17, 37:6, 44:11, 49:11, 56:10
sought [1] - 49:3
sounded [1] - 4:6
sources [2] - 13:23, 30:12
sources' [1] - 30:13

SPEAKER [17] - 5:14, 5:17, 28:17, 30:22, 33:4, 33:16, 33:23, 34:7, 34:10, 34:15, 51:19, 57:8, 58:2, 58:6, 58:13, 58:14, 58:20
speaking [3] - 3:6, 3:8, 8:7
special [2] - 37:16, 37:18
specialties [1] - 11:12
specific [5] - 7:2, 10:24, 12:23, 15:21, 23:16
specifics [1] - 35:7
spectrum [1] - 9:25
spend [1] - 5:24
spent [2] - 13:10, 38:16
spoken [2] - 24:2, 56:21
spread [2] - 37:16, 37:18
squarely [1] - 51:2
St [1] - 2:5
stage [1] - 57:7
standard [1] - 15:9
standards [2] - 12:13, 16:7
start [4] - 35:15, 39:21, 41:18, 48:19
started [2] - 22:20, 43:16
starts [2] - 44:9, 55:1
state [2] - 3:6, 10:15
statement [6] - 46:8, 50:19, 51:18, 52:5, 57:20, 57:24
STATES [1] - 1:1
stay [2] - 34:17
step [2] - 26:11, 28:1
still [4] - 16:25, 24:24, 25:18, 50:18
stone [1] - 40:6
stop [1] - 48:20
stops [1] - 44:10

story [6] - 38:11, 39:18, 39:22, 40:6, 46:15, 49:5
straightforwar d [1] - 3:24
strategy [1] - 15:16
Strawn [2] - 1:22, 2:17
street [1] - 7:23
stretch [1] - 33:15
strong [1] - 8:3
struggles [1] - 57:9
stuff [6] - 28:4, 39:19, 40:5, 48:15, 49:17
sub [1] - 17:23
sub-field [1] - 17:23
subject [18] - 6:20, 7:16, 9:3, 22:16, 36:18, 36:20, 36:22, 37:10, 37:11, 37:12, 42:15, 45:3, 52:3, 55:18, 55:22, 56:23, 57:18
subjects [1] - 38:9
submission [4] - 4:13, 10:18, 34:16, 54:2
submissions [2] - 17:13, 58:10
submit [1] - 33:5
submitted [3] - 53:8, 54:2, 54:6
subsequent [1] - 52:17
substance [4] - 7:7, 47:5, 47:14, 50:5
substantial [1] - 14:18
substantially [1] - 10:15
substantive [1] - 6:24
suddenly [4] - 17:16, 30:11, 44:13, 53:17
sufficient [3] - 6:2, 16:12, 26:16
sufficiently [1] - 14:18
suggesting [1] - 16:11

suggestion [1] - 7:9
suit [1] - 45:1
summaries [3] - 18:12, 18:19, 20:24
summarizing [1] - 18:25
supplied [1] - 7:2
suppliers [1] - 38:15
support [4] - 6:4, 24:10, 28:3, 28:25
supports [1] - 24:11
suppose [1] - 41:11
supposed [2] - 13:25, 56:11
surrounding [4] - 41:2, 41:21, 41:25, 42:5
switches [1] - 7:21

## T

talks [2] - 6:21, 36:9
tastes [1] - 36:10
TEC [1] - 1:4
technological [1] - 18:23
TECHNOLOGI ES [1] - 1:4
technology [1] - 18:25
Teleconferenc e [1] - 58:22
Telephone [1] - 1:13
terms [1] - 24:6
terribly [1] - 34:15
test [17] - 18:12, 18:18, 18:21, 18:24, 18:25, 21:14, 21:15, 21:16, 21:19, 22:23, 27:16, 31:5, 31:11, 34:3, 34:8, 34:13
tested [3] - 19:14, 24:13, 24:18
testified [6] - 38:3, 39:9, 39:12,

