# Exhibit 1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

S.O.I. TEC SILICON ON INSULATOR            :         Civil Action
TECHNOLOGIES S.A. and                      :
SOITEC USA, INC.,                          :
                                           :
            Plaintiffs and                 :
            Counterclaim Defendants,       :
                                           :
      v.                                   :
                                           :
MEMC ELECTRONIC MATERIALS, INC.,           :
                                           :
            Defendant and                  :
            Counterclaim Plaintiff.   :         No. 05-806 (GMS)

- - -

Wilmington, Delaware
Thursday, February 28, 2008
10:30 a.m.
Telephone Conference

- - -

BEFORE:  HONORABLE MARY PAT THYNGE, U.S.M.J.

APPEARANCES:


        JOSEPH B. CICERO, ESQ.
        Edwards Angell Palmer & Dodge LLP
              -and-
        BRIAN M. GAFF, ESQ.
        Edwards Angell Palmer & Dodge LLP
        (Boston, MA)
              -and-
        MICHAEL BRODY, ESQ.
        Winston & Strawn LLP
        (Chicago, IL)

                    Counsel for Plaintiffs
                    and Counterclaim Defendants

1    APPEARANCES CONTINUED:

2            PATRICIA SMINK ROGOWSKI, ESQ.
         Connolly Bove Lodge & Hutz, LLP
3                       -and-
         ROBERT M. EVANS, JR., ESQ., and
4        MARC W. VANDER TUIG, ESQ.
         Senniger Powers
5        (St. Louis, MO)

6                              Counsel for Defendant
                              and Counterclaim Plaintiff
7

8                         -   -   -

9            THE COURT:  Good morning.  This is Judge Thynge.

10           (Counsel respond "Good morning.")

11           THE COURT:  Counsel, before we begin, who is on

12    the line for Soitec?

13           MR. BRODY:  This is Michael Brody, Your Honor.

14           THE COURT:  All right.

15           MR. CICERO:  Your Honor, Joseph Cicero from the

16    office of Edwards Angell Palmer & Dodge here in Wilmington.

17    Michael Brody is on from Winston & Strawn, and Brian Gaff is

18    on from our Boston office.

19           THE COURT:  All right.  Thank you.

20           Who is on the line on behalf of the defendants,

21    then?

22           MS. ROGOWSKI:  Yes, Your Honor.  This is Pat

23    Rogowski of Connolly Bove for MEMC.  Also with me will be

24    Bob Evans and Marc Vander Tuig from Senniger Powers.

25           THE COURT:  Thank you.  All of you have

1    different first names, so that is how I am probably going to

2    refer to you.

3            There is a couple of motions regarding some

4    discovery disputes.

5            Counsel, before we begin, just a couple of

6    reminders:  One, state your name before you begin speaking

7    so that the court reporter, who today is Kevin Maurer, by

8    the way, knows who is speaking.

9            Also, counsel, this is now Judge Sleet's case,

10   and he has not reassigned it to me.  But I felt, in light of

11   the fact that we had had discussions about discovery

12   matters, rather than passing it back to Judge Sleet, I

13   should just handle it and take care of it for him.  I can't

14   predict what is going to happen in the future in this case.

15   I just don't know.  So I am not giving you much direction,

16   if there is any other discovery matters that arise.

17           All right.  Let's take them in some type of

18   order.  Why don't we take the motion for protective order

19   and to exclude a conflicted expert witness, which I believe

20   is Soitec's issue.

21           MR. BRODY:  That is correct, Your Honor.  Would

22   you like us to speak to it?

23           THE COURT:  Sure.

24           MR. BRODY:  I think it's pretty straightforward.

25           We contacted Dr. Rozgonyi a number of months

1    ago.  There was an initial conversation in which Mr. Gaff

2    described some of our theories of the case.  There was a

3    followup conversation between Dr. Rozgonyi, myself, and Mr.

4    Neuner in which we had some further discussions.

5              Dr. Rozgonyi quoted us a rate.  And when we told

6    him it sounded okay to us, he told us he was going to be

7    working for MEMC.

