**EXHIBIT 1 PART 2**

1   contention interrogatories counsel uses information from a

2   consulting expert, that that consulting expert's analysis

3   then becomes free game?

4          MR. BRODY:  I think if the factual basis for the

5   contention is a report from an expert, that expert is no

6   longer a consulting expert, because, precisely because the

7   work product the expert has generated is no longer being

8   held in confidence.  It is being asserted as the basis for

9   the contention.

10          Think about it from the other direction, Your

11   Honor.  If that information could be protected, then what

12   that, in effect, says is you are allowed to know what the

13   contention is but you are not allowed to know why the

14   contention is being made.

15          I just can't -- well, I think we are entitled to

16   that.

17          THE COURT:  I understand.

18          MR. VANDER TUIG:  Your Honor, if I may, we are

19   giving them all the facts and the protocols that underlie

20   the investigation.  You know, the fact that they are getting

21   all the raw data, they are getting all the protocols for how

22   it is collected, they are going to get that.

23          Dr. Mulsamuel (phonetic), the person who wrote

24   the report, did not conduct all of the tests.  I am not sure

25   if he conducted any of the tests.  We had the testing

1    facilities at MEMC that actually ran the tests.  So those

2    are the people that actually did, I believe, most of the lab

3    work.

4         He wrote the report.  When I say report, it's

5    not a Rule 26 report.  It's:  I asked him questions, he

6    answered the questions, and sent it to me in the form of a

7    report.  But he is a nontestifying expert who we asked

8    questions about the data that was collected and he answered

9    them.

10        So it seems to me that this is -- if on a

11   contention interrogatory they suddenly get all of the

12   sources that the attorney uses to assemble and assess the

13   facts, as well as those independent sources' analysis of the

14   facts, well, then, it seems like contention interrogatories

15   automatically amount to a waiver in every circumstance, and

16   I don't know how that works.

17        I think you have got to give people the facts.

18   To the extent contention interrogatories are permissible,

19   you have to answer the contention.  But they are not

20   entitled to all the work product you use in the context of

21   the answer you use with the contention interrogatory.

22        UNIDENTIFIED SPEAKER:  Your Honor, if I could

23   very briefly.  I think Mr. Evans's argument, you know, sort

24   of argues too much and too little.

25        On the one hand, if all you need is the facts,

the underlying data, and that's enough to satisfy their

obligation to explain the basis for their contention, then

they probably don't even owe us the testing data.  They

could just say, you know, you have got the wafers, here are

the tests that were used, you can go ahead and test them

yourself.

        But the point, I think, is that -- it remains

their burden of proof and we are entitled to understand the

factual basis for their contentions.

        On the other side of the coin, Mr. Evans didn't

simply get the test results in the interrogatory answer.  He

didn't ask Dr. Mulsamuel for a report because the data was,

you know, self-evident and transparent and there was no need

for any further analysis of it.  He presumably asked for the

report because he needed help from an expert to draw the

inference that the wafers infringed.

        I don't know that Dr. Mulsamuel went down the

claims and did an analysis for him.  But presumably he gave

him enough information from the perspective of a person of

skill in the art of these kinds of testing methodologies

that let Bob do the legal analysis on his own.

        I don't want Bob's legal analysis.  I am not

entitled to it.  But I do want to know what the basis of the

legal conclusions was.

        THE COURT:  The factual basis.

1          MR. BRODY:   Exactly.

2          THE COURT:   Okay.  I find that the raw data,

3   obviously, should be made available, which I understand.

4   The methodology for analyzing the wafers should also be made

5   available.

6          The issue gets a bit thornier as to how much

7   further beyond that point Soitec would be entitled to

8   information, because, clearly, Rule 26 recognizes experts

9   that are going to be called upon to testify at trial.  And

10  basically it's practically anything and everything they

11  looked at you get access to, even if it didn't become part

12  of their opinion.  Then you have got the balancing with it

13  experts that are used in consultation for the purposes of

14  assisting counsel.

15         I think it gets problematic, although I

16  recognize Soitec's argument that a conclusion was put into

17  the answers to interrogatories, and I think some

18  potential -- let me just try to remember -- response was

19  indicating some of the basis for why the conclusion was what

20  it was.  And this is where -- I don't think that counsel is

21  entitled to know what questions were asked of the Doctor.

