# Exhibit 5

```
 1                  UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF DELAWARE
 3
 4
     S.O.I.TEC SILICON ON INSULATOR)
 5   TECHNOLOGIES S.A. and         )
     SOITEC USA, INC.,             )
 6           Plaintiffs and        )
             Counterclaim          )
 7           Defendants,           )
     vs.                           )Civil Action No.:05806-KAJ
 8                                 )
     MEMC ELECTRONIC MATERIALS,INC.)
 9                                 )
             Defendants and        )
10           Counterclaim Plaintiff.)
11
12
13         VIDEOTAPED DEPOSITION OF EDWARD HEJLEK
                  TAKEN BY MICHAEL BRODY
14              ON BEHALF OF THE PLAINTIFF
                     OCTOBER 23, 2007
15
                    (Attorney's Eyes Only)
16
17            REPORTED BY CINDY R. MESSINA
                CERTIFIED SHORTHAND REPORTER
18              CERTIFIED COURT REPORTER
19
20
21
22
23
24
25
```

                                                                1

```
 1          A.    It is.

 2          Q.    When did Mr. Allen leave Senninger Powers?

 3          A.    On July 31st.

 4          Q.    Of?

 5          A.    This year.

 6          Q.    This year.  Now I don't see any -- was Mr.
 7    Allen in direct communication with Mr. Falster during the
 8    time when he was preparing the application?

 9          A.    Probably not, other than attending a
10    meeting with me.

11          Q.    Do you recall such a meeting during the
12    period when the application was being prepared?

13          A.    This one specifically, no.  I do recall
14    Derick being in meetings with me and Bob Falster, but not
15    particularly relating to this.

16          Q.    Do you recall receiving an invention
17    disclosure statement with respect to the 104 application?

18          A.    No.

19          Q.    If you look at the second page of Exhibit
20    5, SP 1255, Mr. Allen has an entry regarding his review
21    of the invention disclosure; do you see that?

22          A.    I see that.

23          Q.    Does that refresh your recollection that
24    there was such an invention disclosure?

25          A.    That wasn't your question.  Yes, I recall,
```

1   but that did not.

2          Q.    I know.  I'm asking another one.

3          A.    Was there one?  Yes, I believe there was

4   one, but I do not sitting here today recall it.

5          Q.    If you look at Exhibit 7, which is the

6   privileged log, we have been informed by counsel that

7   items 43 and 46 incorporate the invention disclosure

8   statement.

9                MR. VANDER TUIG: Have I got that right,

10  Mr. Vander Tuig?

11               MR. VANDER TUIG:  I don't recall sitting

12  here whether that's right or not.

13               MR. BRODY: I have got your letter.  I just

14  want to make sure of the record as to dates.

15               MR. VANDER TUIG: 43 and 46 it says on

16  here.

17         Q.    (By Mr. Brody)  So those documents are

18  dated July 27th of 1998, which is a fax between MEMC

19  counsel and an MEMC employee responding to legal advice.

20  And apparently that fax was directed to Mr. Allen.  And

21  item 46 is the June 14, 1998 document with information

22  communicated from an MEMC employee to MEMC counsel

23  responding to legal advice.  Do you see that?