43:7, 54:3, 54:21
testify [6] - 32:9, 39:8, 47:21, 48:4, 51:8
testimony [18] - 18:13, 35:2, 35:10, 37:21, 38:23, 39:7, 39:13, 40:1, 41:6, 43:10, 43:20, 46:18, 48:11, 50:21, 50:25, 52:1, 52:2, 53:23
testing [13] - 19:9, 19:24, 21:18, 22:18, 22:19, 25:21, 25:23, 26:4, 26:8, 27:14, 29:25, 31:3, 31:20
tests [8] - 20:23, 21:4, 22:14, 28:14, 29:24, 29:25, 30:1, 31:5
thanking [1] - 5:8
THE [72] - 1:1, 1:2, 2:9, 2:11, 2:14, 2:19, 2:25, 3:23, 4:12, 4:16, 4:20, 5:2, 5:10, 5:15, 5:18, 6:8, 8:12, 9:14, 9:17, 11:7, 11:17, 11:20, 12:5, 18:18, 19:3, 19:7, 19:23, 20:5, 20:12, 20:15, 20:20, 21:3, 21:10, 21:21, 22:1, 22:19, 23:19, 24:12, 24:17, 24:22, 25:12, 25:20, 26:12, 28:5, 28:24, 29:17, 31:25, 32:2, 33:6, 33:19, 34:2, 34:9, 34:12, 34:21, 35:16, 40:8, 41:16, 45:14, 45:16, 49:8, 51:13, 51:21, 52:24, 53:1, 53:9, 54:7, 55:1, 57:11, 58:4, 58:7, 58:16, 58:21
themselves [1] - 27:17
theories [5] -

4:2, 4:10, 6:18, 10:9, 11:25
theory [1] - 7:19
therefore [3] - 14:12, 18:5, 43:2
Therefore [1] - 37:11
thereof [1] - 17:2
thinking [4] - 6:1, 7:5, 7:16, 40:22
third [2] - 52:12, 52:15
thornier [2] - 32:6, 35:3
thoughts [1] - 7:7
three [2] - 4:21, 52:6
throw [1] - 46:13
Thursday [1] - 1:12
Thynge [1] - 2:9
THYNGE [1] - 1:15
tied [1] - 36:22
timing [1] - 40:8
today [5] - 3:7, 9:23, 17:9, 17:12, 20:24
together [3] - 20:25, 27:9, 34:16
tons [1] - 48:23
took [6] - 5:11, 38:6, 39:7, 40:12, 46:21, 49:14
top [1] - 5:9
topics [1] - 12:22
towards [1] - 21:8
transcript [4] - 49:13, 50:11, 53:7, 54:5
transparent [2] - 26:22, 31:13
treat [1] - 9:8
trial [1] - 32:9
tried [1] - 51:24
true [4] - 6:25, 11:2, 11:12, 24:6
try [11] - 20:17, 32:18, 33:13, 33:20, 36:1, 44:8, 44:10, 44:11, 44:15, 58:18
trying [8] - 5:10, 18:20, 35:5, 41:20, 57:21,

58:16
**TUIG** [17] - 2:4, 9:19, 11:11, 11:19, 20:23, 21:8, 21:11, 22:12, 22:22, 29:18, 41:18, 49:7, 49:9, 52:25, 53:2, 53:22, 54:10
**Tuig** [6] - 2:24, 9:20, 11:23, 12:2, 25:25, 47:12
**turn** [1] - 44:14
**Turning** [1] - 43:4
**turning** [1] - 43:10
**two** [16] - 5:16, 6:11, 6:23, 12:6, 18:15, 20:2, 27:9, 27:19, 34:12, 35:9, 35:20, 36:3, 38:6, 45:19, 46:9, 58:10
**type** [12] - 3:17, 7:24, 12:24, 16:20, 24:25, 33:8, 33:11, 33:21, 37:2, 38:14, 38:15, 51:16
**types** [2] - 28:10, 28:13
**typically** [1] - 26:20