8              There is no question that we sent him a copy of

9    the patent.  There is an e-mail from him giving a

10   preliminary read on the patent and on the theories that we

11   had discussed with him.

12             THE COURT:  Why don't you point out to me, Mike,

13   if you wouldn't mind, in your submission where that shows a

14   copy of the patent, the preliminary read.

15             MR. BRODY:  Sure.  That is -- hold on.

16             THE COURT:  I know it's under Exhibit A.  It's

17   what page under Exhibit A?

18             MR. GAFF:  Your Honor, I believe that's Exhibit

19   A, Page 1.

20             THE COURT:  The actual first page.

21             MR. GAFF:  Yes.  There is a series of three

22   e-mails on there.  At the bottom of that page is the initial

23   e-mail from me to Dr. Rozgonyi enclosing the patent.  And

24   then, just above that, there is an excerpt of another e-mail

25   from me, directing him to particular column and lines in the

1    patent.

2              THE COURT:  I just want to double-check, so I

3    make sure we are both on the same page, if you excuse the

4    expression.  "Please see, e.g., Column 23, Lines 8 through

5    12"?

6              MR. GOFF:  Right.  That is a snippet of a second

7    e-mail that I sent to Dr. Rozgonyi after the one just below

8    that on that page, thanking him for his time.  Then Dr.

9    Rozgonyi's response is the top of that page.

10              THE COURT:  Okay.  I am trying to go through

11    this.  Are you saying the one, "I took a quick look at the

12    patent and think I could help with demonstrating how weak

13    MEMC's position is"?

14              UNIDENTIFIED SPEAKER:  Yes.

15              THE COURT:  Then he relates to you, he will be

16    at the Hilton and he is off to Italy in two weeks.

17              UNIDENTIFIED SPEAKER:  That's right.

18              THE COURT:  I have read through these.  I wanted

19    to make sure what sections you were actually relying on.  I

20    have them highlighted.

21              MR. BRODY:  Mr. Gaff, Brian has certainly

22    pointed out the passage.

23              We are not pretending like we asked Dr. Rozgonyi

24    to spend hundreds of hours on this matter.  But there

25    clearly was a series of discussions in which we shared with

6

1    him our thinking about the case and in which he gave us an

2    initial response that was sufficient for us to conclude

3    that -- and, frankly, for him to initially conclude that he

4    could go forward and provide us with expert support in the

5    matter.

6          The case that I think gets cited here is the

7    Koch Refining case.

8          THE COURT:  I have read through that.  I have

9    also read through the Hewlett-Packard Company matter.

10          MR. BRODY:  Okay.  I think the reality, the Koch

11    case kind of sets out two, you know, polar extremes.  One is

12    the case where you have basically an extended compensated

13    relationship, and the other is where there is one call.  And

14    I think we are clearly in between those.

15          Here we would say that at the one extreme is, as

16    Koch characterizes it, there was a series of interactions.

17    They did coalesce to the extent that Dr. Rozgonyi understood

18    our position in the case and our theories of it, and did so

19    well enough to be able to give us his preliminary view on

20    the subject.

21          The other extreme, the Koch Court talks about a

22    situation where you have only one meeting with counsel,

23    which is not the case here.  There were at least two

24    substantive discussions.

25          It's true that Dr. Rozgonyi was not retained,

1    although he quoted us a rate and we proposed to retain him.

2    He was supplied with some specific material in the case,

3    namely, the patents in reference to the particular portions

4    that we wanted him to think about, and, of course, our

5    discussions with him about our thinking.  And he was

6    requested to perform a service.  Essentially, we asked him

7    to give us his preliminary thoughts on the substance of the

8    matter.

9            There is a suggestion in Dr. Rozgonyi's

10    declaration that there is nothing in our conversations that

11    wasn't disclosed in the interrogatory answers.  With due

12    respect to his recollection, in fact, the heart of our

13    discussion had to do with the defense under Section 112 of

14    the Patent Act, which is not a defense that was requested in

15    those interrogatories, and actually is not something that --

16    our thinking on that subject, at least, is not something

17    that we have been asked to share with MEMC.  As a result, we

18    haven't.