22         To the extent that, how he reached his

23  conclusion that there is infringement, that information I do

24  think Soitec is entitled to.  That means that may very well

25  be parsing out portions of this report.  I haven't seen his

1  report, so I can't determine that. And to that extent I

2  would be willing to look at it and give you an idea as to

3  what portions of that report I think are discoverable.

4        UNIDENTIFIED SPEAKER: Would you like us to

5  submit a copy, Your Honor?

6        THE COURT: Yes. And I could go through it,

7  because it's hard for me to explain it. But why he

8  concluded that they infringed, that type of information I do

9  think is disclosable, but not "Did you look at X to make

10  this conclusion" or "Did you look at Y" or "Have you looked

11  at this," that type of information I don't think is.

12        So it is parsing it out. I don't know whether

13  you want to try to go through one, run through and produce

14  it and see without me looking at it, because I am no expert

15  in this field by any stretch of the imagination.

16        UNIDENTIFIED SPEAKER: I haven't thought about

17  the report from that direction. So I want to look through

18  it and see.

19        THE COURT: Sure. And if you want me to review

20  it, I will, and try to give some direction as to where I see

21  what type of disclosures I think are appropriate and where I

22  don't think they are appropriate.

23        UNIDENTIFIED SPEAKER: I would feel more

24  comfortable, probably, with letting you be the arbiter of

25  what should and not be produced to me. Why don't we send

34

1    you a copy of the report confidentially, and go from there.

2    THE COURT: That is fine. Show me where the

3    areas that were not disclosed -- I don't want the raw test

4    data, thank you. It is not going to help me one iota. You

5    can send it to me. But I am not real comfortable I am going

6    to be able to figure out what that means.

7    UNIDENTIFIED SPEAKER: There is a fair amount of

8    volume on the actual test data.

9    THE COURT: I would imagine.

10    UNIDENTIFIED SPEAKER: We are going to give it

11    to them anyway.

12    THE COURT: Those two points definitely, I

13    think, the methodology and also the raw test data. I don't

14    know how long the report is or how it is broken down.

15    UNIDENTIFIED SPEAKER: It is not terribly long.

16    Why don't we put together a submission to you that sort of

17    explains what we think should stay in and what should stay

18    out and why in the context of what you are saying now. We

19    will forward it to you and then you can give us guidance or

20    tell us what to do.

21    THE COURT: That is fine.

22    The report, obviously, I think maybe -- if I

23    have any problems I will just get us back on the phone

24    again.

25    Okay. The next issue is, from what I

1    understand, you are requesting documents and deposition

2    testimony relating to the conception of the alleged

3    invention at issue.  This I find to be a little thornier,

4    too, as far as analysis is concerned in this.  I am really

5    trying to understand what information you are trying to get.

6    I guess you got to provide me with a little bit more

7    specifics, to the extent that you feel comfortable doing

8    that, and what information was allegedly provided, because

9    the two of you seem to be at odds as to what invention

10   disclosure and related testimony was conveyed, because

11   what's been pointed out to me -- and I know the Fed Circuit

12   does recognize this -- is that invention disclosures

13   generally fall within the category of attorney-client

14   privilege.

15                  MR. BRODY:  Is it all right if I start on this?

16                  THE COURT:  Absolutely.  It is your motion.

17                  MR. BRODY:  Yes.  We are not disputing that

18   invention disclosures are sort of prima facie privileged,

19   and this is a clear waiver issue.

20                  Really, there are two things that we are asking

21   for.  One is what I will call the '302, the bulk silicon,

22   let me put it that way, invention disclosure.  And the other

23   is, we are asking to be allowed to pursue some questions

24   with Mr. Hejlek and Dr. Falster about some conversations

25   that they had.

1          Let me try to be brief about the factual

2   background.  But I do think it's helpful here.

3          Basically, MEMC has two sets of patents.  One is

4   sort of a patent on, if you will, chunky peanut butter.  And

5   another is a patent on putting chunky peanut butter in a

6   sandwich.

7          MEMC disclosed the -- and, I guess I would add

8   that the patent on chunky peanut butter in a sandwich

9   essentially talks about how great chunky peanut butter

10  tastes and what a wonderful feeling it is.

11         MEMC has produced the invention disclosure on

12  chunky peanut butter.  So one question is whether -- and

13  there is a separate invention disclosure on putting it in a

14  sandwich, which has not been produced.