24         A.    I see that.

25         Q.    Okay.  So that would seem to indicate that

| | | |
|---|---|---|
| 1 | A. | If the question is whether I participated |
| 2 | in a brainstorming session, the answer is no. | |
| 3 | Q. | (By Mr. Brody) Do you know whether such |
| 4 | sessions occurred at MEMC, such a session occurred? | |
| 5 | A. | I do not know that, but I believe they did |
| 6 | not. | |
| 7 | Q. | Okay. Going back to the conversation that |
| 8 | you had with Mr. Falster -- | |
| 9 | A. | I'm sorry, I didn't hear. |
| 10 | Q. | Going back to the conversation that you |
| 11 | had with Mr. Falster regarding the -- the first | |
| 12 | conversation you had regarding the subject matter of the | |
| 13 | 104 patent, do you have any recollection as to how long | |
| 14 | that conversation lasted? | |
| 15 | A. | No. |
| 16 | Q. | Was this like an afternoon, a quick phone |
| 17 | call? | |
| 18 | A. | Somewhere between those two. |
| 19 | Q. | Okay. It was a substantial enough |
| 20 | conversation so that he was actually communicating | |
| 21 | substance to you, as opposed to just an informal, gee, | |
| 22 | maybe we could do this type of thing? | |
| 23 | A. | I can't pinpoint the conversation. I know |
| 24 | a conversation occurred. So, I'm a little vague on what | |
| 25 | surrounded it and, you know, the context, but it was more | |

```
 1   than just a, oh, gee, we ought to do this.  But it wasn't
 2   a sit down, let's go through every detail kind of
 3   discussion.
 4           Q.      Can -- right now I'm just asking for your
 5   recollection.  Can you recall anything as to the
 6   substance of what was said during this conversation?
 7           A.      Specifics, no.
 8           Q.      Generally?
 9           A.      Yes.
10           Q.      Okay.  What was said generally and by
11   whom?
12                   MR. VANDER TUIG:  Objection, calls for the
13   witness to disclose attorney/client communication, and
14   I'll instruct the witness not to answer.
15           Q.      (By Mr. Brody)  Are you going to follow
16   counsel's instruction?
17           A.      Yes.
18           Q.      Was there eventually a conversation in
19   which you did sit down with Mr. Falster and go through
20   the, you know, detailed information which you needed to
21   prepare an application?
22           A.      According to these time entries I met with
23   him for half an hour on the -- it looks like July 24th,
24   '98.
25           Q.      Okay.  And is that the conversation where
```

1     Falster.
2         Q.    (By Mr. Brody)  Okay.  Did Mr. Falster,
3     did his description of the conception of the invention
4     differ in any way from what's disclosed in MEMC's
5     Interrogatory Response to Interrogatory No. 5?
6         A.    What is described here is consistent with
7     what my recollection is.
8         Q.    Did he give you additional information
9     about the conception?
10            MR. VANDER TUIG:  Object to the extent it
11    calls for disclosure of attorney/client communication.
12            MR. BRODY:  That question I don't think
13    calls for disclosure of any substance.  I'm just asking
14    if there was any additional substance disclosed, not what
15    it was, although that's going to be my next question.
16        A.    Yes, he shared more than what's here with
17    me.
18        Q.    (By Mr. Brody) What else did he share with
19    you?
20            MR. VANDER TUIG: Object, calls for
21    disclosure of attorney/client communication.
22            MR. BRODY:  Well, setting aside whether it
23    does or it doesn't, I don't see how it can be privileged
24    if half of the communication has been disclosed already.
25    You can't disclose part of a communication and not the

152

```
1    rest of it.
2              MR. VANDER TUIG:  The substance -- I
3    disagree.  I think it is privileged.  The substance of
4    the communication may address facts that are known
5    through other channels, but the conversation Mr. Hejlek
6    had with Mr. Falster remains privileged.  And I instruct
7    the witness not to answer.
8              MR. BRODY:  He's already testified that
9    the conversation disclosed the information that's
10   provided in the interrogatory response.
11       Q.   (By Mr. Brody)  That's correct; isn't it?
12   You just said that about two minutes ago?
13       A.   I believe so.
14       Q.   What else was said during that
15   conversation?
16             MR. BRODY:  Are you going to instruct him
17   not --
18             MR. VANDER TUIG:  Can we take a break?
19             MR. BRODY:  Pardon?
20             MR. VANDER TUIG:  Can we take a break?
21             MR. BRODY: Sure.
22             THE VIDEOGRAPHER: Off record.
23                (A brief recess was taken.)
24             THE VIDEOGRAPHER: On record.
25       Q.   (By Mr. Brody)  Let's sort of get back
```