## U

**U.S.M.J** [1] - 1:15
**ultimately** [1] - 27:16
**unambiguous** [2] - 10:24, 15:22
**uncharacteristic** [1] - 26:2
**under** [15] - 4:16, 4:17, 7:13, 10:14, 10:21, 10:23, 14:12, 37:25, 38:19, 38:20, 40:16, 55:15, 55:20, 56:4, 57:7
**underlie** [1] - 29:19
**underlying** [7] - 19:22, 26:6, 26:16, 26:17, 31:1, 40:15,

50:15
**understood** [1] - 6:17
**undertaken** [1] - 14:8
**unduly** [2] - 16:1, 16:2
**unfairly** [2] - 43:24, 44:4
**unfairness** [4] - 49:12, 50:4, 52:23, 54:23
**UNIDENTIFIED** [17] - 5:14, 5:17, 28:17, 30:22, 33:4, 33:16, 33:23, 34:7, 34:10, 34:15, 51:19, 57:8, 58:2, 58:6, 58:13, 58:14, 58:20
**UNITED** [1] - 1:1
**unless** [2] - 24:18, 28:22
**unlike** [1] - 13:6
**unrelated** [1] - 45:2
**up** [16] - 7:19, 7:21, 8:9, 18:10, 19:5, 23:8, 23:9, 26:1, 36:22, 39:20, 40:20, 42:4, 43:13, 45:10, 54:1
**USA** [1] - 1:5
**uses** [2] - 29:1, 30:12

## V

**VANDER** [17] - 2:4, 9:19, 11:11, 11:19, 20:23, 21:8, 21:11, 22:12, 22:22, 29:18, 41:18, 49:7, 49:9, 52:25, 53:2, 53:22, 54:10
**Vander** [6] - 2:24, 9:19, 11:22, 12:2, 25:25, 47:12
**various** [2] - 22:24, 49:17
**verbatim** [1] - 37:6
**version** [1] - 51:11
**view** [3] - 6:19,

11:23, 20:7
**viewed** [1] - 27:17
**violated** [1] - 24:9
**volume** [1] - 34:8

## W

**wafer** [1] - 19:10
**wafers** [15] - 19:14, 19:25, 20:9, 22:13, 22:15, 24:1, 24:3, 24:4, 24:6, 24:24, 27:18, 31:4, 31:16, 32:4, 37:2
**waive** [3] - 52:18, 52:20, 53:18
**waived** [12] - 22:4, 23:8, 23:9, 26:14, 37:15, 41:1, 42:10, 43:2, 43:5, 46:2, 53:17
**waiver** [24] - 21:9, 21:12, 21:13, 21:20, 21:24, 22:3, 30:15, 35:19, 36:18, 37:19, 37:20, 39:16, 40:1, 41:10, 42:7, 43:9, 48:24, 49:3, 50:14, 52:3, 52:14, 52:15, 53:16, 53:21
**waivers** [2] - 41:10, 41:14
**waiving** [1] - 53:16
**walk** [1] - 44:15
**wall** [1] - 40:6
**warranted** [2] - 14:1, 15:1
**water** [1] - 27:11
**ways** [1] - 51:3
**weak** [1] - 5:12
**week** [2] - 40:22, 40:24
**weeks** [1] - 5:16
**well-established** [1] - 48:25
**whole** [1] - 57:17
**willing** [3] - 24:7, 33:2, 39:18
**Wilmington** [2] -

1:12, 2:16
**window** [1] - 28:4
**Winston** [2] - 1:22, 2:17
**wish** [1] - 58:11
**wishes** [2] - 9:15, 11:21
**withholding** [1] - 48:15
**witness** [4] - 3:19, 9:7, 44:3, 49:11
**witnesses** [5] - 11:6, 13:1, 13:14, 28:7, 45:10
**wonder** [1] - 28:5
**wonderful** [1] - 36:10
**word** [1] - 15:11
**works** [1] - 30:16
**worthless** [1] - 24:17
**write** [1] - 19:5
**written** [9] - 17:12, 18:24, 23:21, 25:4, 52:5, 52:12, 52:21, 55:23, 56:14
**wrote** [2] - 29:23, 30:4

## Y

**year** [1] - 40:24
**years** [3] - 38:6, 40:24, 46:9
**yourself** [1] - 31:6