19            So he knows about our theory of the case that up

20    to now had been confidential.  It's a problem for us if he

21    picks up and switches sides.

22            While I realize that folks with these

23    qualifications, you can't exactly find one on every street

24    corner, there are a number of people who do this type of

25    work.  I don't understand the contention that, in fact, MEMC

1    would be without recourse if Dr. Rozgonyi were disqualified

2    in this case.  In fact, they have retained another expert in

3    this matter, who has very strong credentials in this field,

4    and presumably could address these issues if they need him

5    to.

6         So we have a real concern here.  I think we had

7    a legitimate expectation that we were speaking to Dr.

8    Rozgonyi on a confidential basis.  And we would prefer not

9    to see him popping up on the other side.  And we think we

10   have a right to request that.

11        (Pause.)

12        THE COURT:  Counsel, we are back.  Mr. Maurer

13   expresses his apologies.

14        Michael, are you finished?

15        MR. BRODY:  Mr. Gaff has, I think, a brief

16   thought to add to this.

17        MR. GAFF:  Your Honor, Brian Gaff here.

18        In my initial conversation with Dr. Rozgonyi,

19   the first thing I inquired into was any conflicts of

20   interest on his part, whether he was familiar with the

21   parties who are involved, did he have a working relationship

22   with any of them currently or any time in the recent past.

23        And he assured me that there were no conflicts.

24   And based on that representation, I then launched into a

25   discussion with him of the details of the case, the history

1    of the dispute, the parties, et cetera.  And I can assure

2    you that I would never have had that conversation regarding

3    that subject matter with Dr. Rozgonyi had he indicated that

4    there was a conflict of interest, if, for example, he said

5    he had a relationship with MEMC.

6              It has always been my practice to tell an expert

7    witness in these discussions that the discussions are

8    confidential and that he should treat information

9    confidentially going forward.

10             Again, I wouldn't have had the conversation with

11   him had there been any representation on his part that there

12   could have been a conflict of interest.

13             Thank you.

14             THE COURT:  Thank you.  Is there anything else

15   that the plaintiffs' counsel wishes to add?

16             MR. BRODY:  No, Your Honor.

17             THE COURT:  Thank you.  Can I please hear MEMC's

18   argument.

19             MR. VANDER TUIG:  Yes, Your Honor.  Mark Vander

20   Tuig for MEMC.

21             First of all, we would contend that even the

22   details that have been added to the conversations with Dr.

23   Rozgonyi by Soitec during the phone call today, they clearly

24   fall on sort of the initial screening informal relationship

25   side of the spectrum.  The details that they have identified

1    are those which you have to disclose to any expert to

2    determine whether or not that expert has the appropriate

3    knowledge to be helpful in the case.

4        I don't think they have identified anything by

5    identifying the copy of the patent and the Column 23 excerpt

6    that has been identified.  It's simply the definition

7    section of the '104 patent.  They have identified nothing

8    that is anything more than they have disclosed in this

9    lawsuit as far as their theories of the case, their

10   position.

11       Mr. Brody identified the fact that we never

12   asked about 112.  But they have in Interrogatory No. 7,

13   which is attached as Exhibit D to our filing, they did flag

14   an ambiguous defense, which would be under 112, Paragraph 2,

15   they state the phrase "substantially free of agglomerated

16   intrinsic point defects," which happens to be the column

17   number that they referenced here, the column and line number

18   that they reference in their submission.  That phrase, they

19   claim, is ambiguous and cannot be construed.

20       So they have disclosed their position that they

21   think that's indefinite under 112, it is my reading of that.

22       That was just a counter to Mr. Brody's point.

23       They have to identify under the law something

24   specific and unambiguous that would prejudice them if it is

25   revealed.  I just don't think that they have done so here.