15         So one question is whether disclosing the

16  invention disclosure or producing the invention disclosure,

17  the feature of the combination that makes it sort of novel

18  and patentable, is a waiver with respect to the subject

19  matter of the second disclosure.

20         There we think the argument is that the subject

21  matter of the second disclosure, if you will, or the second

22  patent, is inextricably tied up with the subject matter of

23  the first disclosure.

24         It's not that they are claiming that they

25  invented silicon on insulator or peanut butter and peanut

1    butter sandwiches.  It is they are claiming that using a

2    particular type of material in these devices, these wafers,

3    makes them particularly desirable.

4            In fact, a very large portion, I don't know what

5    the exact percentage is, 30, 40, 50 percent of the

6    disclosure is sort of simply lifted verbatim from the patent

7    on peanut butter.

8            There is additional disclosure about making the

9    combination, making the sandwich.  But there is no question

10   that the subject matter of the second patent encompasses the

11   subject matter of the first patent.  Therefore, the subject

12   matter of the second disclosure encompasses the subject

13   matter of the first disclosure.

14           And they, in effect, are saying, well,

15   notwithstanding that we have waived the privilege with

16   respect to how you make the special spread, we are going to

17   preserve the privilege with respect to a sandwich containing

18   that special spread.

19           I think that's a pretty clear waiver.  If it

20   weren't, even if it weren't, I think that the waiver is

21   compounded by the deposition testimony that we did get.

22   Apparently, what happened is that at some point after the

23   patent issued there was a conversation between counsel and

24   Dr. Falster, the inventor, patent counsel and Dr. Falster,

25   the inventor, about the circumstances under which he

1        conceived this invention.  Apparently, an issue arose as to

2        whether Soitec was a co-inventor, and, in fact, that is an

3        issue in the case, and Mr. Hejlek having testified as to a

4        conversation he had with Dr. Falster about whether, in fact,

5        Soitec was a co-inventor, and about a meeting that everybody

6        acknowledges took place about almost two years before the

7        patent was applied for, in which Soitec's folks and Dr.

8        Falster talked about essentially the combination, the

9        subjects of the patents in the case.

10                In addition, in their interrogatory answers, and

11       at Dr. Falster's deposition, the story that we have been

12       given is that he conceived of this sandwich in conjunction

13       with a meeting between him and Soitec where Soitec was

14       saying, in essence, we want to make a sandwich of this type.

15       We are looking for suppliers to provide us with this type of

16       peanut butter.  Can you do it?  And then he spent some time

17       explaining to them how he thought in fact he could.

18                So, you know, what we have got is a disclosure

19       in the interrogatories as to the circumstances under

20       which -- or some disclosure as to the circumstances under

21       which he claims to have conceived the invention, the

22       invention disclosure as to the critical element in the

23       combination.  We have got testimony from counsel about his

24       conversations with Dr. Falster regarding what was disclosed

25       in the interrogatories.

1          I asked Mr. Hejlek if Dr. Falster's discussion

2     with him had been consistent with what was in the

3     interrogatories.  And he was allowed to answer that

4     question, and he said yes.  And then I asked, and did he

5     tell you anything else about the conception of the invention

6     or about the meetings.  And at that point I was told that

7     the testimony was privileged.  And then when I took Dr.

8     Falster's deposition, he wasn't even allowed to testify to

9     as much as Mr. Hejlek testified to.

10          So there is a disclosure out there that either

11     confirms or disconfirms what's disclosed in the

12     interrogatories and what Mr. Hejlek testified to.  There is

13     presumably testimony available that goes beyond what was

14     said that's consistent with the interrogatory answer.  And

15     we are not being allowed to get it.