1   into the flow of the questioning and then you can tell me
2   whether you're going to assert the privilege.  We were
3   talking about a conversation between the time the 104
4   patent issued and the time the lawsuit was filed between
5   you and Dr. Falster about his conception of the 104
6   invention.  Are we together so far?
7       A.   Sort of.
8       Q.   Okay.
9       A.   It wasn't about his conception, it was
10  about his bringing to my attention circumstances
11  predating the filing of the application and in connection
12  with Soitec's allegations.
13      Q.   Okay.  And the interrogatory answer sets
14  forth some of what he told you during that conversation.
15  And my question was what else did he tell you during that
16  conversation?
17           MR. VANDER TUIG:  Objection, assumes facts
18  not in evidence.  Also object to the extent it calls for
19  him to divulge facts between Falster and himself.  I'm
20  going to allow him to state the facts of conception based
21  on his understanding that are not reflected in this
22  document, but I'm going to draw the line at any further
23  communications between Bob Falster and Mr. Hejlek,
24  including Mr. Hejlek's legal opinion, if any, given to
25  Mr. Falster.

```
1         Q.    (By Mr. Brody)  I'm not sure what that
2    means, but in light of your counsel's instruction what
3    response can you make to my question?
4         A.    Well, I interpret that to mean to the
5    extent that there are other facts which were brought to
6    my attention to proceed, but to the extent I drew
7    conclusions, communicated opinions or anything of that
8    sort, legal advice, that's where the line is going to be
9    drawn.
10        Q.    What other facts -- let's take them one at
11   a time.  What other facts were brought to your attention?
12        A.    I was aware of a meeting that was attended
13   by Bob Falster at Soitec's offices.  I'm sorry, that is
14   in here.  That's the -- presumably October 13, '96.
15        Q.    October 13, 1996 meeting; right?
16        A.    Correct.  So, he brought to my attention
17   that meeting and the fact that he had conceived it before
18   that meeting.  I'm sorry, I overlooked that before.
19        Q.    Okay.  And when you say "conceived it
20   before that meeting" I take it you're saying -- telling
21   me in conjunction with that meeting?
22              MR. VANDER TUIG: Objection,
23   mischaracterized his testimony.
24        A.    He had conceived the invention before
25   attending that meeting.
```

```
1          Q.     (By Mr. Brody)  Okay.  Did he tell you
2     when he had conceived the invention?
3          A.     I do not recall a date.
4          Q.     Did he tell you anything about the
5     circumstances under which he had conceived the invention?
6          A.     No.  That was the question you asked me
7     before, no.
8          Q.     Have you seen any written material
9     corroborating his recollection as to his conception of
10    the invention?
11         A.     Other than an invention disclosure, no.
12         Q.     Have you seen an invention disclosure
13    corroborating his conception of -- his account of the
14    conception of the invention?
15         A.     You say "his account."  Do you mean this
16    account?  I'm not sure what you mean.  Because you sort
17    of moved your hand like it was suppose to communicate
18    something.
19         Q.     I communicated that I was moving my hand,
20    I think, nothing more.  Have you seen any written
21    material corroborating the account of the conception of
22    the invention that's set forth in Interrogatory No. 5,
23    and apparently was communicated to you sometime between
24    2001 and 2005?
25         A.     I do not recall any such documents.
```

```
 1          Q.      Okay.  Have you spoken with anybody other
 2   than Mr. Falster who corroborated his account?
 3          A.      As to what subject?
 4          Q.      As to the conception of the invention
 5   that's set forth in the response to Interrogatory No. 5?
 6          A.      To corroborate the date, no.
 7          Q.      To corroborate any other aspect of the
 8   conception?
 9          A.      No.
10          Q.      To your knowledge is there any
11   corroboration as to Dr. Falster's conception of the
12   invention, other than the disclosure that was provided to
13   Senniger Powers in the early summer of 1993?
14                  MR. VANDER TUIG:  Objection, vague, calls
15   for a legal conclusion.
16          A.      Sitting here today I do not recall such
17   documents if they exist.
18          Q.      (By Mr. Brody)  Are you telling me that
19   you don't recall one way or another whether they exist,
20   or you are -- your recollection is that no such documents
21   exist?
22          A.      I do not recall whether any such documents
23   exist.
24          Q.      Okay.  So they may exist, they may not
25   exist, you just don't know?
```

1       A.      Correct.

2               MR. BRODY:  Mr. Vander Tuig, can you tell

3   me whether any such documents have been logged?