1    To address the point about the limited number of

2  experts in this field, it's true that there is, as Mr. Brody

3  points out, there is a limited number with the appropriate

4  qualifications.  And I note that Soitec at the time it

5  contacted Dr. Rozgonyi had already retained several

6  witnesses with expertise in this field.

7    THE COURT:  I read Soitec's argument, as far as

8  MEMC was concerned on this what you call, I guess, public

9  information or public concern, that MEMC has been able to

10 retain an expert in the same field.

11    MR. VANDER TUIG:  They have one expert, that's

12 true.  They have retained one expert.  Their specialties are

13 a little different.  The reason we approached Dr. Rozgonyi

14 was to explore different areas of expertise that wouldn't

15 have been covered by Bergholz, who is the other expert we

16 have retained.

17    THE COURT:  All right.  Have you finished your

18 arguments for MEMC?

19    MR. VANDER TUIG:  Yes, Your Honor.

20    THE COURT:  Is there any brief rebuttal that

21 Soitec wishes to present?

22    MR. BRODY:  Your Honor, very briefly, Mr. Vander

23 Tuig is certainly correct that we indicated our view that

24 that phrase was ambiguous.  The concern is that we talked

25 with Dr. Rozgonyi about our theories as to why that was the

1    case.  And that's what we shared with him, and that's what

2    we really would prefer not to share with Mr. Vander Tuig and

3    Mr. Evans until we get to the appropriate point in the

4    litigation.

5              THE COURT:  Well, I had a chance to go over the

6    two cases I predominantly looked at, because they seem to

7    have been cited numerous times by both sides, the

8    Hewlett-Packard case and the Koch Refining Company matter, I

9    think both of them are instructive to this Court.

10             I note that one, the Hewlett-Packard case, is

11   from the Northern District of California.  The Koch Refining

12   Company case is from the Fifth Circuit.  But the issue the

13   way that I was looking at it was the standards that were

14   outlined in both of those opinions.  And I also note that in

15   the Hewlett-Packard case there was a bit of a conflict as to

16   what information was conveyed to the expert.  And I also

17   note that in the Hewlett-Packard case, the relationship with

18   the expert, from what I can tell, in that case certainly

19   advanced further in my mind, based upon information that was

20   discussed, than what necessarily occurred in this case.

21             For example, I think counsel in that case

22   claimed the topics he had discussed included impressions of

23   the patent, specific claim limitations, prior art, accused

24   inventions, the type of evidence needed to prove

25   infringement, and the names and qualifications of other

1    potential expert witnesses.

2            Of course, the expert characterized the

3    conversation very differently.  So the Court in

4    Hewlett-Packard was faced with some conflicting differences

5    between counsel who had had the discussion with the expert

6    and the expert himself, not too unlike what we have here,

7    that there is a difference between what counsel remembers

8    and what the expert remembered.

9            In addition, that expert, I think, was

10   compensated for his time that he had spent in his analysis

11   on behalf of the party who had first contacted him.

12           There is a couple, I think, though, aspects that

13   can't be ignored.  One is that although we as Courts have

14   the power to disqualify expert witnesses to protect the

15   integrity of the adversarial process, disqualification is

16   considered to be a drastic measure that the Courts impose

17   hesitantly and rarely.

18           Also, there is a difference between

19   communication between counsel and an expert and the

20   attorney-client privilege, which was pointed out in the

21   Hewlett-Packard case, noting that experts perform a very

22   different function in litigation than do attorneys, and they

23   are not advocates in the litigation but sources of

24   information and opinions.

25           What this Court is supposed to look at to

1    determine if a disqualification of an expert is warranted,

2    based upon the prior relationship with an adversary,

3    includes whether the adversary had a confidential

4    relationship with the expert and the adversary disclosed

5    confidential information to the expert that is relevant to

6    the current litigation.

7            To do the analysis of whether the disclosures

8    were confidential is whether they were undertaken without an

9    objectively reasonable expectation that they would be so

10   maintained as being confidential or if, despite a

11   relationship conducive to such disclosures, no significant

12   disclosures were made, and therefore under those

13   circumstances disqualification would be inappropriate.