16          I think it's a pretty fundamental rule of waiver

17     law that you can't get a little bit pregnant on these

18     things.  If you are willing to disclose part of the story,

19     the stuff that helps, you just got to, you know, give the

20     rest of it up as well.  We are entitled to the entire --

21     once they start down the road of sharing with us the

22     privileged information on the conception story, they have to

23     give us the rest of it.  And they have given us the

24     invention disclosure on the peanut butter, which they

25     acknowledge is privileged, and which they acknowledge was a

1   waiver.   They have given us testimony about conversations
2   between counsel and the inventor on the conception of the
3   peanut butter, to the extent they are consistent with the
4   interrogatory answer on the conception of the peanut butter.
5   But when we ask, can we see the other stuff that might
6   disconfirm your story, that's when we get the stone wall.
7   And I don't think they can do that.
8            THE COURT:   They seem to emphasize the timing of
9   this discussion as being significant.
10           MR. BRODY:   I saw that.  And I apologize.  I
11  will express this directly.  I don't see that as a response.
12  The fact that the conversation took place after the
13  application was filed probably goes to the question of
14  whether Mr. Hejlek should have disclosed it at some point.
15  But it doesn't go to -- the underlying question is, when did
16  he conceive the invention and under what circumstances.  And
17  that's a huge issue in this case, because we think he did it
18  in conjunction with our people, that actually we gave him
19  the basic idea.
20           He says, no, no, no.  I came up with it
21  separately.  If Mr. Falster, Dr. Falster, had told Mr.
22  Hejlek last week, you know what, Ed?  I have been thinking
23  about it, and Soitec is right, the fact that that came last
24  week or, you know, a year ago or five years ago doesn't have
25  anything to do with it.

1            The question is whether they have waived the

2    privilege with respect to facts surrounding the conception

3    of this invention.  And the reality is that they have given

4    us admittedly privileged documents -- and they are not

5    asking for it back -- about the conception of the peanut

6    butter, that they have given us testimony about

7    conversations between inventor and counsel, which, you know,

8    are clearly within the scope of the attorney-client

9    relationship, and they want to give us some but not all.

10           The fact that the waiver, you know, the waivers

11    came both before and after, I suppose the application is

12    being prepared -- I am sorry, the invention disclosure and

13    the conversation came before and after the application was

14    prepared.  But the waivers both came in the context of this

15    litigation.  And they can't give us some and not the rest.

16           THE COURT:  All right.  Thank you.

17           From MEMC's part, please?

18           MR. VANDER TUIG:  I guess I will start by

19    saying -- your question to Mr. Brody was what info are you

20    trying to get here.  I think what they are trying to get and

21    what we agree they are entitled to are the facts surrounding

22    the conception of the invention claimed in the '104 patent.

23    And they have had a full opportunity, and already have

24    deposed the inventor, Dr. Falster, on this issue.  And we

25    did not block on the facts surrounding the conception of the

1    invention.

2              I wanted to make that clear.

3              The info that they are really seeking is, okay,

4    when did you come up with this idea and what were the

5    surrounding circumstances, that they have had full

6    opportunity to depose Dr. Falster on.  Now we are just

7    dealing with the waiver issue.  And I will take their points

8    one at a time.

9              The first point that they raise is that MEMC

10   waived the privilege it has in its '104 patent invention

11   disclosure by producing the invention disclosure relating to

12   the '302 patent, the perfect silicate patent.  That

13   production of that document occurred in a separate

14   litigation concerning the '302 patent.  And it has to do

15   with different subject matter.

16             The fact that the patents are somehow related, I

17   don't think that carries the day for Soitec.  Patents are

18   received all the time on combination of prior developments.

19   Here, this is a classic situation where there was a prior

20   invention and that was built upon, and another patent was

21   received for the combination of prior invention and the new

22   invention.

23             I didn't notice that Soitec was able to find any

24   authority for the fact that, if you disclose one invention

25   disclosure, all related patents, all invention disclosures

1    for all related patents, the attorney-client privilege in

2    those documents is therefore waived.  And I think that would

3    be a bad outcome and a very slippery slope.

4          Turning now to the argument that the

5    interrogatory response somehow waived the attorney-client

6    privilege with respect to conception, there we just set

7    forth the facts of the conception as testified to by our

8    inventor, Dr. Falster.  And I just don't quite understand

9    how that can be a waiver of the attorney-client privilege.

10          Finally, turning to the testimony of the patent

11    attorney, Mr. Hejlek, to the extent, as you correctly

12    pointed out, Your Honor, the disclosure, the discussion

13    there -- let me back up a little bit.

14          After the prosecutions closed and the '104

15    patent issued and it was out in the public domain, Soitec

16    started making noise in the marketplace somehow that there

17    is some inventorship issue.  And it is at that point that

18    Mr. Hejlek was approached to provide advice on the issue.

19    And to the extent there was any disclosure of the facts of

20    conception through Mr. Hejlek's testimony, it related to

21    that issue and not to anything that occurred during

22    prosecution.