4               MR. VANDER TUIG:  Again, sitting here I

5   cannot.

6               MR. BRODY:  Well, if there are any

7   documents corroborating Dr. Falster's conception of the

8   invention other than items 43 and 46 on the privilege log

9   -- let me start over.  If there are any documents on the

10  privilege log corroborating Dr. Falster's conception of

11  the invention, other than items 43 and 46, we would ask

12  that those documents be identified.  Is that something

13  you can do for us?

14              MR. VANDER TUIG:  I'll take it under

15  advisement.  I also request that you put all of these

16  various requests that we have had maybe in an email or

17  some sort of letter so I'm clear exactly what you're

18  requesting.  I'd appreciate that.

19              MR. BRODY:  Sure.

20      Q.      (By Mr. Brody)  Mr. Hejlek, in response to

21  my prior question you said you were going to tell me what

22  facts had been communicated in your conversation with Mr.

23  Falster, but you weren't going to tell me about what

24  advice or legal conclusions were communicated in the

25  course of that conversation.

158

1                   Did I understand that correctly?

2           A.      I think so.

3           Q.      Okay.

4           A.      Well, in the course of that conversation,

5    I mean, as a consequence of it?

6           Q.      Well, let's take them one at a time.  Was

7    any legal advice or were any legal communications

8    communicated during the course of that conversation in

9    response to Dr. Falster's -- the information that Dr.

10   Falster had given you?

11          A.      Undoubtedly.

12          Q.      What do you recall that information, that

13   advice being?

14                  MR. VANDER TUIG:  Objection, calls for him

15   to disclose attorney/client communication, attorney work

16   product.

17                  MR. BRODY:  It can't possibly be

18   privileged.  If he has told me half of what happened in

19   the conversation you cannot assert the privilege with

20   respect to the other half.

21          Q.      (By Mr. Brody)  Go ahead and respond to

22   the question.