14           It is the burden on the party seeking

15   disqualification of an expert to demonstrate that it was

16   reasonable for it to believe that a confidential

17   relationship existed, and if so whether the relationship

18   developed into a matter sufficiently substantial to make

19   disqualification or some other judicial remedy appropriate.

20           And in evaluating the reasonableness of the

21   parties' assumptions, there are a number of factors that

22   were pointed out in the Hewlett-Packard case for this Court

23   to look at, which I think have been discussed by the parties

24   in this.  And that Court also pointed out, as was oppositely

25   pointed out in the Koch case, that you could have

1    disqualification denied, that is, it is not warranted, even

2    if the expert has signed a confidentiality agreement with

3    the adversary.

4            Koch and Hewlett-Packard both recognized that

5    you don't have to have a confidential agreement already

6    signed.  Both cases emphasized what was the relationship and

7    the expectation from, and really what is emphasized is

8    whether there was confidential information disclosed.

9            As I said, there is a different standard, to

10   some extent, as to what that confidentiality may very well

11   be.  Different isn't the right word.  It's not the same as

12   attorney-client privilege.

13           Confidential information is information of

14   particular significance which can be readily identified as

15   either attorney work product or within the scope of

16   attorney-client privilege.  And the strategy of the

17   litigation is part of it that the Court takes into account.

18   However, as decided in the Hewlett-Packard case, I find that

19   the discussions between counsel and experts do not carry the

20   presumption that confidential information has been

21   exchanged.  And the party is required to point to specific

22   and unambiguous disclosures that if revealed would prejudice

23   the party.

24           The Court is also required to consider the

25   issues of fundamental fairness, that is, asking whether the

moving party was unduly disadvantaged and the opposing party would be also unduly disadvantaged, and whether any prejudice might occur if the expert is or is not disqualified.

Having considered all those factors, in applying it to this case, I am finding that Soitec hasn't met the standards that have been outlined in both the Koch and the Hewlett-Packard case.

Recognizing that there is some dispute between the expert as to what was disclosed, I don't think disclosing the patent and suggesting areas of the patent for the expert to read is sufficient enough, falls into the category of confidential information.

First of all, the patent is clearly not a confidential document. And pointing out an area or areas that they want the expert to concentrate on is insufficient, in my mind, to necessarily meet the aspect of was confidential information disclosed.

It to me is more like an initial screening process, certainly the type of questions that I believe Brian pointed out that he would have asked the expert, that is to determine if he is qualified, to determine if there is any conflicts of interest. And although, Brian, you may have expected that everything you were going to say to him was confidential, it still had to qualify that what you were

1    saying to him qualified as being confidential based upon the

2    relationship or lack thereof that existed between the expert

3    and counsel that was part of the conversation.

4           If, as you pointed out to me, Brian, you said

5    you wouldn't have continued the discussions if there had

6    been areas of potential conflict, that's fine.  But

7    potential conflict does not necessarily mean information

8    disclosed rises to the level of being confidential.  What I

9    have heard so far today, I don't find that to have existed.

10          So I am not going to disqualify Dr. Rozgonyi in

11   this case in light of the information that has been conveyed

12   to me both in the arguments today and in the written

13   submissions.

14          I also recognize that there is no doubt that

15   this is a limited area of experts.  I find that just because

16   MEMC has retained an expert in this area, that suddenly

17   means that MEMC is locked in and solely -- and that goes to

18   somehow disprove that because it's been able to retain an

19   expert there are available experts elsewhere.  I note that

20   parties frequently in patent litigation, and it doesn't seem

21   this litigation is any different in that regard, frequently

22   retain experts within the same field that may have a

23   sub-field of expertise that might be particularly important

24   to certain issues in the litigation.

25          I also find that some of the information that

18

1    was disclosed, apparently disclosed by Soitec to the expert,

2    was also disclosed to the defense. I am not saying

3    necessarily all, but certainly a piece of it. So that again

4    removes the confidentiality aspect to me.