23          I am kind of at a loss as to how they are

24    unfairly prejudiced and that they can't get the full facts

25    of conception when they are not allowed to probe the

attorney-client privileged communications that occurred a

after the patent issued, so we are dealing with, you have a

hearsay witness -- I am just at a loss as to how they are

unfairly prejudiced if they are not allowed to explore those

communications.

MR. EVANS: Your Honor, one other point I would

make is, we answer interrogatories. We object at

deposition. We try to be respectful to process and we try

to make judgment calls as to where privilege starts and

stops. And we try not to get the Court involved with a lot

of them. We try to be sort of even-handed about it.

The frustration that I am feeling a little bit

is we provide discovery in good faith, and then suddenly we

turn around and we hear because we gave them something we

are entitled to more. And they try to walk you down the

slope.

Here, invention disclosures per the Federal

Circuit are clearly a privileged document. The invention

disclosure that we did give them was one that had been

produced in an earlier litigation. And in that earlier

litigation it was produced inadvertently, but it was

produced nonetheless. And so since it was out there and

couldn't get it back in that case, we in good faith said

well, it is no longer a privileged document, so we gave

to them here. But it is a patent that is not related

1    priority of the patents in suit here. It was an
2    patent. So it is an unrelated patent as a matter of
3    priority. As a matter of subject matter, Mr. Brody is
4    correct, a fair amount of it does appear in the '104 patent,
5    but it appears in the '104 patent in the context of
6    explaining one component, one part, if not the invention,
7    you know, that is at issue here.
8              So the law is pretty clear, these documents are
9    privileged. I don't understand why we answer an
10   interrogatory, we, you know, put witnesses up on the facts,
11   and now they think they are entitled to the privileged
12   documents that are also related to other areas, when the
13   Federal Circuit case law is directly against that.
14              THE COURT:  Okay.
15              MR. BRODY:  Can I respond, Your Honor?
16              THE COURT:  Yes, please do. Because I am now
17   getting the feel that you are talking at cross-purposes.
18   But go ahead.
19              MR. BRODY:  I think there are two critical
20   things here. First of all, the conception of the invention
21   happens when the inventor has in his mind a complete idea of
22   the invention. This invention involves making a sandwich
23   with a particular filling. And in order to have that
24   conception, it was necessary for Dr. Falster to have a
25   conception both of the filling and of the idea of using it

1    in a sandwich.

2              They have admittedly waived the privilege as to

3    the first part of that conception, but they have insisted

4    that they are entitled to continue to assert the privilege

5    as to the second part.

6              That I just think is not -- the reason it is not

7    fair is because, with due respect, I am 98-percent sure that

8    when we get that invention disclosure statement, it's going

9    to indicate that he conceived of this two years later and

10   that he didn't acknowledge Soitec's role in it, or maybe

11   it's going to say that he thought of it when he met with

12   Soitec.

13             But one way or another, it is going to throw

14   light on whether he actually conceived of it on his own and

15   when he did so.  They can't give us half of the story and

16   not the other half.

17             Second.  With respect to the interrogatory

18   answer and the testimony, the interrogatory answer discloses

19   their contention as to how the invention was conceived.

20   When I was deposing Mr. Hejlek, I asked him about this

21   conversation with Dr. Falster.  He acknowledged that it took

22   place.  Then I said -- this is in Exhibit 4 at Page 152 of

23   the deposition:

24             Okay.  Did Dr. Falster, did his description of

25   the conception of the invention differ in any way from

1    what's disclosed in MEMC's Interrogatory Response to

2    Interrogatory No. 5?

3              So I am asking him directly about a conversation

4    between attorney and client.  And I am asking him about the

5    substance of that conversation.  And I am asking was it

6    consistent with what's in your interrogatory answer.  And he

7    was allowed to answer that question.  And he said:

8              What's described here is consistent with what my

9    recollection is.

10              And then I said:  Did he give you additional

11    information about the conception?

12              And Mr. Vander Tuig interposed an objection.

13    And I said, Well, right now I am not asking for the

14    substance.  I am just asking whether anything else was

15    disclosed.