23          A.      My understanding is he was explaining his

24   recollection of the facts of the conception relating to

25   the disclosure in the interrogatory.

```
 1                    MR. BRODY:  Is it your instruction that he
 2     should not respond to the question that's pending?
 3                    MR. VANDER TUIG:  Yes.
 4                    MR. BRODY:  It's your position that he can
 5     disclose, which he has, some of the substance of the
 6     communication, but not the rest of it?
 7                    MR. VANDER TUIG:  My position is that his
 8     mental impressions and any communications and during that
 9     conversation are either attorney/client privileged or
10     work product, and he should not disclose them.
11                    MR. BRODY:  Which are you asserting,
12     privilege or work product?
13                    MR. VANDER TUIG:  Both.
14          Q.    (By Mr. Brody)  With respect to work
15     product was there any litigation pending between Soitec
16     and MEMC?  I think you told me that the lawsuit hadn't
17     been filed yet.
18          A.    Not that I'm aware.
19          Q.    Had Soitec threatened to sue MEMC at that
20     time?
21          A.    That I do not know because any -- I'm
22     sorry, Soitec did threaten.  The date of it I do not
23     recall.
24          Q.    At the time you had the conversation was
25     it your understanding that litigation was eminent between
```

```
1    the two companies?
2         A.    Can't answer that because I can't put it
3    all in precise time.
4               MR. BRODY:  Okay.  Well, then I would
5    respectfully submit that there can't be any basis for a
6    work product claim as to the privilege, actually as to
7    both.  He can't give us half of the conversation.  Are
8    you going to stand on your instruction that he not tell
9    us the rest of the conversation?
10              MR. VANDER TUIG:  I am.
11        Q.    (By Mr. Brody)  Are you going to follow
12   your counsel's instruction?
13        A.    Yes.
14        Q.    Now, you asked me to make a distinction
15   between what happened during the conversation and what
16   you did as a consequence of the conversation.  Did you
17   formulate legal advice to MEMC at some point after the
18   conversation as a consequence of what -- the information
19   that was provided to you?
20        A.    Yes.
21        Q.    How did you communicate that advice?
22        A.    Orally.
23        Q.    Okay.  Who did you communicate it to?
24        A.    One of Dave Golland or John DeLuca.
25        Q.    How did you communicate it?  Was it face
```

```
 1   to face or over the telephone?
 2          A.    Over the phone.
 3          Q.    Do you recall when this occurred?
 4          A.    After the conversation with Falster.
 5          Q.    Okay.  So within a couple of days, months,
 6   years, decades?
 7          A.    Certainly not decades, certainly not
 8   years, somewhere between days and weeks.
 9          Q.    And do you recall how long the
10   conversation was?
11          A.    With whom?
12          Q.    I think you -- the telephone conversation
13   you had after your conversation with Mr. Falster?
14          A.    Okay.  Back up.  I do not.
15          Q.    Did you make any written record of that
16   conversation?
17          A.    My habit is to not make written records of
18   conversation.
19          Q.    Do you know whether whoever you were
20   speaking to made such a record?
21          A.    I do not.
22          Q.    And was anybody on the phone other than
23   you and either Mr. Golland or Mr. -- was it Fleisher?
24          A.    I didn't say Fleisher, I said John DeLuca.
25          Q.    I'm sorry, Mr. Golland or Mr. DeLuca.
```

1        A.    They would not have been.

2        Q.    What was the subject matter of the legal

3   advice that you provided?

4              MR. VANDER TUIG:  Object to the extent

5   that it calls for disclosure of attorney/client

6   communication or work product.

7        Q.    (By Mr. Brody)  I will ask you in a second

8   for the substance, but right now I just want to know the

9   subject matter?

10       A.    Related to the issue of inventorship.

11       Q.    And what did you say and what was said to

12  you on that subject?

13             MR. VANDER TUIG:  Object to the extent it

14  calls for disclosure of attorney/client communication or

15  attorney work product.

16             MR. BRODY:  I don't see how it can be

17  privileged given the disclosure of the initial

18  conversation.

19       Q.    (By Mr. Brody)  Are you going to stand on

20  the privilege?

21       A.    I am.

22             MR. BRODY:  Are you going to instruct him

23  not to answer?

24             MR. VANDER TUIG:  I am.

25       Q.    (By Mr. Brody)  Are you going to follow

```
 1    your counsel's instruction?
 2           A.    Yes.
 3           Q.    Did Mr. Falster ever tell you anything
 4    about what actually happened at that meeting at Soitec's
 5    place of business in October of 1996?
 6                 MR. VANDER TUIG:  Object to the extent it
 7    calls for disclosure of attorney/client communication.
 8                 MR. BRODY:  You have already let him
 9    testify as to the events leading up to the meeting.
10    You're not going to let him testify as to the meeting, as
11    to what was told to him about the meeting?
12                 MR. VANDER TUIG:  My objection stands.
13    I'm not going to argue.
14                 MR. BRODY:  Are you instructing him not to
15    answer that question?
16                 MR. VANDER TUIG:  To the extent it
17    requires him to divulge further attorney/client
18    communication.
19           Q.    (By Mr. Brody)  Can you respond to the
20    question without divulging attorney -- what your counsel
21    has characterized as attorney/client communication?
22           A.    I can probably short circuit a lot of
23    this.  I have no recollection of the contents of that
24    meeting.
25           Q.    That does short circuit a lot.  I take it
```