5            So, therefore, I am finding that, basically

6    denying the motion to disqualify Dr. Rozgonyi.

7            All right. I think there is a series of

8    different concerns, I believe, that have been expressed in

9    the other motion that was filed in this case. Let me just

10   pull that up, counsel.

11           Again, this is another motion by Soitec. First

12   of all, it deals with the test data summaries and then your

13   request for documents and deposition testimony relating to

14   the conception of the alleged invention at issue.

15           So am I correct, this is the two other remaining

16   issues that are both Soitec's?

17           MR. BRODY:  That's correct, Your Honor.

18           THE COURT:  Okay. Let's do the test data

19   summaries. Michael, what I would like to really know from

20   you is: What are you trying to get? I mean, you said that

21   MEMC has agreed to produce the raw test data. Understand

22   that you are talking to somebody that is completely ignorant

23   about this technological area, so I am not exactly certain

24   what the raw test data doesn't have that the written

25   technology report summarizing and analyzing the test data

1    would have, that you would expect it to have.

2                MR. BRODY:  Well, it's got the conclusions.

3                THE COURT:  I understand it has the conclusions.

4                MR. BRODY:  The data, it's not an accident that

5    you have somebody write up reports on this sort of data.

6    The data requires interpretation, and it requires analysis.

7                THE COURT:  And you are basically saying that

8    the sole basis given for MEMC's allegation of patent

9    infringement was the testing that MEMC had performed on the

10   donor wafer seized in the French case.  Is that the same

11   argument, is that being made in this case?

12               MR. BRODY:  Yes.  In fact, the interrogatory

13   answer, we asked them why do you think we infringe.  Their

14   answer was, well, we tested the wafers we seized and we

15   concluded that they infringed.  So what I think we are

16   entitled to is both the data on which that conclusion rests

17   and the report drawing the conclusion and explaining the

18   basis for the inference from the data.

19               So it's a situation where we have, you know, a

20   contention of infringement that purports to be based on a

21   report, and they are giving us half of, you know, the

22   underlying data but not the report.

23               THE COURT:  What do you do about their argument

24   that you could easily conduct your own further testing of

25   these wafers that are in your possession and find out why

1    they concluded in such a fashion?

2            MR. BRODY:  I think there are two answers to

3    that.  The first is, I think we are entitled to know -- I

4    don't understand --

5            THE COURT:  You are entitled to know the basis

6    for their contentions.

7            MR. BRODY:  Yes, exactly.  Our view is that --

8    in fact, we have already produced to them documentation that

9    at least some of the wafers that were seized don't infringe.

10   They apparently reached a different conclusion.  So we would

11   like to know what it is.

12           THE COURT:  They seem to feel that there is an

13   argument that this is attorney work product.

14           MR. BRODY:  Yes.  I am not clear --

15           THE COURT:  Would you prefer to hear their

16   argument as to the basis as to why it is attorney work

17   product before you try to answer that in the abstract?

18           MR. BRODY:  Sure.  I think that would probably

19   be more productive.

20           THE COURT:  I do, too, because if somebody is

21   alleging attorney work product, the burden is on them to

22   show that it is.  So that is my first question to MEMC.

23           MR. VANDER TUIG:  Your Honor, the tests that

24   were run and the summaries that are at issue today were both

25   conducted and put together at the request of counsel for

1    litigation with Soitec.  As such, we think that that is a
2    showing that it is attorney work product.
3            THE COURT:  Let me put it this way:  Haven't you
4    put into issue that Soitec infringes?  And if these tests
5    were run to show that Soitec has infringed, even though the
6    attorney may have requested them being run, haven't you
7    directly put into issue that particular point?
8            MR. VANDER TUIG:  That would be going towards
9    the waiver argument, I think?
10            THE COURT:  Sort of, yes.
11            MR. VANDER TUIG:  On that point we think that
12    the scope of work product waiver is narrowly construed, and
13    to the extent there was a waiver in our interrogatory
14    responses by alluding to the test data, our agreement with
15    Soitec's counsel to produce the raw test data, the numbers
16    generated by the test methodology that were relied on would
17    be the extent of that scope, that any kind of conclusions or
18    opinions of MEMC's employees who conducted the testing
19    concerning the test data would fall outside the scope of
20    that narrow waiver, if there was one.
21            THE COURT:  Well --
22            MR. BRODY:  I just want to make clear, we are
23    not contending that the production of the raw data was a
24    waiver, because we did have an agreement with Mr. Evans to
25    that effect.