16              And Dr. Falster was allowed to answer.  He said:

17              Yes, he shared more than what's here with me.

18              Then I said, What else did he share with you?

19              Then the objection was interposed.

20              So he was allowed to -- Hejlek was allowed to

21    testify that Falster said some things that were consistent

22    with what's in the interrogatory and what's been disclosed,

23    that he gave -- that he, Falster, gave Hejlek additional

24    information, and we weren't allowed to inquire about it.

25              So, you know, they -- if the second question was

1    privileged, so was the first question.  And if he is allowed

2    to answer the first question, he has to be allowed to answer

3    the second question.  And what's more, if he is allowed to

4    testify, if they are going -- if he is allowed to testify as

5    to evidence that is confirmatory of their contention, we

6    have got to be allowed to see -- and if we are going to get

7    the disclosure that's confirmatory of his conception of a

8    piece of the invention that was prior to the Soitec meeting,

9    we have to be allowed to see the disclosure that goes to the

10   rest of the invention, and we have to get the rest of the

11   testimony.

12         I appreciate Bob's comments.  But, frankly, from

13   our perspective, it's not that they are being kind of good

14   citizens about this.  It's that they have disclosed the

15   stuff that helps them and they are withholding the stuff

16   that may or may not help them.

17         It's not just that there was a disclosure in a

18   prior case, but there was also disclosure in this case.  And

19   they can't -- once they choose to start down the slippery

20   slope, they don't get to be the ones who decide to stop.

21         If there really was an inadvertent disclosure in

22   the prior case, then presumably they were entitled to get

23   that back.  There is tons of law about how inadvertent

24   disclosure is not a waiver and documents can be gotten back.

25   All of that is well-established.  Even if they couldn't have

1   gotten it back there, at least they could have contended

2   here that that disclosure was inadvertent and they could

3   have sought to reestablish the waiver in this case.

4              But they didn't.  They gave us what they wanted

5   to give us on this story, and they haven't given us the

6   rest.  And they just can't do that.

7              MR. VANDER TUIG:  Your Honor, may I respond?

8              THE COURT:  Sure.

9              MR. VANDER TUIG:  I just wanted to point out

10  that -- first of all, we are not going to rely on Mr. Heljek

11  as some sort of corroborating witness on conception, which

12  the unfairness argument seems to rely on.  And secondly, on

13  the pages of that deposition transcript of Hejlek that

14  follow the part that Mr. Brody pointed out, we actually took

15  a break and Mr. Hejlek came back and described some of the

16  situations -- some of the facts, that he was aware of

17  various stuff relating to the meeting that they are

18  concerned about.

19             So I don't think it's accurate that we cut him

20  off and only allowed him to confirm the accuracy of the

21  facts in the interrogatory response.  In fact, if you read

22  Pages -- this is in the exhibit, I can't remember which

23  exhibit -- but it is Pages 154 through to about 158 or so,

24  or even further, there is a point where the line was

25  eventually drawn is when they wanted to get into Mr.

1    Hejlek's legal advice relating to the situation that

2    developed after the '104 patent had issued where the line

3    was drawn.

4         So this unfairness argument really, I don't

5    think there is much substance to it because they did

6    actually get from Mr. Hejlek all the facts that they wanted

7    relating to the October '96 meeting and what Mr. Hejlek was

8    aware of, the facts that he was aware of concerning that

9    meeting.  I wanted to clarify that.

10         MR. BRODY:  With due respect, first of all,

11    please do look at the transcript.  You know, eventually we

12    were not allowed to inquire.  But the fact that he was

13    allowed to answer further questions, you know, merely

14    compounds the waiver with respect to whatever may have

15    been -- whatever the underlying evidence is with respect to

16    Falster's conception.

17         At Falster's deposition, we weren't allowed to

18    ask anything.  And we still haven't seen the disclosure

19    statement.

20         You know, it's not that we are looking to Hejlek

21    to corroborate Falster's testimony.  Frankly, we think that

22    if we are allowed the discovery, we are going to be getting

23    evidence that disconfirms the contentions.  And that is

24    exactly what we are looking for.

25         This isn't hearsay.  This is testimony by the

1   inventor, who is an employee of the party, which makes it

2   squarely an admission.