22

1        THE COURT:  And I wasn't reading that that is

2   what you were saying.  I got the read from you, and I wasn't

3   talking about a waiver in the sense of production of, that

4   somehow you waived by producing the raw data.

5        My question is, haven't you put Soitec's

6   infringement directly into issue in this case?  And in doing

7   that, if it's in issue, I don't know how protected anything

8   is, whether it is attorney work product or whatever.  But

9   the information that they are asking for, is this

10  information that will be used in the case to prove

11  infringement?

12       MR. VANDER TUIG:  No, Your Honor.  We asked

13  Soitec to produce wafers in this case, in the Delaware

14  litigation, and they have.  And tests have been conducted

15  and are being conducted on those wafers, and that will be

16  the subject of our expert reports in this case on

17  infringement, and we will not be relying on the prefiling

18  testing that occurred.

19       THE COURT:  But you used the prefiling testing

20  to justify what you started off in this case.  Is that

21  correct?  So that you could avoid Rule 11.

22       MR. VANDER TUIG:  That's correct, Your Honor.

23  We relied on the test data, the raw test data.  We didn't

24  rely on, necessarily, the various opinions and discussions

25  that were in the report that was generated by MEMC's

1    employees at counsel's request.

2              MR. EVANS:  Your Honor, we asked the employee to

3    answer a number of questions for us and look at a number of

4    different things.  So he answered our questions in the

5    course of his report.  The concern we have is that when we

6    produce anything -- and we will see it in the next question

7    with respect to conception -- every time you do something,

8    somebody says, well, you've waived up to that point, you've

9    waived up to that point, you've waived up to that point.

10              Our point is to the extent there is infringement

11   in the prefiling investigation, and we believe there is, we

12   have given them all that raw data and answered the

13   interrogatory as to our contention on that, the contention

14   interrogatory.

15              To the extent we ask an employee in the context

16   of an ongoing lawsuit, you know, specific questions and look

17   at things from different directions, that would seem to be

18   work product.

19              THE COURT:  I see what you are saying.

20              MR. EVANS:  So this is the employee's analysis

21   that was written from our perspective of, you know, in the

22   context of our discussions with him and what we wanted.  All

23   the raw data, they can look at it, they can reach their own

24   conclusions.

25              Michael Brody, Mr. Brody said that there were

some wafers where they believe they don't infringe. And we

have spoken with Mr. Brody, and we agree with him that on

the wafers that showed what we call agglomerated defects, we

have agreed with him that those wafers don't infringe.

So we don't have a dispute, I don't think, in

terms of what wafers are in true contention here and which

ones are not. And we are willing to give them all the raw

data, and then they can make their own arguments if they

think we have violated Rule 11, to make the argument as to

why they think the data doesn't support what we did. We

think it supports what we did.

THE COURT: When you gave them the raw data, did

you give them the protocols on how they were tested?

MR. EVANS: If we haven't given them how the

data was collected, we would certainly be happy to give them

the protocols for how it was collected, certainly, yes.

THE COURT: Because the raw data is worthless

unless you know how it was tested.

MR. EVANS: No. We are not going to hide

behind -- if they need that information or don't have that

information, we will certainly get that to them.

THE COURT: So is your argument to me, and

explain this to me, that by giving conclusions of why the

wafers that are still in dispute infringe, it would

constitute basically crawling into your mind as to the type

1    of questions that were asked of these employees in doing

2    their analysis?

3            MR. EVANS:  Yeah.  I think the employee's

4    analysis written for the attorney in response to

5    conversations with the employee is a work product document.