3           So, you know, they can't have it both ways.  It

4   can't both be the case that Hejlek's conversation with

5   Falster about conception -- and there is no question that

6   they had a conversation about conception -- it can't both be

7   that that conversation was privileged, which it clearly was,

8   and that they are allowed to testify as to that

9   conversation, and then say, but, you know, that's all you

10  get.

11          So we have got Hejlek's version of a

12  conversation on conception --

13          THE COURT:  Let me just finish this.  You should

14  have been entitled to get Hejlek's recollection of what the

15  conception was once it was allowed, you should have been

16  allowed to ask the Doctor the same type questions to confirm

17  it.  The issue then that I think that is left is what do we

18  do about the invention disclosure statement.

19          UNIDENTIFIED SPEAKER:  Let me speak directly to

20  that, if it is okay.

21          THE COURT:  Yes.  Because that, I will tell you

22  right now, is the one that is giving me probably the most

23  indigestion.

24          MR. BRODY:  We tried to save the hard ones for

25  you, Judge.

1           If we are entitled to that testimony, then the

2    reason we are entitled to the testimony is because there is

3    a subject matter waiver as to what was communicated between

4    attorney and client about conception.  And that's exactly

5    what the written disclosure statement is.

6           You know, there apparently were three

7    communications between Falster and his lawyers about his

8    conception of this invention.  One was the initial invention

9    disclosure on the bulk silicon patents, the peanut butter

10   patents.  The second was a conversation between Hejlek and

11   Falster about the conception of the peanut butter sandwich

12   patent.  And the third is the written disclosure about the

13   conception of the peanut butter sandwich patent.

14          If there is a waiver as to the first and the

15   third communications, then there is also a waiver as to the

16   second, because it's the same subject matter.  It's the same

17   as if there had been a subsequent or a prior conversation

18   about conception.  They can't waive with respect to one

19   conversation and not with respect to the other.

20          They can't waive with respect to the oral

21   communication and not with respect to the written

22   communication.

23          That is the unfairness.

24          THE COURT:  Okay.

25          MR. VANDER TUIG:  Can I respond, Your Honor?

1        THE COURT:  Yes.

2        MR. VANDER TUIG:  I would just like to point out

3  that Mr. Hejlek clearly said that he did not have a

4  conversation about conception.  He had a conversation with

5  Dr. Falster about this October meeting from which Soitec was

6  making these inventorship allegations after the '104 patent

7  issued.  If you look at Page 156 of the transcript that

8  Soitec submitted --

9        THE COURT:  Let me say this:  The problem that I

10  am facing in this is the fact that, apparently, is it Dr.

11  Falster, was cut off with some information relating to

12  conception.  There was some exploration, and probably what's

13  been represented to me, further exploration allowed with the

14  attorney.  And that was even piece-mealed out.

15        The problem that I have is, did that go to

16  waiving the -- and I think there was a waiver.  If this was

17  confidential, you just don't suddenly say, we only waived

18  this section of it, we didn't waive the rest.  I do think

19  you did.

20        The question I have is, that I am asking is,

21  does that constitute a waiver of the invention disclosure.

22        MR. VANDER TUIG:  Well, Your Honor, my point was

23  that you did not -- that the Hejlek testimony was not to

24  conception but it was to the fact of this October '96

25  meeting which Soitec alleges was, when their employee came

1  up with the idea, rather than the conception of the

2  invention.  We submitted in our submission the fact that Mr.

3  Hejlek testified that he never had a conversation with Dr.

4  Falster about conception during prosecution of the '104

5  patent.  And at Page 156 of the transcript that Soitec

6  submitted --

7          THE COURT:  But that may go to inequitable

8  conduct.  I don't know whether it goes to conception and

9  reduction to practice.

10         MR. VANDER TUIG:  The point is they didn't talk

11  about conception.  They talked about this October meeting,

12  which is different.

13         So to address one other point that he raised,

14  Dr. Falster was not cut off as to the facts of conception.

15  They had a full opportunity to explore all the facts

16  relating to his conception of the idea.

17         He was instructed not to answer when he was

18  asked what conversations he had with Hejlek after the '104

19  patent issued, that conversation we have been talking about.

20  He was not allowed to talk about that conversation.  But he

21  was -- I mean, he testified fully about the facts of

22  conception.

23         I mean, there is no unfairness here, Your Honor.

24  They have all the facts they need.  I am not sure what else

25  they want.