6    He has prepared it for us to address the questions that we

7    asked.  And the raw data is what it is.  And their expert

8    can look at the raw data and reach whatever conclusions they

9    want.

10            So it seems like the employee's impressions and

11    responses to our questions are classic work product.

12            THE COURT:  I understand what you are saying

13    then.

14            Does that help you a little more, Mike, as to

15    what their basis is for the work product argument?  And do

16    you have any response?

17            MR. BRODY:  Yes, it does help me understand.  I

18    know you won't be shocked to learn that I still see an issue

19    here.

20            THE COURT:  Did you get the protocols, first of

21    all, on how the testing was done?

22            MR. BRODY:  First of all, we haven't actually

23    gotten all the testing yet or the protocols.

24            We have had a very good-faith relationship, I

25    think, with Mr. Evans and Mr. Vander Tuig.  And if he says

he is going to give us everything up to the reports, it
would be uncharacteristic of him not to do that. So I am
confident he will give us full disclosure of what the
testing was and how it was done. And if we have other
questions, I am confident he will give us all that
underlying information.

I think the real focus here is on, you know,
essentially you have got the testing. You have got a
report. Then you have got an interrogatory answer that was
provided to us. The real focus is on that intermediate
step.

THE COURT: Yes.

MR. BRODY: And whether that is work product and
whether any privilege was waived.

I guess I would say that every expert report is
always based on underlying data. If it were sufficient to
simply disclose the underlying data, then we wouldn't have
some of the provisions that we have in Rule 26, and we
wouldn't have anywhere near the sort of disclosure that we
typically do, precisely because the reason you ask an expert
to prepare a report is to interpret data that is not
transparent to lawyers or judges or juries and about which
reasonable experts may disagree.

And in evaluating the data -- and more
importantly, I mean, it's not just that we want to ask our

1    expert what do you think the data shows.  We also want to

2    ask our expert, do you think that MEMC was justified in

3    reaching the conclusion that is stated as a contention in

4    the interrogatories.  And part of that analysis is

5    understanding precisely the inference that's made from the

6    data to the contention.  And that is what is in the report.

7                  You know, we have got the conclusion, we will

8    get the data.  But we are not being given the glue that

9    holds the two together.

10                  In order to understand whether the contention

11   holds water, I think we are entitled to that.

12                  Now, Mr. Evans, I have forgotten if it was Bob

13   or Marc, indicated that there would probably be further

14   testing, which there may well be.  But that actually kind of

15   heightens the importance of exactly the report, because we

16   are entitled to test whatever we ultimately get against what

17   they themselves initially viewed as an appropriate

18   methodology for analyzing these wafers.  You know, it may be

19   that the two are perfectly consistent.  But it may well be

20   that they aren't.

21                  We certainly ought to be in a position to

22   understand that.

23                  The fact that questions were asked the first

24   time around that may or may not have been asked the second

25   time around, you know, again, is really very much fair game.

1    Once you get past the step of talking about a consulting

2    expert, once you get to the point where you are relying on

3    an expert to support a contention made in a formal pleading,

4    I think all that stuff is out the window.

5           THE COURT:  Well, now, I wonder about that.

6    That's the question I do have.  If these individuals are not

7    going to be called as experts, or used as factual witnesses

8    for information to reach a conclusion -- the factual

9    information they may have, but whether or not they are

10   going -- what I was just told was that the types of

11   questions that were asked of these employees -- and this is

12   how I interpret it, and MEMC can tell me whether I am right

13   or wrong on this -- those types of questions that were asked

14   of those employees on these series of tests, and the

15   findings or conclusions they made, will not be used in this

16   case.

17          UNIDENTIFIED SPEAKER:  That's correct, Your

18   Honor.

19          MR. BRODY:  But they have already been used.

20   They formed the basis of a contention as to our

21   infringement.  We can't know what the basis of that

22   contention is unless we know what the analysis was that was

23   done to get from the raw data to the contention.

24          THE COURT:  Are you saying, then, that in all

25   circumstances, Mike, that if in support of responding to