1          THE COURT:  Let's look at Page 155.  It starts

2    out where there was a meeting that was attended by Dr.

3    Falster at Soitec's office sometime in October of '96.

4          So he brought to my attention the meeting and

5    the fact that he conceived it before the meeting.

6          I am sorry, I overlooked that before.  When you

7    say conceived it, I take it you are saying in conjunction

8    with the meeting, he had conceived the invention before

9    attending the meeting.

10          Then:  Did he tell you when he had conceived it?

11          The answer was, I do not recall the date.

12          Not that he didn't know the date.  That he

13    didn't recall it.

14          Did he tell you anything about the circumstances

15    under which he had conceived the invention?

16          No.  That was a question you asked me before.

17    No.

18          So the privilege doesn't even apply then, I

19    guess, if I looked at this literally, the fact that Dr.

20    Falster has circumstances under which he conceived the

21    invention that he didn't share with his attorney, that

22    obviously isn't even subject to privilege.

23          Have you seen any written material corroborating

24    his recollection as to his conception of the invention?

25          Other than the invention disclosure, no.

1    So, you know, those four series of questions

2  seems to be in conflict with one another.  But what the

3  attorney said was he didn't tell him anything about the

4  circumstances under which he had conceived the invention.

5    Have you seen an invention disclosure

6  corroborating his concept of, his account of the conception

7  of the invention?

8    And then the attorney says, you asked his

9  account.  Do you mean this account?  I am not sure what you

10  mean because you sort of moved your hand like it was

11  supposed to communicate something.

12    I communicated that I was moving my hand, I

13  think nothing more.

14    Have you seen any written material corroborating

15  the account of the conception of the invention that's set

16  forth in Interrogatory No. 5 and apparently was communicated

17  to you sometime between 2001 and 2005?

18    I don't recall any such documents.

19    So he is saying I don't recall.  He is not

20  saying he didn't have it.

21    Have you spoken with anybody other than Mr.

22  Falster about who corroborated his account?

23    Answer:  As to what subject?

24    As to the conception of the invention that's set

25  forth in response to Interrogatory No. 5.

1          To corroborate the date, no.

2          To corroborate any other aspect of the

3     conception?

4          No.

5          So it is clear that he had conversations with

6     Foster about something.  But it's not clear to me what's

7     even under the privilege at this stage of the game.

8          UNIDENTIFIED SPEAKER:  That is one of the

9     struggles, Your Honor, at the deposition, is to figure out

10    where to draw lines.

11         THE COURT:  That is the problem.  That is the

12    reason why I am finding that you are going to produce the

13    invention disclosure.  I think there is enough here that has

14    caused -- I don't think the Court can, in the end, parse

15    out, okay, this much we disclosed and we allowed it and we

16    were good guys by disclosing it, but the rest of it we are

17    going to protect.  I think there has been a whole host of

18    related subject matter that has been disclosed.  I am not

19    just relying upon the fact that the disclosure of the

20    disclosure statement of the '104 patent was produced.

21         It seems to me that trying to draw these nice,

22    little lines and areas is just, if you will excuse the

23    expression, dammed near impossible.

24         So the disclosure statement for the, my

25    understanding of the patent that is in dispute here, which

1    is, I think is the '302 disclosure, will be provided.

2              UNIDENTIFIED SPEAKER:  It is the '104, Your

3    Honor.

4              THE COURT:  It is the '104 in this case but the

5    '302 had been disclosed.

6              UNIDENTIFIED SPEAKER:  Yes.

7              THE COURT:  I got them confused.  I apologize.

8    Then the '104 will also be disclosed.

9              So I think I have covered all the issues that

10   were addressed by the parties in their two submissions,

11   except for the one thing that is left is if you wish me to

12   do that review.  And I will do it.

13             UNIDENTIFIED SPEAKER:  Okay.

14             UNIDENTIFIED SPEAKER:  Thank you very much for

15   your patience, Judge.

16             THE COURT:  It's not patience.  It's just trying

17   to parse out what you are asking me to do.  And sometimes I

18   can't do the impossible.  It's just easier to try to draw

19   some line someplace.

20             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

21             THE COURT:  Thank you, all.

22             (Teleconference concluded at 12:05 p.m.)

23                       -  -  -

24   Reporter:  Kevin Maurer

25